IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

———————————————————— x
                    :

**ROBERT T.E. LANSING**,         :      **JURY TRIAL DEMANDED**
                    :

          Plaintiff,      :      Case No.  1:11-cv-04153
                    :

     v.                  :      Judge:
                    :

**GEORGE W. CARROLL**,       :
                    :

          Defendant.    :
                    :
———————————————————— x

## <u>COMPLAINT</u>

COMES NOW Plaintiff, Robert T.E. Lansing, by and through his attorneys, Winston & Strawn LLP, and brings this Complaint against Defendant, George W. Carroll, as follows:

### INTRODUCTION

1.    This dispute arises from George Carroll's bad faith, fraud, and failure to honor his contractual obligations to Robert Lansing under twelve separate investment fund ownership agreements.  Lansing and Carroll entered into these agreements for the purpose of forming and managing various real estate investment funds, known as The Westminster Funds.  As co-owners, directors, and managers of The Westminster Funds' management entities, Lansing and Carroll are responsible for managing over $600 million in real estate investments for over a hundred private investors located across the United States, primarily consisting of the family offices of wealthy families.

2.    Carroll has failed to honor his duties owed to Lansing and to the funds.  Over the past three years, Carroll has progressively disengaged himself from the operations of the funds:

-1-

he failed to attend investor meetings; he failed to effectively coordinate management of real-estate investment properties over which he had responsibility; he failed to participate in management meetings; and he shuttered his responsibilities in preparing critical investor reports.

3.     As Carroll no longer adds value to the funds, Lansing decided to end his business relationship with Carroll. On November 1, 2010, Lansing exercised specific contractual mechanisms — known as "buy/sell" provisions — in each of the agreements, and made a binding offer to purchase Carroll's interests, or alternatively to sell his own interests in the various management entities, for $14,045,000. Carroll and Lansing mutually agreed to these buy/sell provisions in order to provide a fair, efficient, and final means to effectuate a business divorce so as not to disrupt the operation of the funds, nor to disrupt their stewardship of the funds consistent with their fiduciary duties to investors.

4.     Rather than respond to Lansing's offer in good faith, Carroll instead sabotaged the purpose of the buy/sell provisions. Despite knowing he lacked the financial resources and the ability to obtain necessary funding, Carroll purportedly "accepted" Lansing's offer and chose to purchase Lansing's interests for $14,045,000. He made this purported commitment even though he was unfamiliar with most of the funds' properties, he did not have the support or confidence of most of the investors (indeed, he never met approximately 90% of the investors), and he had a deteriorating relationship with management entity employees and key fund lenders. Nevertheless, Carroll "agreed" to purchase Lansing's interests out of a personal vendetta and to shamelessly attempt to extract more money from Lansing above and beyond the buy/sell price for his interests pursuant to the requirements of the buy/sell clauses in the agreements.

5.     Carroll's blatant bad faith frustrated investors' confidence in the funds. As Carroll had little acquaintance with, nor the support or confidence of the investors, many of them

became concerned when Carroll announced he was purchasing Lansing's interests and would relieve Lansing of his responsibilities. The uncertainty continued to mount over the next four months, as worried investors had little contact with Carroll during the supposed transition period.

6.     Still, despite repeated promises by Carroll that he would purchase Lansing's interests as soon as possible, he was not able to close the transaction by the contractually required closing date of March 29, 2011 – notwithstanding Carroll's fraudulent representations to Lansing that he was in a position to purchase Lansing's interests. Not only did he fail to close, but he also refused to pay Lansing in excess of $700,000 in earnest money that Carroll put up to secure his performance at the closing.

7.     These failures constitute material breaches under the agreements. Due to these material breaches, Carroll's bad faith purported "acceptance" of Lansing's buy/sell offer, and his fraudulent misrepresentations that a closing would occur, the buy/sell provisions in the agreements provide Lansing the right to purchase Carroll's interests of the ownership entities for the same $14,045,000 buy/sell price. As if the delay and chaos he has caused is not enough, Carroll now disputes that Lansing has a right to purchase Carroll's interests.

8.     Thanks to Carroll's bad faith, material breaches, fraud, and his refusal to recognize Lansing's rights under the agreements, investors are understandably concerned as to the operations and future direction of the funds. This concern is magnified by Carroll's progressive dereliction of duties over the past several years. Accordingly, this Court should order that Lansing has the right to purchase Carroll's interest in The Westminster Funds management entities at the buy/sell price, allowing a speedy and complete end to their business association as envisioned by the buy/sell provisions, and bringing certainty to the ownership and

leadership of the funds and stability for the execution of fiduciary obligations by fund management.

## PARTIES

9.      Robert Lansing is an individual who is a citizen of the State of Illinois.  Lansing resides in Lake County, Illinois.  Lansing is physically present in Illinois and intends Illinois to be his true, fixed, and permanent home.  Lansing is a part owner, as well as a manager and director, of the management entities for The Westminster Funds.

10.     Upon information and belief, George Carroll is a resident of Los Angeles, California and is citizen of the State of California.  Upon information and belief, Carroll is physically present in California and intends California to be his true, fixed, and permanent home.  Carroll is a part owner, as well as a manager and director, of the management entities for The Westminster Funds.

