IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT T.E. LANSING, | ) | |
|     Plaintiff, | ) | |
| | ) | No. 11 CV 4153 |
| v. | ) | Judge Blanche M. Manning |
| | ) | |
| GEORGE W. CARROLL, | ) | |
|     Defendant. | ) | |

**MEMORANDUM AND ORDER**

After 24 years as business partners, the relationship between plaintiff Robert Lansing and defendant George Carroll deteriorated to the point that Lansing gave Carroll notice that he wanted to end the partnership. Carroll initially agreed to buy out Lansing's shares in the various investment funds they operated, but then failed to do so. Lansing has sued Carroll for breach of contract, fraud, and for a declaratory judgment establishing the parties' rights. Before the court is Carroll's motion to dismiss most of those claims. For the reasons that follow, the motion to dismiss is granted.

**BACKGROUND**

The following facts are taken from the First Amended Complaint, and accepted as true for purposes of resolving the motion to dismiss. *See Scanlan v. Eisenberg*, 669 F.3d 838, 841 (7th Cir. 2012).

In 1996, Lansing and Carroll began establishing a group of investment funds they called the Westminster Funds, which were vehicles for investing client monies in commercial real estate. The Westminster Funds is comprised of ten investment funds managed by eleven general partner entities. Lansing and Carroll are the primary members of each general partner entity, and each entity is governed by a separate Operating Agreement. In addition, Lansing and Carroll

created Litchfield Advisors, Inc., which provides management services to the Westminster Funds and is governed by a Shareholders Agreement. Because the relevant provisions of the various agreements are essentially identical, for ease of analysis the court will follow the parties' lead and treat the individual Operating Agreements and the Shareholders Agreement collectively as a single Operating Agreement. As was done in the First Amended Complaint, the court shall cite to the Operating Agreement for Westminster Advisors VIII LLC (attached as Exhibit A to the First Amended Complaint [14-1]).

The Operating Agreement contains a buy/sell provision, under which either partner can submit to the other partner an offer to both (1) sell his shares to the other partner, and (2) buy out the other partner's shares. The other partner has 30 days to decide which of those two offers to accept. If the other partner fails to accept either offer within 30 days, then the Offeror (here it was Lansing) obtains the right to purchase the interests of the Offeree (here it was Carroll), and the Offeree is obligated to sell. Any purchase or sale is required to close within 120 days after such right to buy or sell has been exercised. The relevant rights and obligations are set out in § 6.7(2) of the Operating Agreement:

> (2) <u>Exercise of Buy-Sell Provision</u>. At any time either the Carroll Owners or the Landing Owners shall be permitted to institute the following compulsory buy-sell provisions:
>
> (a) The Offerors may make an Offer to the Offerees to sell all of the Interests of the Offerors (a "Sell Offer"), and to purchase all of the Interests of the Offerees (a "Purchase Offer"). No Offer shall be subject to the provisions of this <u>Section 6.7</u> unless such Offer is both an Offer to sell all of the Interests of the Offerors and an Offcer to purchase all of the Interests of the Offerees, and such Offer must specify a price per Interest at which the Offerors is [sic] willing both to sell and to purchase all of the

applicable Interests (the "Buy/Sell Price") and that the total purchase price is payable by bank certified, cashier's or treasurer's check. The Offer shall go into effect on the later of the notice of the Offer or when the Offerors place into escrow with a mutually acceptable escrow agent a cash sum equal to five percent (5%) of the Offer amount to purchase. Such escrow shall be included in the purchase consideration and delivered to the Offerees if the Offerees accept the Offer of the Offerors and the Offerors complete the purchase, or shall be returned to the Offerors if the Offerees do not accept the Offer to purchase. Should the Offerors fail to complete a purchase accepted by the Offerees, the funds deposited in escrow shall be promptly paid to the Offerees by the escrow agent. Such Offer shall be irrevocable for a period of thirty (30) days, and the Offerees may, on or before the thirtieth (30th) day after the date of such Offer, accept either the Sell Offer or the Purchase Offer.