## JURISDICTION AND VENUE

11.     This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.  Diversity of citizenship exists because Lansing is a resident and citizen of the State of Illinois, and Carroll is a resident and citizen of the State of California.  Additionally, the amount in controversy exceeds $75,000 because this dispute involves breaches of contracts and contractual interpretation issues valued in the millions of dollars.

12.     This court has jurisdiction over this matter pursuant to 28 U.S.C. § 2201 as this is an action seeking, in-part, a declaration of the rights and other legal relations of interested parties to contracts.

13.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims in this proceeding occurred within this

district, and the ownership entities at issue are situated in this district. Specifically, the ownership entities are formed under the laws of the State of Illinois, have their principle place of business in Lake Forest, Illinois, and the agreements are governed in accordance with the laws of the State of Illinois. Additionally, as provided below, the failed closing at which Carroll did not perform was held in Chicago, Illinois.

14. Personal jurisdiction is proper in this Court because, among other reasons, Carroll transacts business in this judicial district, serving as a co-owner, director, and employee of the funds, and/or the ownership entities, all of which are formed under Illinois law and have their principle place of business in Illinois. Additionally, the agreements at issue, to which Carroll is a party, are governed by Illinois law. Also, Carroll chose Chicago, Illinois for the failed closing at which he breached the agreements. Furthermore, Carroll has expressly consented to the personal jurisdiction of this Court in one of the agreements at issue.

## FACTS AND BACKGROUND

### I.     The Westminster Entities

15. Beginning in approximately 1996, Lansing and Carroll began establishing a group of investment funds for the purpose of investing in commercial real estate. Lansing and Carroll formed a total of ten funds, each consisting of diversified real estate holdings comprised primarily of income-producing property, including office and industrial buildings, retail properties, and medical office buildings located predominantly in smaller U.S. metropolitan areas (collectively, "The Westminster Funds"). The Westminster Funds have over a hundred private investors. Since their beginning, the Westminster Funds have raised and invested more than $600,000,000 in over 70 real-estate investment properties.

II.     **Overview of the Relevant Agreements**

A.  **The Limited Partnerships**

16.     The Westminster Funds consist of ten limited partnerships serving as the funds through which investors invest in the properties.  These limited partnerships are known as: (1) Westminster Fund LP; (2) Westminster Fund II LP; (3) Westminster Fund III LP; (4) Westminster Fund IV LP; (5) Westminster Fund V LP; (6) Westminster Fund VI LP; (7) Westminster CCRC Investors LP; (8) Westminster Fund VII LP; (9) Westminster Fund VIII LP; and (10) Westminster CCRC Investors II LP.  The Westminster Funds were formed under the laws of Illinois and are governed by separate limited partnership agreements.

B.  **The General Partner Entities**

17.     Each of The Westminster Funds consists of (1) one general partner entity — in all cases, a limited liability company controlled by Lansing and Carroll — and (2) various limited partners, consisting of the various fund investors.  The general partner for each fund is responsible for the management of the corresponding limited partnership.  To undertake these management responsibilities, Lansing and Carroll established the following ten companies to act as general partners for The Westminster Funds: (1) Litchfield Investments LLC; (2) Westminster Advisors II LLC; (3) Westminster Advisors III LLC; (4) Westminster Advisors IV LLC; (5) Westminster Advisors V LLC; (6) Westminster Advisors VI LLC; (7) Westminster CCRC Advisors LLC; (8) Westminster Advisors VII LLC; (9) Westminster Advisors VIII LLC; (10) Westminster CCRC Advisors II LLC and its companion entity, Westminster CCRC Capital II, LLC (each, a "General Partner Entity" and collectively, the "General Partner Entities").

18.     Lansing and Carroll typically serve as the sole members of each General Partner Entity, and both have an equal ownership stake in the General Partner Entities.  Each of the

-6-

General Partner Entities were formed under Illinois law and has its principal office located in Lake Forest, Illinois.

19.    The General Partner Entities are each governed by an Operating Agreement between Lansing and Carroll (collectively, the "Operating Agreements").    The Operating Agreement for Westminster Advisors VIII LLC is attached hereto as **Exhibit A**.  The Operating Agreements for the other General Partner Entities are attached hereto as **Exhibit B**.[12]

### C.  The General Partner Entities Each Have A Buy/Sell Provision

20.    In forming the General Partner Entities, Lansing and Carroll realized that a time might come when they would want to end their business relationship and disassociate themselves from the funds.  To that end, each of the Operating Agreements contain a buy/sell provision.  As is common in closely-held partnerships (particularly in the investment real-estate industry), buy/sell provisions afford either partner the opportunity, at any time, to commence a partner buy out by making an offer at a stated price.  Once an offer is made, the partner receiving the offer has the option to either sell his interests at the offered price, or to buy the offeror's interests at that same price.  Because the party receiving the offer has the choice to either buy or sell at a given price, buy/sell provisions offer a fair way for business partners to dissociate from each other in a speedy, discreet, and efficient manner so as not to disrupt the operation of the underlying entity.

21.    Recognizing these needs, Lansing and Carroll both agreed to incorporate a buy/sell provision in each of the Operating Agreements.   Under Section 6.7 of each of the

---

[1] One of the funds, Westminster CCRC Investors II LP,  is managed by a general partner, but has a companion entity known as Westminster CCRC Investors Capital II, LLC, a limited liability company controlled by Lansing and Carroll.