. . .

(c) Upon acceptance of this Offer, the Offerors shall be required to sell or to purchase, as the case may be. If the Offerees elect to accept the Sell Offer, each Offeree shall be obligated to purchase a pro rata portion of each Offeror's Interest equal to the product of (i) the total number of Interests held by such Offeror multipled by (ii) the quotient of such Offeree's total Interests divided by the total Interests held by all Offerees. If the Offerees fail within such thirty (30) day period to accept such Offer to sell or to purchase, then the Offer shall automatically expire and be of no further force or effect; provided, however, that the Offerors shall thereupon have the right, on or before the fifteenth (15th) day after the expiration of such thirty (30) day period, to purchase the Interests of the Offerees, at the Buy/Sell Price, and if the Offerors exercise such right, the Offerees shall be required to sell their Interests herein. If the Offerors fail to exercise the right to purchase within the time specified, either Declaring Member may thereafter make a new Offer pursuant to this Section 6.7.

(d) If the Offerors or Offerees, as the case may be, exercise rights hereunder to buy or sell, a closing thereunder shall be held at the time and place and on the date specified by the purchasers by written notice to the sellers, which date shall in any case be on or prior to the one hundred twentieth (120th) day after

>such right to buy or sell has been exercised. The purchasers shall have the right to designate nominees or other designees to accept the Transfer of title to the Company Interests being transferred. A condition precedent to any closing on such purchase shall be that the purchasers shall use commercially reasonable efforts to see that the sellers and any of their principals or Affiliates are released from all liability on any personal guaranties made by them, with respect to the Company's liabilities.

Operating Agreement (attached as Exhibit A to the First Amended Complaint [14–1] at 15-16).

In addition, the Operating Agreement contains a choice of law provision under which Illinois law governs its interpretation, construction, and enforcement. *Id.* at 17. It also contains the following integration clause: "This Agreement contains the entire agreement among the parties hereto relating to the Company." *Id.*

On November 1, 2010, Lansing sent a letter to Carroll pursuant to § 6.7(2)(a) of the Operating Agreement in which he offered to either buy Carroll's interests in the Westminster Funds, or to sell to Carroll his own interests, for $14,045,000, less Carroll's unmet or future capital obligations. On November 26, 2010, Carroll responded with a letter in which he accepted Lansing's offer to sell. He also deposited 5% of the sales price into escrow, and set the closing for March 29, 2011. However, Carroll never showed up to the closing and never consummated the purchase. After the sale fell through, Lansing twice demanded that Carroll release the $702,250 in escrowed funds to him, but Carroll has not done so.

On April 3, 2011, Lansing wrote to Carroll stating that as a consequence of Carroll's failure to purchase Lansing's shares, the terms of the Operating Agreement now gave Lansing the right to purchase Carroll's shares for the previously offered price of $14,045,000, and required Carroll to forfeit his $702,250 in escrow. In a letter dated April 5, 2011, Carroll rejected

Lansing's interpretation of the Operating Agreement under which Lansing purported to have acquired the right to purchase Carroll's shares and to the funds in escrow. Specifically, under Carroll's interpretation, the Operating Agreement addresses only the failure of the Offeror (Lansing) to complete a purchase of the shares of the Offeree (Carroll), in which case the Offeree acquires the right to purchase the Offeror's shares and to the funds in escrow. According to Carroll, the Operating Agreement does not address the situation of an Offeree's failure to purchase the Offeror's interests.

Despite Carroll's response, Lansing went ahead and scheduled June 21, 2011, as the closing date on which he intended to complete his purchase of Carroll's interests in the Westminster Funds. In advance of the closing date, on June 17, 2011, Lansing sent Carroll a Transfer Agreement and a copy of a cashier's check in the amount of $13,016,385.72, representing the $14,045,000 purchase price Lansing previously offered, less Carroll's $21,678.18 unmet and $1,006,936.10 future capital obligations to the Westminster Funds. Carroll responded to his receipt of the Transfer Agreement and a copy of the cashier's check by stating that he needed more time to evaluate the situation. Lansing then delayed the closing date by one day, to June 22, 2011.