[2] Because all of the Operating Agreements contain substantially similar terms, any citation to a section of Exhibit A is a citation to all of the Operating Agreements.

Operating Agreements, either Lansing or Carroll may at any time place an offer to purchase the other's interests, or to sell all of their interests. Once an offer is made, it remains irrevocable for a period of 30 days. During the 30-day period, the partner receiving the offer must make one of three choices: 1) to sell to the offeror at the offered price; 2) to purchase from the offeror at the offered price; or 3) take no action, in which case the offeror has the option to elect purchase from the offeree for the offered price." (Ex. A at Section 6.7(2)(a, c, d).).

22.     Specifically, the buy/sell rights under Section 6.7 of the Operating Agreements are outlined as follows:

> The Offerors may make an Offer to the Offerees to sell all of the Interests of the Offerors (a "Sell Offer") and to purchase all of the Interests of the Offerees (a "Purchase Offer"). No Offer shall be subject to the provision of this Section 6.7 unless such Offer is both an Offer to sell all of the Interests of the Offerors and and Offer to purchase all of the Interests of the Offerees, and such Offer must specify a price per Interest at which the Offerors is willing both to sell and to purchase all of the applicable Interests (the "Buy/Sell Price")… … Such Offer shall be irrevocable for a period of thirty (30) days, and the Offerees may, on or before the thirtieth (30th) day after the date of such Offer, accept either the Sell Offer or the Purchase Offer.
> …
>
> Upon acceptance of this Offer, the Offerors shall be required to sell or to purchase, as the case may be. … If Offerees fail within such thirty (30) day period to accept such Offer to sell or to purchase, then the Offer shall automatically expire and be of no further force or effect; provide, however, that Offerors shall thereupon have the right, on or before the fifteenth (15th) day after the expiration of such thirty (30) day period, to purchase the Interests of the Offerees at the Buy/Sell Price, and if the Offerors exercise such right, the Offerees shall be required to sell their Interests herein.
> …
>
> If the Offerors or Offerees, as the case may be, exercises its rights hereunder to buy or sell, a closing thereunder shall be held at the time and place and on the date specified by the purchasers by written notice to the sellers, which date shall in any case be on or prior to the one hundred twentieth (120th) day after such right to buy or sell has been exercised. …

(Ex. A at Section 6.7(2)(a, c, d).)

23.     Under Section 6.7 of the Operating Agreements, in the event the offeree fails to respond within 30 days to be a buyer or a seller, the partner making the original offer has the automatic right to purchase the interests of the offeree at the stated offer price.  (Ex. B at Section 6.7(2)(a, c, d).)  This provision is intended to provide certainty to the buy/sell process, so that a partner cannot avoid his buy/sell obligations or delay the process.

24.     Once an offer is accepted, a closing to consummate the transaction must occur within 120 days "after such right to buy or sell has been exercised."  (Ex. A at Section 6.7(2)(a, c, d).)

**D.  Litchfield Advisors**

25.     Prior to  the formation of the first of the Westminster Funds in 1996, Lansing and Carroll had established Litchfield Advisors, Inc. ("Litchfield"), which would act as the management services entity to provide real estate management, administrative, accounting, and other employee services to The Westminster Funds and the General Partnership Entities. Litchfield was formed through a Shareholders Agreement between Lansing and Carroll, amended and restated as of December 26, 2007.  Pursuant to the Shareholders Agreement, Lansing and Carroll each own 50% of the shares of Litchfield.  Litchfield is formed under the laws of the State of Illinois and has its principal office located in Lake Forest, Illinois.  A true and accurate copy of the Shareholders Agreement, as amended, is attached hereto as **Exhibit C**.

26.     The following chart illustrates the overall structure of The Westminster Funds, the General Partner Entities, and Litchfield.



1 – Landing and Carroll each own, directly or indirectly through wholly controlled entities, equal interests in each General Partner Entity and Litchfield. The interests range in size from 43.3% up to 50%.

Litchfield Advisors Incorporated, a services company, owned 50% each by Landing and Carroll which is subject to the buy-sell provisions of the Shareholders Agreement.

Underlying Limited Partnerships managed by the General Partner Entities.

General Partner Entities including Westminster CCRC Capital II LLC, which is a limited partner of Westminster CCRC Investors II LP, which are owned equally by Landing and Carroll and are the subject of the buy-sell provisions of the operating agreements.

Additionally, an organization chart showing the relationship of The Westminster Funds, all General Partner Entities, and Litchfield is attached hereto as **Exhibit D**.