Lansing attended the June 22, 2011, closing, but Carroll did not. Lansing extended the closing date to June 29, 2011, but, again, Carroll did not participate. As a result, Lansing considered Carroll's interests to have passed to him.

Lansing then filed the instant suit against Carroll. The First Amended Complaint consists of three counts. In Count I, Lansing seeks a declaratory judgment that under the terms of the Operating Agreement (1) Lansing (and his designee, Realty Portfolio Holdings LP) acquired

Carroll's interests in the Westminster Funds as of June 29, 2011, and (2) Carroll owes Lansing the $702,250 placed in escrow. In Count II, Lansing alleges that Carroll breached the Operating Agreement and the November 26, 2010, agreement to purchase Lansing's interests by failing to (1) close the purchase of Lansing's interests within 120 days of November 26, 2010; (2) tender the $702,250 that Carroll placed in escrow; (3) honor Lansing's right to purchase Carroll's interests after Carroll failed to purchase Lansing's interests; (4) voluntarily relinquish control of his interests to Lansing at the closings scheduled for June 22, 2011, and June 29, 2011; and (5) act in good faith.

In Count III, Lansing alleges that Carroll made "various false representations" about his ability to purchase Lansing's shares. First Am. Compl. [14-1] ¶ 69. However, the only false representations alleged are: (1) when Carroll's attorney "informed" Lansing's attorney on March 17, 2011, that Carroll had the money to close by March 29, 2010, and (2) draft transaction documents and correspondence sent by Carroll's attorneys to Lansing's attorneys beginning on March 22, 2011. *Id.* ¶ 71.

Carroll has moved to dismiss Counts I and III in their entirety, and the portions of Count II in which Lansing alleged that that Carroll breached the parties' contracts by failing to (1) tender the $702,250 that Carroll placed in escrow; (2) honor Lansing's right to purchase Carroll's interests after Carroll failed to purchase Lansing's interests; (3) voluntarily relinquish control of his interests to Lansing; and (4) act in good faith.

ANALYSIS

I.  **Standard of Review**

A complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Seventh Circuit explained that this "[r]ule reflects a liberal notice pleading regime, which is intended to focus litigation on the merits of a claim rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (internal quotations omitted); *see also McCormick v. City of Chicago*, 230 F.3d 319, 322-24 (7th Cir. 2000) (stating that claims under 42 U.S.C. § 1983 are not subject to a heightened pleading standard, but are only required to set forth sufficient allegations to place the court and the defendants on notice of the gravamen of the complaint).

However, a complaint must contain "enough facts to state a claim to relief that is plausible on its face" and also must state sufficient facts to raise a plaintiff's right to relief above the speculative level. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 547 (2007). In *Ashcroft v. Iqbal,* the Supreme Court stated that a claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009).

The court is neither bound by the plaintiff's legal characterization of the facts, nor required to ignore facts set forth in the complaint that undermine the plaintiff's claims. *Scott v. O'Grady,* 975 F. 2d 366, 368 (7th Cir. 1992). Nevertheless, "in examining the facts and matching them up with the stated legal claims, we give 'the plaintiff the benefit of imagination,

so long as the hypotheses are consistent with the complaint.'" *Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F. 3d 599, 603 (7th Cir. 2009).

For ease of analysis, the court begins with the motion to dismiss portions of Lansing's breach of contract claim (Count II), before considering the motion to dismiss the declaratory judgment (Count I) and fraud (Count III) claims.