27.      Like the General Partner Operating Agreements, the Litchfield Shareholders Agreement also contains a "Buy/Sell" provision, enabling one shareholder to conclusively

divorce and separate from the other.  Specifically, the  Litchfield Shareholders Agreement states

as follows:

> The Offeror may make the Offeree an Offer to sell all of the Share of the Offeror,
> and to purchase all of the Shares of the Offeree.  …  [S]uch Offer must specify a
> price per Share at which the Offeror is willing to both sell or to purchase all of the
> Shares (the "Buy/Sell Price") and that the total purchase price is payable by bank
> certified, cashier's or treasure's check.  …  Such Offer shall be irrevocable for a
> period of thirty (30) days, and the Offeree may, on or before the thirtieth (30th)
> day after the date of such Offer, accept either the Offer to sell or the Offer to
> Purchase.
> …
>
> Upon acceptance of this Offer, the Offeror shall be required to sell or to purchase,
> as the case may be.  If the Offeree fail within such thirty (30) day period to accept
> such Offer to sell or to purchase, then the Offer shall automatically expire and be
> of no further force or effect; provide, however, that Offeror shall thereupon have
> the right, on or before the fifteenth (15th) day after the expiration of such thirty
> (30) day period, to purchase the interest of the Offeree, at the Buy/Sell Price, and
> if the Offeror exercises such right, the Offeree shall be required to sell its interests
> herein.
> …
>
> If the Offeror or Offeree, as the case may be, exercises its rights hereunder to buy
> or sell, a closing thereunder shall be held at the time and place and on the date
> specified by the purchaser by written notice to the seller, which date shall in any
> case be on or prior to the one hundred twentieth (120th) day after such right to buy
> or sell has been exercised.  …

(Ex. C, Section 12.2 (a, b, c).)

## III.    The Westminster Funds' Management Team

28.    The success of the Westminster Funds through the current "Great Recession" is

almost entirely a result of the tireless efforts of Lansing and the team of dedicated Litchfield

employees located in Lake Forest, Illinois.  Litchfield  currently employs a dozen people, nine of

whom work out of Litchfield's headquarters in Lake Forest, Illinois.  Lansing and the Litchfield

team are responsible for serving as the "asset managers" for more than 95% of the property

investments held by The Westminster Funds.  These asset management responsibilities include

tasks such as ensuring that taxes and mortgages are paid, rents are collected, mortgage financing is obtained and refinanced, working with third-party property management companies hired to conduct the day-to-day operations of investment properties, preparing properties for sale, and developing properties to generate investment returns for investors.

29.     Lansing is the President of Litchfield, the most visible face of The Westminster Funds, and the undisputed leader of the organization.  Not only does he manage the Lake Forest team, but he also serves as the primary contact with investors, having sourced and raised nearly all of the $600,000,000 of investor capital commitments that comprise The Westminster Funds. Under Lansing's leadership, the Westminster Funds have provided strong returns to investors for more than a decade, maintaining stability during the recent recession and material downturn in the real estate market.  Unlike many real estate investment funds that have recently failed or lost properties to lender foreclosure, The Westminster Funds, as of this date, have not returned any properties to lenders to satisfy mortgage obligations.

**IV.    Carroll's Failures As A Fiduciary And As An Asset Manager**

30.     Although the funds have been anchored by Lansing's strong leadership, Carroll's management involvement over the past three years has been, at best, sparse.   Years ago, Carroll moved to Los Angeles.   While working primarily on three assets in Southern California, Carroll began to neglect his general partner management and oversight responsibilities, and withdrew from regular communications and interactions with the management team based in Lake Forest. In fact, for almost a two year period between January 1, 2009 and November 1, 2010, Carroll did not visit the Lake Forest office at any time.  He has refused to engage in routine interactions with other Litchfield employees.  In some instances, he has become belligerent toward employees of Litchfield, as well as third-parties involved with The Westminster Funds' investment properties.

And, more recently, he has admitted to stalking Litchfield employees by improperly accessing and reading emails without authorization. These and other acts and failures have caused Lansing and the rest of the management team to lose all faith in Carroll's ability to carry out his job responsibilities and fiduciary duties to The Westminster Funds.

31.     Carroll no longer meaningfully participates in the management of the funds. For instance, The Westminster Funds hold quarterly review meetings, during which assets and investment holdings of the funds are assessed. Despite the import of these meetings, Carroll rarely participated in a meaningful way in recent years. He has also spurned critical duties, such as providing quarterly updates for the few properties he does manage. Although investors rely on the accuracy and integrity of these quarterly reports, in recent years Carroll has shuttered his responsibility to prepare them. (*See* **Exhibit E**, e-mail from Carroll asking not to be bothered about the "QI 2010" report.) In essence, Carroll has effectively withdrawn from his management role as an officer of Litchfield and general partner of The Westminster Funds.

32.     In addition, Carroll adds virtually no value in connection with investor relations or raising new funds. He has failed to attend any of the bi-annual investor meetings since May, 2004 — a critical component of his normal duties as an owner and director of Litchfield and general partner of the funds. Given Carroll's limited contact, very few of The Westminster Funds' investors have ever met him or know who he is, let alone have confidence in his ability to steward their investments.

33.     Carroll's neglect continues. He is responsible as primary asset manager for three properties in California, but in recent years he has neglected his duties, requiring his replacement as primary asset manager. For example, Carroll has failed to undertake his duties as an asset manager to prepare properties for sale. Carroll is the asset manager for a shopping mall in

Riverside, California, as well as for a housing development located in Austin, Texas. These properties have been held by The Westminster Funds for many years and need to be sold, but Carroll is not up to the task as lead asset manager.

34.     These and other failures have caused Lansing and the rest of the management team to lose all faith in Carroll's ability to carry out his job responsibilities and fiduciary duties as a general partner of The Westminster Funds.