## II.     Count II (Breach of Contract)

Carroll seeks to dismiss those portions of Count II in which Lansing alleged breach of contract based upon (1) Carroll's bad faith failure to honor Lansing's right to purchase Carroll's interests and to tender those interests, and (2) Carroll's failure to tender the money placed into escrow. Carroll contends that he was not required to do either of those things under the terms of the Operating Agreement and, therefore, no breach occurred.

The court must first interpret the Operating Agreement in order to determine the parties' rights and obligations. Under Illinois law, the interpretation of a contract is generally a question of law, and the "starting point of contract analysis is the language of the contract itself." *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 821 (Ill. 2005). Under the four corners rule, the court begins by determining whether the contract is facially unambiguous and, if it is, then the contract is "'presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence.'" *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999) (quoting *Western Illinois Oil Co. v. Thompson*, 186 N.E.2d 285, 287 (1962)).

If the contract contains ambiguous terms susceptible to more than one meaning, "[o]nly then may parol evidence be admitted to aid the trier of fact in resolving the ambiguity." *Id.*

Page 8

Some Illinois courts have also provisionally looked to parol evidence to show that a contract that appears to be facially unambiguous actually contains an ambiguity. *Id.* at 885. However, this provisional admission approach is inapplicable to the Operating Agreement because it contains an integration clause. *Id.* ("This court, however, has never formally adopted the provisional admission approach, and we decline to do so today because the contract in the case before us contains an explicit integration clause.").

> A. **Lansing's Purported Right to Purchase Carroll's Interests**

When Carroll failed to close the purchase of Lansing's interests in the Westminster Funds, Lansing contends that he acquired the right to purchase Carroll's interests, and that Carroll breached the Operating Agreement by refusing to sell his interests to Lansing. However, Lansing's interpretation of the Operating Agreement is not supported by the plain meaning of its terms. Under the Operating Agreement, Carroll was obligated to sell his shares to Lansing under only two circumstances. First, Carroll was obligated to sell to Lansing only if he accepted Lansing's offer to sell or, as the Operating Agreement puts it, in the event Carroll

> exercise[s] rights hereunder to . . . sell, a closing thereunder shall be held at the time and place and on the date specified by the purchasers by written notice to the sellers, which date shall in any case be on or prior to the one hundred twentieth (120th) day after such right to buy or sell has been exercised.

Operating Agreement (attached as Exhibit A to the First Amended Complaint [14-1]) § 6.7(2)(d). Second, Carroll is obligated to sell to Lansing if Lansing submits a buy/sell offer, but Carroll

> fail[s] within such thirty (30) day period to accept such Offer to sell or to purchase[. T]he Offerors shall thereupon have the right, on or before the fifteenth (15th) day after the expiration of such thirty (30) day period, to purchase the Interests of the Offerees at

>     the Buy/Sell Price, and if the Offerors exercise such right, the
>     Offerees shall be required to sell their Interests herein.

*Id.* § 6.7(2)(c).

Neither circumstance occurred here. On November 26, 2010, Carroll wrote to Lansing and accepted Lansing's offer to sell his interests to Carroll. Therefore, under the terms of § 6.7(2)(d), Carroll was obligated to *buy* Lansing's interests, as opposed to being obligated to *sell* his interests to Lansing. In addition, because Carroll accepted Lansing's buy/sell offer on November 26, 2010, Carroll never acquired the right under § 6.7(2)(c) to "purchase the Interests of the Offerees at the Buy/Sell Price."

Nevertheless, Lansing argues that Carroll's acceptance on November 26, 2010, should be ignored, and he should be deemed to have acquired the right to purchase Carroll's shares under § 6.7(2)(c), because Carroll's acceptance was invalid. Lansing contends that Carroll's acceptance was invalid for two reasons: (1) Carroll repudiated the contract, and (2) he breached the duty of good faith and fair dealing. As a result, Lansing contends that Carroll's acceptance was a nullity and, therefore, Lansing acquired the right to purchase Carroll's shares upon Carroll's failure to accept his buy/sell offer. The court addresses each argument in turn.