**V.      Lansing Exercises the Buy/Sell Provisions And Carroll's Bad Faith Acceptance**

35.     Due to Carroll's failures and neglect, Lansing no longer wished to be a business partner of Carroll. On November 1, 2010, Lansing exercised the buy/sell provisions contained in both the Operating Agreements of the General Partner Entities, as well as the Litchfield Shareholder's Agreement. Lansing invoked these provisions by sending Carroll a letter, attached hereto as **Exhibit F**.

36.     In doing so, Lansing offered to either buy all of Carroll's shares in the General Partner Entities and Litchfield, or to sell to Carroll all of Lansing's shares in the General Partner Entities and Litchfield, for a price of $14,045,000.[3]  Specifically, Lansing's letter stated as follows:

> Pursuant to and in accordance with Section 12.2(a) of the Shareholders Agreement and Section 6.7(2)(a) of the Operating Agreements, this letter constitutes, and serves as notice of, both the undersigned's offer to purchase (the "Buy Offer") all shares of LAI owned by Carroll and all of the Carroll Owners' Interests and rights in the LLCs, and the undersigned's offer to sell (the "Sell Offer" and, together with the Buy Offer, the "Offer") to the Carroll Owners all shares of LAI owned by Lansing and all of the Lansing Owners' Interests and rights in the LLCs, in each case for an gross purchase price equal to $14,045,000 (the "Buy/Sell Price"). This Offer shall remain open for a period of thirty (30) days from the date hereof.

(Ex. F at p. 1.)

---

[3] Less required capital contributions, which today are approximately $21,768.18, and less unmet capital call for unfunded capital commitments, which amount to $1,006,936.10.

-14-

37.     Even though Carroll alienated himself from his fellow employees, investors, and lenders of The Westminster Funds, on November 26, 2010, Carroll elected and agreed to purchase all of Lansing's interest in the General Partner Entities and Litchfield for $14,045,000, "accepting" Lansing's sell offer under the buy/sell provisions.  Carroll's supposed "acceptance" is memorialized in a letter attached hereto as **Exhibit G.**  Pursuant to the terms of Lansing's November 1, 2010 letter and the Operating and Shareholders Agreements, this transaction was to close no later March 29, 2011.

38.     As the declared purchaser, Carroll deposited $705,000 into an escrow account as required under the terms of the agreements.  Specifically, the ultimate purchaser of shares under the buy/sell provisions is required to place five-percent of the purchase amount in escrow:

> The offer shall go into effect on  the latter of the notice of the Offer or when the Offeror places into escrow mith a mutually acceptable escrow agent a chase sum equal to five percent (5%) of the Offer amount to purchase.  Such escrow shall be included in the purchase consideration and delivered to the Offeree if the Offeree accepts the Offer of the Offeror and the Offeror completes the purchase….  Should the Offeror fail to complete a purchase accepted by the Offeree, the funds deposited in escrow shall be promptly paid to the Offeree by the escrow agent.

(Ex. C, Section 12.2(a).)  The Operating Agreements contain similar provisions.

39.     Accordingly, to comply with the agreements, in his letter of November 26, 2010 Carroll stated:

> We accept your selection of the escrow holder.  As a result, on Monday I will cause to be deposited on behalf of Carroll and the Carroll Owners a cashier's check equal to 5% of the Buy/Sell Price into escrow….

(Ex. G at 1.)

40.     However, Carroll's so-called acceptance of Lansing's offer to sell his interests in the various entities was done in bad faith.  As Lansing now knows, Carroll never had the money or the wherewithal to purchase Lansing's interests.  Nor did he have any reasonable prospect to

secure the necessary funding to effect purchase of Lansing's interests. Carroll knew little about running the Westminster Funds' operations, nor had (and currently does not have) the management experience and leadership qualities to run and manage the organization. He did not have support from the employees or investors - indeed no informed investors in adequate numbers would back him with funds to effect the purchase of Lansing's interests. Still, apparently to frustrate Lansing and pursue what by all appearances is his personal vendetta against Lansing, Carroll purportedly "accepted" Lansing's offer to sell his interests in the various entities.

41. Upon his bad faith "acceptance," Carroll planned and took actions that were adverse to The Westminster Funds and their investors, including making misrepresentations to the investors. For example, Carroll failed to develop a transition plan for the management of The Westminster Funds. While Carroll visited the Lake Forest offices on January 12, 2011 for approximately three and one-half hours – his first visit in years – and on January 14, 2011 for approximately four more hours, he never returned. And while he was there on January 12, Carroll **fell asleep** during an important meeting to review the property portfolio of The Westminster Funds and **left** the meeting before its conclusion and before he was to report on properties under his asset management.

42. Additionally, beyond neglecting to learn about the properties, Carroll engaged in a confused session with the Litchfield employees, wherein he indicated that they might retain their jobs or that they might lose their jobs. He promised to send each employee an individualized letter concerning their employment but no individualized letters were ever received by employees.

-16-

43.     Moreover, on January 4, 2011, and without any prior consultation with Lansing, Carroll sent a bizarre and damaging letter to most of The Westminster Fund investors, informing them of the details of Lansing's invocation of the buy/sell provisions (attached hereto as **Exhibit H**).  In this letter, Carroll, upon information and belief, made misrepresentations to the investors that he planned "to close the transaction as soon as possible," that the "transfer of interests should be seamless for investors and our operations will not be disrupted," and that in "the near future I will be spending almost 100% of my time at our office in Lake Forest…."