### 1. Repudiation

Under Illinois law, repudiation occurs when a party states that it cannot or will not perform its obligations under a contract. *See Busse v. Paul Revere Life Ins. Co.*, 793 N.E.2d 779, 783 (Ill. App. Ct. 2003). "Although a party may state that it intends to honor its obligations, it may still repudiate the contract by insisting that it is obligated to perform only according to its own incorrect interpretation of the contract's terms." *Id.*

Lansing argues that Carroll repudiated the Operating Agreement much like the plaintiff did in *PAMI-LEMB I Inc. v. EMB-NHC, LLC*, 857 A.2d 998 (Del. Ch. 2004). *PAMI* involved an agreement between partners that included a buy/sell provision similar to the one in the Operating Agreement. Specifically, like the buy/sell provision at issue here, in *PAMI* if the offeree failed to accept an offer to either buy or sell, the offeror acquired the right to purchase the offeree's interests. *Id.* at 1014-15. Rather than accept NHC's buy/sell offer as made, PAMI purported to accept it on terms different than the ones offered. *Id.* at 1014. The court held that PAMI's purported acceptance on terms other than those offered was a repudiation of the contract and, therefore, the acceptance was invalid. *Id.* Because of the lack of a valid acceptance, the court held that NHC had acquired the right to purchase PAMI's interests. *Id.* at 1015.

The court notes first that *PAMI* was decided under Delaware, not Illinois law. However, even if the states' laws on repudiation are similar, *PAMI* is nevertheless distinguishable because the acceptance in that case was invalid because it purported to change the terms of the offer. In contrast, Carroll accepted Lansing's November 1, 2010, offer without any attempt to change its terms. Therefore, even under *PAMI*, Carroll's acceptance was not a repudiation of the Operating Agreement.

Lansing's allegations are inconsistent with any repudiation by Carroll for the additional reasons that Carroll offered repeated assurances that he would close his purchase of Lansing's shares right up to the planned closing on March 29, 2011. First Am. Compl. ¶ 36. He has also alleged that Carroll sent a letter to Westminster Funds' investors stating that he "'plan[ned] to close the transaction as soon as possible.'" *Id.* ¶ 34 (quoting Carroll letter dated January 4, 2011, attached as Exhibit G).

Because Carroll's acceptance did not attempt to alter the terms of Lansing's offer, and because he repeatedly stated that he intended to go through with his purchase of Lansing's interests, Lansing's allegations are inconsistent with his argument that Carroll repudiated the Operating Agreement.

### 2. Good Faith and Fair Dealing

Alternatively, Lansing contends that Carroll's acceptance was invalid because it was not made in good faith. Under Illinois law, a duty of good faith and fair dealing is implied in every contract. *See Reserve at Woodstock, LLC v. City of Woodstock*, 958 N.E.2d 1100, 1112-13 (Ill. App. Ct. 2011). "Its purpose is to ensure that parties do not take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or do anything that will destroy the other party's right to receive the benefit of the contract." *Gore v. Indiana Ins. Co.*, 876 N.E.2d 156, 161 (Ill. App. Ct. 2007). The duty requires "a party vested with contractual discretion to exercise it reasonably, and not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Seip v. Rogers Raw Materials Fund, L.P.*, 948 N.E.2d 628, 637 (Ill. App. Ct. 2011). However, the duty is "not an independent source of duties for the parties to a contract, and is 'used as a construction aid in determining the intent of the parties where an instrument is susceptible of two conflicting constructions.'" *Id.* (quoting *Fox v. Heimann*, 872 N.E.2d 126, 134 (Ill. App. Ct. 2007)).

Lansing alleges that Carroll exercised discretion when he decided to accept Lansing's November 1, 2010, offer to sell, that he did so in bad faith because he "never had the resources or the ability to purchase Lansing's interests," and that his bad faith stemmed "from his ill will developed against Lansing after [Lansing] initiated the buy/sell process." First Am. Compl. ¶ 32.