44.     None of these representations were true.  In reality, Carroll had no capability to close the transaction.  It was impossible — he had no means to do so nor the ability to run the organization.  He accepted Lansing's sell offer in bad faith out of spite against Lansing as a way to delay the buy/sell process and to vindictively frustrate and otherwise disrupt Lansing from continuing on with managing The Westminster Funds.

45.     Furthermore, despite Carroll's assurances in his January 4 letter that his purchase of Lansing's interest would be seamless for The Westminster Funds' investors,  Carroll disturbed a large number of investors when he represented that he would make "some immediate changes in the firm's governance and investment strategy, including…[e]xploring alternate asset classes, such as purchasing debt secured by real property…with the potential of acquiring the underlying real-estate at a major discount."  (Ex. H at 3.)  He made these representations to investors even though The Westminster Funds had never before invested in these assets, nor had investors been informed that distressed debt would be an investment target of The Westminster Funds.

46.     These representations rightfully concerned many investors, particularly since few if any of the investors had ever met Carroll, let alone have confidence in him.

VI.    **Carroll's Breaches And Fraudulent Assurances**

47.    Predictably, despite Carroll's representations to The Westminster Fund investors that he "planned to close the transaction as soon as possible," Carroll failed to close the transaction and purchase Lansing's interest in the General Partner Entities or Litchfield as agreed.

48.    The closing date was set for March 29, 2011 in Chicago, Illinois. Lansing was present at the closing on March 29, 2011 and was prepared to comply with his contractual obligations and sell his interests in the various entities to Carroll. Nevertheless, Carroll never showed up, never tendered payment, and never consummated the purchase — all in material breach of all agreements at issue.

49.    Carroll's material breaches occurred despite his repeated and fraudulent assurances over many months that the transaction would close. Indeed, just days before the failed closing, Carroll fraudulently represented that he had secured funds to effectuate the purchase and that the transaction would close as planned.

50.    Carroll's repeated, false assurances that the transaction would close on March 29, 2011 allowed Carroll to delay his material breaches and to cover up his bad faith "acceptance" of Lansing's sell offer, hiding his inability to purchase Lansing's shares until the last possible moment, all the while causing further and significant damage to Lansing's reputation and the goodwill he had built up with investors over many years.

51.    Following Carroll's bad faith, fraudulent misrepresentations, his material breach of the agreements, the failed closing, and the expiration of the 120-day period as provided under

both the Operating Agreements and the Shareholders, Lansing exercised his right to purchase Carroll's interest in the General Partner Entities and Litchfield.

52.     Specifically, the Litchfield Shareholders Agreement provides as follows:

If the Offeree fails within such thirty (30) day period to accept such Offer to sell or to purchase, then the Offer shall automatically expire and be of no further force or effect; provided, however, that the Offeror shall thereupon have the right, on or before the fifteenth (15th) day after the expiration of such thirty (30) day period, to purchase the interests of the Offeree, at the Buy/Sell Price, and if the Offeror exercises such right, the Offeree shall be required to sell its interest herein.

(Ex. C, Section 12.2(b).)  Additionally, the Operating Agreements each contain the following provision:

"If the Offerees fails within such thirty (30) day period to accept such Offer to sell or to purchase, then the Offer shall automatically expire and be of no further force or effect; provided, however, that the Offerors shall thereupon have the right, on or before the fifteenth (15th) day after the expiration of such thirty (30) day period, to purchase the interests of the Offerees, at the Buy/Sell Price, and if the Offerors exercises such right, the Offerees shall be required to sell their interest herein."

(Ex. A, Section 6.7(2)(c).)

53.     On April 3, 2011, by way of letter and well within the fifteen day window after Carroll's material breach of the agreements, Lansing exercised his rights under these provisions. Lansing expressly stated that he "hereby exercises that right" to purchase Carroll's interests for $14,045,000.  This April 3, 2011 letter is attached hereto as **Exhibit I**.  Lansing invoked these rights in an effort to bring a speedy and complete conclusion to the buy/sell process and ensure the appropriate management of the properties for the benefit of The Westminster Funds' investors.

54.     Despite Lansing's invocation of his rights under the agreements, on April 5, 2011 Carroll informed Lansing that he "disagrees with the statement in your letter that Lansing is entitled under the 'buy/sell' provisions of the agreements to purchase Carroll's interests…."

Carroll continued, saying that the "language of [the] agreements does not provide as you assert…." This letter is attached hereto as **Exhibit J**.

55.     Although Carroll engaged in prolonged and fraudulent tactics to cover up his bad faith, Carroll continues to assert that Lansing does not have the right to purchase his interest in the General Partner Entities and Litchfield despite correspondence and discussions concerning Lansing's rights.  In a letter dated May 20, 2011, Carroll continues to assert that Lansing has no right to purchase his interest in the Westminster Funds.  This letter is attached hereto as **Exhibit K**.

56.     Lansing stands ready to purchase Carroll's interest, and would have done so already but for Carroll's bad faith and fraud.  Carroll's  refusal to recognize Lansing's right to purchase Carroll's interests is preventing the speedy and complete conclusion to the buy/sell process.