As a result, Lansing contends that Carroll's bad faith nullifies his acceptance. In support, he cites *Pielet v. Hiffman*, 948 N.E.2d 87 (Ill. App. Ct. 2011), for the proposition that an act performed in bad faith can be disregarded, and the other party may proceed as if the bad faith conduct had not occurred. Response [20-1] at 8.

In *Pielet*, a real estate partnership offered limited partnerships to its employees as an inducement to stay with the company. *Id.* at 97. However, the limited partnerships were subject to a repurchase clause, under which the general partners could buy back the limited partnerships owned by departing employees. *Id.* The general partners did not exercise the repurchase clause when two employees left the company in the early 1990's. *Id.* In 2001, those two former employees sued the general partners for breach of fiduciary duty regarding the limited partnerships they still owned. *Id.* at 91.

Eight years after the former employees filed suit, the general partners for the first time purported to exercise the repurchase clause. *Id.* at 93. They then filed a motion to dismiss, arguing that because the former employees no longer owned limited partnerships, they lacked standing. *Id.* The state circuit court agreed and dismissed the breach of fiduciary duty count. *Id.* However, the state appellate court reversed because the repurchase clause had been exercised in bad faith and, therefore, dismissal for lack of standing had been improvidently granted:

> The motivation behind the exercise of that right was not to buy back interests of limited partners no longer associated with HSA, but primarily to simply remove intervenors' standing. Doing so is an exercise of discretion that was utilized in a manner inconsistent with the parties' reasonable expectations.

*Id.* at 97. Because the general partners exercised the repurchase agreement in a manner that could not have been contemplated when it was drafted and did so to destroy the plaintiffs' rights, the repurchase "cannot operate to remove a party's standing under circumstances like those." *Id.*

Lansing contends that Carroll's conduct likewise falls outside the scope of what the parties could have contemplated when drafting the Operating Agreement. Specifically, he contends that as drafted, the Operating Agreement "would allow Carroll to repeatedly avoid his buy/sell obligations by sending 'acceptance' notices without ever having to close or even having the intention to close the deal." Response [20-1] at 10. However, as evidenced by the terms of the Operating Agreement, the parties did contemplate an Offeree agreeing to purchase the Offeree's interests, but then failing to timely complete the purchase, and guarded against that risk by imposing a 120-day deadline. Missing the deadline subjects the party who failed to complete the buy-out to a claim of breach of contract, and the remedies that flow from the breach. Because the Operating Agreement contemplates an Offeree's failure to complete a purchase and treats it as a breach of contract, the situation presented here is a far cry from the situation presented in *Pielet*, where the parties never contemplated exercising a repurchase clause in order to defeat standing.

As discussed above, the duty of good faith and fair dealing is not an independent source of duties for parties. *See Fox*, 872 N.E.2d at 134. Therefore, it cannot be used to create additional contractual terms. *See LaSalle Bank Nat'l Ass'n v. Moran Foods, Inc.*, 477 F. Supp. 2d 932, 938-39 (N.D. Ill. 2007). Yet Lansing attempts to do just that by interpreting the Operating Agreement to give him the right to purchase Carroll's shares in the event that Carroll accepted an offer to purchase Lansing's shares but failed to do so within the 120-day deadline. The explicit

terms of the contract do not give him that right, and he may not use the duty of good faith and fair dealing to create such a right. Rather, as the Operating Agreement contemplates, any failure to complete an agreed-upon transaction within 120 days results in a breach of contract, and that is where Lansing must look to for any remedies he is owed.

Accordingly, based upon the terms of the Operating Agreement and the allegations of the First Amended Complaint, the duty of good faith and fair dealing is inapplicable to Carroll's acceptance of Lansing's offer to sell, and does not nullify Carroll's acceptance.