57.     The delay has caused consternation and concern among the investors over their investments.  As one can imagine, the investors in The Westminster Funds want a speedy resolution to the buy/sell process between the owners of the General Partner Entities and Litchfield.  Moreover, many of the investors in The Westminster Funds have concerns about Carroll obtaining control.  These investors have no confidence in Carroll and do not believe him to be capable of effectively managing The Westminster Funds and stewarding their investments.

58.     As a result of Carroll's bad faith, fraud, and material breaches, the reputation of The Westminster Funds, as well as the reputation of Lansing, is being jeopardized by the inability to quickly and completely finalize the buy/sell process thanks to Carroll's refusal to recognize Lansing's rights under the agreements.

## COUNT I
## Breach of Contract

59.    Lansing repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 58 above.

60.    The Shareholders Agreement[4] and the Operating Agreements are valid, binding, and enforceable contracts between Lansing and Carroll.

61.    Carroll was obligated to comply with the buy/sell provisions in the Shareholders Agreement and the Operating Agreements when Lansing sent a buy/sell letter to Carroll on November 1, 2010, offering to either buy all of Carroll's interests in the General Partner Entities and Litchfield, or to sell Carroll all of Lansing's interests in the General Partner Entities and Litchfield for $14,045,000.

62.    Carroll breached the Shareholders Agreement and the Operating Agreements when he failed to comply with the buy/sell provisions in each of those contracts, including by, among other things, "agreeing" in bad faith to purchase Lansing's interests, by making material misrepresentations regarding Carroll's ability to close the transactions, and by failing to honor Lansing's rights to purchase Carroll's interests under the Shareholders Agreement and the Operating Agreements.   Carroll's fraud and bad faith "acceptance" to purchase Lansing's interests did not constitute valid acceptances under the contracts, and thus, Lansing has the right to purchase all of Carroll's interests under the Shareholders Agreement and the Operating Agreements.

63.    Lansing at all times has fully performed his obligations under these contracts.

---

[4]    To the extent that Section 16, "Arbitration," of the Shareholders Agreement applies to this dispute, Lansing is prepared to dismiss his claims under the Shareholders Agreement and proceed in arbitration with his claims arising under that agreement.

64. Carroll also breached the covenant of good faith and fair dealing when he, in bad faith, "accepted" Lansing's buy/sell offer in order to pursue his personal vendetta against Lansing, knowing that he neither had the means to close the transaction or the ability to operate and manage The Westminster Funds. Carroll's bad faith "acceptance," as well as his subsequent refusal to sell his interests to Lansing, constitutes arbitrary and unreasonable conduct designed to prevent Lansing from receiving his benefit under the contracts.

65. Lansing has been damaged by Carroll's breaches by, among other things, Carroll's failure to release his escrowed amount of $705,000 to Lansing as required by the contracts, the incurring of unnecessary legal expenses in connection with preparing to perform under the contracts, by the loss of his benefit of the bargain under the contracts, and by the damage to the reputation to both Lansing and the Westminster Funds.

**WHEREFORE**, Lansing prays that the Court:

(a) enter judgment in his favor against Carroll;

(b) award monetary damages to compensate Lansing for Carroll's breaches;

(c) award specific performance ordering Carroll to sell his interests to Lansing as is now required under the Shareholders Agreement and the Operating Agreements;

(d) award specific performance ordering Carroll to release the $705,000 in escrow to secure his ability to perform;

(e) pre-judgment interest and reasonable attorney's fees as called for by the agreements; and

(f) other relief this Court may deem proper, with the specific monetary amount to be determined at trial.

## COUNT II
## Fraud

66.     Lansing repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 65 above.

67.     After Carroll's bad faith "acceptance" of Lansing's November 1, 2010 buy/sell offer under the Shareholders Agreement and the Operating Agreements, Carroll continued to make various false representations regarding his ability to "close" the transaction.

68.     For example, Carroll – through his attorney – informed Lansing's attorney on March 17, 2011 that Carroll has the money and intends to close by March 29, 2010.  This was false, as Carroll did not have the money.

69.     To perpetuate this fraud, Carroll instructed his attorneys to prepare and send draft transaction documents and correspondence to Lansing's attorneys in preparation for the fraudulent "closing" beginning on March 22, 2011 and continuing throughout the following days.  Each draft and piece of correspondence constituted further misrepresentations that Carroll was able and prepared to close the transaction by March 29, 2011.  Carroll was not able and was not prepared to close by March 29, 2011.

70.     Each of Carroll's misrepresentations were material.

71.     Carroll's material misrepresentations were done with the intent to deceive Lansing that Carroll had sufficient money to close the buy/sell transaction and was otherwise able and ready to close the transaction.

72.     Lansing relied on these material misrepresentations by preparing for the failed closing and incurring significant attorneys fees to review and prepare necessary documents relating to the fraudulent closing.

73.     In reliance on Carroll's material misrepresentations, Lansing suffered significant damages, including attorneys fees in preparing for the fraudulent closing.