### 3. Carroll's Acceptance Was Not "Invalid"

Neither the doctrine of repudiation nor the duty of good faith and fair dealing serve to invalidate Carroll's acceptance of Lansing's offer to sell. Therefore, under the terms of the Operating Agreement, Lansing never acquired the right to purchase Carroll's interests, and the claims in Count II that Carroll breached the Operating Agreement by failing to (1) honor Lansing's right to purchase his interests, (2) relinquish his shares to Lansing, and (3) act in good faith regarding his acceptance of Lansing's offer to sell are dismissed with prejudice.

### B. Lansing's Purported Right to Earnest Money

Lansing alleges that Carroll also breached the Operating Agreement by failing to release the $702,250 Carroll placed in escrow when he accepted Lansing's offer to sell. In support, Lansing cites the following language from the buy/sell provision in the Operating Agreement:

> The Offer shall go into effect on the later of the notice of the Offer or when the Offerors place into escrow with a mutually acceptable escrow agent a cash sum equal to five percent (5%) of the Offer amount to purchase. . . . Should the Offerors fail to complete a purchase accepted by the Offerees, the funds deposited in escrow shall be promptly paid to the Offerees by the escrow agent.

Page 15

Operating Agreement (attached as Exhibit B to the First Am. Compl. [14-1]) § 6.7(2)(a). The quoted language does not support Lansing's position. Under § 6.7(2)(a), only the Offeror (Lansing) was required to place 5% of the offer amount into escrow, and only a failure to complete the purchase by the Offeror required the release of the funds held in escrow to the Offeree (Carroll). The provision places no requirement on the Offeree to place any funds in escrow, nor does it require the Offeree to release any funds placed in escrow.

Nevertheless, Lansing argues that the Operating Agreement "plainly contemplates that the purchasing party under the buy/sell provision is required to escrow money which would be paid to the seller party in the event of a failure to complete the purchase . . . regardless of the definition of 'Offeror' and 'Offeree' . . ." Response [20-1] at 13. He argues that his interpretation is further supported by the fact that Carroll placed money in escrow even though the Operating Agreement does not explicitly require the Offeree to do so.

Under Illinois law, contracts are interpreted based on the plain meaning of the terms used, and the parties' intent is discerned solely from those terms absent any ambiguity. *See Avery*, 835 N.E.2d at 821. The Operating Agreement unambiguously requires only the Offeror to place money in escrow, and those funds must be released only if the Offeror fails to complete an agreed-upon purchase. Accordingly, the Operating Agreement does not require Carroll to release to Lansing the funds placed in escrow or to release funds that are held in escrow.

Therefore, the claim in Count II alleging that Carroll breached the Operating Agreement by failing to release the escrow funds is dismissed with prejudice.

**III.    Declaratory Judgment (Count I)**

Carroll also seeks the dismissal of Count I, in which Lansing seeks a declaratory judgment that (1) he and his designee, Realty Portfolio, have acquired Carroll's interests in the Westminster Funds, and (2) Carroll must release to Lansing the $702,250 in escrow.

To begin, the court notes that in Count I, Lansing essentially seeks the same relief sought in Count II—an order that Carroll's interests in the Westminster Funds have passed to Lansing because of Carroll's breach, and that Carroll must release to Lansing the funds in escrow. Because the declaratory judgment claim (Count I) "fails to add anything" not already raised in the breach of contract claim (Count II), in an exercise of its discretion the court dismisses Count I. *See Vulcan Golf, LLC v. Google, Inc.*, 552 F. Supp. 2d 752, 778 (N.D. Ill. 2008) (the court has discretion not to hear a declaratory judgment claim, including the discretion to dismiss a declaratory judgment claim that is duplicative of other claims).

In addition, the court notes that even if it had not exercised its discretion to dismiss the declaratory judgment claims as duplicative, those claims would be subject to dismissal for the same reasons that led the court to dismiss portions of Count II. Specifically, Lansing's allegations that Carroll was obligated to purchase Lansing's interests and was obligated to release to Lansing the funds in escrow are at odds with the plain language of the Operating Agreement.