**WHEREFORE**, Lansing prays that the Court:

    (a) enter judgment in his favor against Carroll;

    (b) award monetary damages to compensate Lansing for his damages from Carroll's fraud;

    (c) award specific performance ordering Carroll to sell his interests to Lansing as is now required under the Shareholders Agreement and the Operating Agreements;

    (d) pre-judgment interest and reasonable attorney's fees; and

    (e) other relief this Court may deem proper, with the specific monetary amount to be determined at trial.

### COUNT III
### Declaratory Judgment

74.     Lansing repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 73 above.

75.     The Shareholders Agreement and the Operating Agreements are valid, binding, and enforceable contracts between Lansing and Carroll.

76.     Lansing at all times has fully performed his obligations under these contracts. Lansing now stands ready to perform and purchase Carroll's interests in the General Partner Entities and Litchfield.

77.     As described above, Carroll disputes that Lansing has a right under the contracts to purchase his interests the General Partner Entities and Litchfield.  Carroll's basis for his position is that the "language of the agreements does not provide…that upon Carroll's failure to close within 120 days either Lansing has the right to purchase Carroll's interests…."  (Ex. J.)

-24-

78.     The agreements state that "[i]f the Offeree fails within such thirty (30) day period to accept such Offer to sell or to purchase, then the Offer shall automatically expire and be of no further force or effect; provided, however, that the Offeror shall thereupon have the right, on or before the fifteenth (15th) day after the expiration of such thirty (30) day period, to purchase the interests of the Offeree, at the Buy/Sell Price, and if the Offeror exercises such right, the Offeree shall be required to sell its interest herein." (Ex. C, Section 12.2(b); *See also* Ex. A, Section 6.7(2)(c).)

79.     Carroll's bad faith "acceptance" to purchase Lansing's interests, his fraudulent misrepresentation to cover up his bad faith, as well as his material breach of all agreements, amounts to no acceptance of Lansing's invocation of the buy/sell process and provides Lansing the right to purchase Carroll's interests in the General Partner Entities and Litchfield.

80.     Carroll continues to dispute Lansing's rights under the agreements.

81.     There exists an actual controversy between Lansing and Carroll within the jurisdiction of this Court as to whether Lansing is now entitled to purchase Carroll's interests.

**WHEREFORE**, Lansing prays that the Court:

(a) enter judgment in his favor against Carroll;

(b) enter an order declaring that Lansing is entitled under the Shareholder Agreement and the Operating Agreements to purchase Carroll's interests in the General Partner Entities as well as Litchfield;

(c) award specific performance ordering Carroll to sell his interests in the General Partner Entities as well as Litchfield to Lansing as is now required under the Shareholders Agreement and the Operating Agreements;

(d) award specific performance ordering Carroll to release the $705,000 in escrow to secure his ability to perform;

(e) pre-judgment interest and reasonable attorney's fees as called for by the agreements; and

(f) other relief this Court may deem proper, with the specific monetary amount to be determined at trial.

**COUNT IV**
**Breach of Contract (in the alternative)**

82.     Lansing repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 81 above.

83.     In the event Carroll's bad faith "acceptance" of Lansing's November 1, 2010 letter to Carroll – which incorporated the buy/sell provisions of the Shareholders Agreement and the Operating Agreements – constitutes a valid, binding, and enforceable contract between Lansing and Carroll, Carroll breached that contract by failing to perform.

84.     Under the buy/sell provisions of these contracts, Carroll was obligated to purchase Lansing's interests by or before March 29, 2011 for $14,045,000.

85.     Carroll breached these agreements by failing to close the transaction and purchase Lansing's interests.

86.     Lansing at all times has fully performed his obligations under the Shareholders Agreement, the Operating Agreements, and this purported buy/sell contract.

87.     Carroll's failure to close the transaction and purchase Lansing's interests provides Lansing the right to purchase Carroll's interests under the Operating Agreements and Shareholder Agreement.

88.     Lansing has been damaged by Carroll's breaches by, among other things, Carroll's failure to release his escrowed amount of $705,000 to Lansing as required by the contracts, the incurring of unnecessary legal expenses in connection with preparing to perform under the contracts, by the loss of his benefit of the bargain under the contracts, and by the damage to the reputation to both Lansing and the Westminster Funds.

**WHEREFORE**, Lansing prays that the Court:

(a) enter judgment in his favor against Carroll;

(b) award monetary damages to compensate Lansing for his damages from Carroll's breaches;

(c) award specific performance ordering Carroll to sell his interests to Lansing as is now required under the Shareholders Agreement and the Operating Agreements;

(d) award specific performance ordering Carroll to release the $705,000 in escrow to secure his ability to perform;

(e) pre-judgment interest and reasonable attorney's fees as called for by the agreements; and

(f) other relief this Court may deem proper, with the specific monetary amount to be determined at trial.

Dated:  June 17, 2011                          Respectfully submitted,


                                               ROBERT T.E. LANSING


                                               By:  /s/ Michael P. Mayer
                                                    One of its Attorneys

Michael P. Mayer
J. Malcolm Cox
**WINSTON & STRAWN LLP**
35 West Wacker Drive
Chicago, Illinois 60601
Telephone:  (312) 558-5600
Facsimile:  (312) 558-5700
mmayer@winston.com
mcox@winston.com

*Attorneys for Plaintiff Robert T.E. Lansing*

-28-