Accordingly, Count I is dismissed with prejudice.

**IV.    Fraud (Count III)**

Finally, in Count III Lansing alleges that Carroll made "various false representations regarding his ability to 'close' the transaction," and did so with "ill will." First Am. Compl. [14-1] ¶ 69. The alleged false representations are not quoted, but rather are summarized as follows:

(1) Carroll's attorney "informed Lansing's attorney on March 17, 2011, that Carroll has the money and intends to close by March 29," 2011, and (2) "[e]ach draft and piece of correspondence" that Carroll instructed his attorneys to send to Lansing's attorneys beginning on March 22, 2011, in preparation for the planned March 29, 2011, closing. *Id.* ¶¶ 70, 71. The complaint alleges that the misrepresentations "were done with the intent to frustrate Lansing's consummation of the buy/sell process," and caused him to "incur[] significant attorney's fees to review and prepare necessary documents" for a closing that never occurred. *Id.* ¶ 73.

Carroll moves to dismiss for failure to state a claim, focusing on the fact that Illinois law restricts the ability to prevail on a claim of fraud premised on a promise of future conduct. *See, e.g., HPI Health Care Serv., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 682 (Ill. 1989) ("misrepresentations of intention to perform future conduct, even if made without a present intent to perform, do not generally constitute fraud"). But the court notes a more fundamental problem with Lansing's allegations touched on only briefly in the motion to dismiss: the lack of particularity.

To establish a claim of fraud under Illinois law, a plaintiff must satisfy each of the following elements: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 841 (7th Cir. 2007). In addition, under Federal Rule of Civil Procedure 9(b), to state a claim of fraud, the plaintiff "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy the particularity requirement, an allegation of fraud must include

the "who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

Lansing has failed to satisfy the particularity requirements for stating a claim of fraud. Although the complaint alleges that the first misrepresentation occurred on March 17, 2011, it never quotes the specific misrepresentation made and, in fact, never identifies whether the misrepresentation was written or oral, characterizing it only as Carroll's attorney having "informed" Lansing's attorneys that Carroll had the money to close. As for the draft transaction documents that Lansing also contends constituted misrepresentations, he alleges only that Carroll's attorneys began sending them on March 22, 2011. The complaint does not attach or quote from the documents, identify whether they were accompanied by any oral or written statements such as a cover letter, or in any other way describe the circumstances surrounding their delivery.

Without such particulars, whether Lansing has alleged a misrepresentation about a current fact or a promise of future performance cannot be assessed, nor can the applicability of Illinois' economic loss doctrine. Furthermore, in the absence of any allegation about the circumstances accompanying the delivery of draft closing documents, it is questionable whether their delivery alone is even a factual assertion that can serve as the basis of a claim of fraud. *See In re Polo Builders*, 388 B.R. 338, 379 (Bankr. N.D. Ill. 2008) (the tender of a check as earnest money is not a factual assertion absent any express representation by the tenderer as to the validity of the check).

Because Lansing has failed to allege fraud with particularity, Count III is dismissed without prejudice to him filing an amended complaint satisfying the requirements of Federal Rule of Civil Procedure 9(b).

## CONCLUSION

For the reasons stated, the motion to dismiss is granted and the following claims are dismissed: Count I is dismissed with prejudice; the claims in Count II premised on Lansing's alleged rights to Carroll's interests in the Westminster Funds and in the funds held in escrow are dismissed with prejudice; and Count III is dismissed without prejudice. The remainder of Count II—the allegations that Carroll breached the parties' agreements by failing to purchase Lansing's shares—was not the subject of the motion and is not dismissed. Lansing is granted leave to file a Second Amended Complaint in conformance with this order by May 4, 2012. The parties shall report for a status hearing on May 29, 2012, at 11:00 a.m.

ENTER:

DATE: April 11, 2012

_Blanche M. Manning_
Blanche M. Manning
United States District Judge