# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 11 C 4153 | **DATE** | 2/14/2013 |
| **CASE TITLE** | Lansing et al. vs. Carroll et al. | | |

**DOCKET ENTRY TEXT**

Realty Portfolio Holding LP's motion to dismiss Count I of the counter-plaintiffs' counterclaim [#69] is denied. See statement section of this order for details.

■[ For further details see text below.]   Notices mailed by Judicial staff.

## STATEMENT

On October 5, 2012, this court gave counter-plaintiffs George W. Carroll and GW Carroll VI LLC (collectively "counter-plaintiffs") leave to join Realty Portfolio Holdings LP ("Realty Portfolio") as a counter-defendant to Count I of the amended counterclaim. (*See* Dkts. #58, #63.) Count I of the amended counterclaim alleges breaches of fiduciary duties against de Gelderse Blom LP, RTE Lansing CCR LLC, and RTE Lansing VI LLC (collectively the "Lansing Owner Entities"), Robert T.E. Lansing, and Realty Portfolio Holdings LP (collectively "counter-defendants"). Realty Portfolio has now moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) arguing that counter-plaintiffs fail to plausibly suggest that (1) Realty Portfolio participated in Lansing's and the Lansing Owner Entities' breach of their fiduciary duties; and (2) the self-interest exception to the intracorporate conspiracy doctrine does not apply. For the reasons set forth herein, the motion (dkt. #69) will be denied.

**Legal Standard**

A motion to dismiss under Rule 12(b)(6) challenges a complaint for failure to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6); *Gen. Elec. Capital Corp.* v. *Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). In ruling on a 12(b)(6) motion, the court accepts as true all well-pleaded facts in the defendant's counterclaim and draws all reasonable inferences from those facts in the defendant's favor. *See Dixon* v. *Page*, 291 F.3d 485, 486 (7th Cir. 2002). To survive a Rule 12(b)(6) motion, the counterclaim must not only provide fair notice of a claim's basis, but must also establish that the requested relief is plausible on its face. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *Bell Atl*. v. *Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A [counter]claim has facial plausibility when [it] pleads factual content that allows the court to draw the reasonable inference that the [counter-defendant] is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. At the same time, the counterclaim need not plead legal theories. *Hatmaker* v. *Mem'l Med. Ctr*., 619

**STATEMENT**

F.3d 741, 743 (7th Cir. 2010). Rather, it is the facts that count.

**Background**[1]

As it relates to Count I of the amended counterclaim, counter-plaintiffs allege, *inter alia*, that

"On June 29, 2011, Lansing and Realty Portfolio purported to unilaterally 'close' on the purchase of Carroll's Interests, through the one-sided execution of the Transfer Agreement his counsel had drafted, signed only by Lansing, individually and as the manager of the LLC serving as Realty Portfolio's general partner. Lansing claimed that as a result of this unilateral closing, 'all of Mr. Carroll's interests in the entities subject to the compulsory Buy-Sell have passed to Mr. Lansing' and, accordingly, Carroll would 'no longer be receiving any payments to which he would be entitled to receive as an owner of those entities.' . . . [This constituted a conversion of] Carroll's Interests by Lansing and Realty Portfolio . . . . [which] wrongfully deprived [counter-plaintiffs of] the income, distributions, and other benefits they should have received based on their ownership of Carroll's Interests for the time period following the first quarter of 2011.

In fact, neither the Litchfield Shareholders' Agreement nor the General Partner Entities' LLC Operating Agreements provided Lansing with a right to purchase or unilaterally close on the purchase of Carroll's Interests and Carroll never agreed to the terms of, or signed, the Transfer Agreement. . . . Realty Portfolio . . . participated in the breach of Lansing and the Lansing Owner Entities' fiduciary duties by providing or agreeing to provide the funds that were to make the contemplated lowball purchase [of Carroll's Interests] possible and by signing the 'Transfer Agreement' at the unilateral 'closing' and asserting ownership and control of Carroll's Interests as of June 29, 2011 and thereafter. Realty Portfolio had knowledge that the one-sided transaction amounted to a breach of Lansing and the Lansing Owner Entities' fiduciary duties because the Buy/Sell Provisions did not provide them with the right to purchase Carroll's Interests in such an instance."

(Am. Countercl. ¶¶ 65–67, 74, 86 (exhibit citations omitted).)

**Analysis**

**I. Participation in breach of fiduciary duty**

"Under Illinois law, a cause of action may lie against one who has 'participated' in a breach of another's fiduciary duty." *In re John Dawson & Assoc., Inc.*, 271 B.R. 270, 272 (N.D. Ill. 2001). To state a "participation" claim, the plaintiff must allege "(1) an act or omission which furthers or completes the breach of trust by the trustee and (2) knowledge at the time that the transaction amounted to a breach of trust, or the legal equivalent of such knowledge." *Chabraja* v. *Martwick*, 618 N.E.2d 800, 803, 248 Ill. App. 3d 995, 188 Ill. Dec. 230 (Ill. App. Ct. 1993) (citing G. Bogert, Trusts & Trustees § 901, 258–259 (2d ed. 1982)); *accord Crawford Supply Grp., Inc.* v. *Bank of Am., N.A.*, 829 F. Supp. 2d 636, 643 (N.D. Ill. 2011). Additionally, the plaintiff must allege that the defendant benefitted from the breach. *See, e.g., Nat'l Union Fire Ins. Co. of Pittsburgh, Pa* v. *Wilkins-Lowe & Co.*, 29 F.3d 337, 341 (7th Cir. 1994) ("[A] third party who colludes with a fiduciary in committing a breach of the fiduciary's duty, and who benefits thereby, is under a duty of restitution to the beneficiary and liability may be premised upon a defendant's participation in a fiduciary's breach of trust.") (internal quotation marks and citations omitted); *accord Kehoe* v. *Saltarelli*, 786 N.E.2d 605, 613, 337 Ill. App. 3d 669, 272 Ill. Dec. 66 (Ill. App. Ct. 2003); *Regnery* v. *Myers*, 679 N.E.2d 74, 80, 287 Ill. App. 3d 354, 223 Ill. Dec. 130 (Ill. App. Ct. 1997).[2]

As to the first element, counter-plaintiffs allege that Realty Portfolio acted to further Lansing's and

the Lansing Owner Entities' breach of their fiduciary duties by (1) agreeing to provide the funds to make the lowball purchase of Carroll's interests possible; (2) signing the transfer agreement at the June 29, 2011 closing; and (3) asserting ownership and control over Carroll's interests thereafter. (*See* Am. Countercl. ¶ 86.) Relying on *Borsellino* v. *Goldman Sachs Group, Inc.*, 477 F.3d 502 (7th Cir. 2007), Realty Portfolio argues that these allegations fail to plausibly suggest that it furthered or completed the underlying breach.

In *Borsellino*, plaintiff Borsellino was a one-third partner in Chicago Trading and Arbitrage ("CTA"), a company that facilitated stock trading through a remote access system. Borsellino alleged that his former partners improperly used CTA's resources to develop and market a new business called Archipelago. Defendant Goldman Sachs funded Archipelago in return for a 25% ownership interest in the company. Borsellino was not a party to the deal. *Id.* at 505–06. In affirming dismissal, the Seventh Circuit stated that the allegations in the complaint made "neither economic nor common sense." *Id.* at 508. As explained by the court,

"Why would Goldman Sachs prefer cutting Borsellino out—and creating a situation in which he could, if he found out about the misuse of CTA's resources, threaten Goldman Sachs's claim to Archipelago—rather than allowing him into the venture? Its investment and return would presumably have been exactly the same whether Borsellino participated or not. More fundamentally, if Goldman Sachs learned that [Borsellino's former partners] had built Archipelago upon a fraud, why wouldn't it walk away instead of joining the fraud and going ahead with the investment?"

*Id.* Concluding that the complaint failed to allege "how a breach would have benefitted [Goldman Sachs] in any way" and "any active misbehavior on the part of Goldman Sachs," the Seventh Circuit affirmed the dismissal of the tortious inducement claim. *Id.* at 509.

Here, unlike in *Borsellino*, the alleged breachor (Lansing) exercised direct control over the alleged participant (Realty Portfolio). Lansing was the only member of Realty Holdings GP LLC ("Realty Holdings"), which was the general partner of Realty Portfolio. (Am. Countercl. ¶ 24.) Thus, unlike Goldman Sachs, Realty Portfolio was not a neutral third-party to the transaction but, rather, it was controlled by a party with a direct interest in the outcome of the deal. (*See id.* ¶ 60.) Moreover, unlike in *Borsellino*, counter-plaintiffs have alleged active misbehavior on the part of Realty Portfolio, *i.e.*, signing the transfer agreement and asserting ownership over Carroll's interests. These facts, if proved, permit an inference that Realty Portfolio furthered or completed Lansing's and the Lansing Owner Entities' breach.

As to the second element, counter-plaintiffs allege that Realty Portfolio knew at the time of the closing that the transaction amounted to a breach of Lansing's and the Lansing Owner Entities' fiduciary duties because neither the Litchfield Shareholders' Agreement nor the General Partner Entities' LLC Operating Agreements provided Lansing with the right to purchase Carroll's interests in such an instance. (Am. Countercl. ¶ 86.) Additionally, on April 11, 2012, this court stated that "Lansing's interpretation of the Operating Agreement is not supported by the plain meaning of its terms." (*See* Dkt. #23, Memo. & Order 4/11/2012, at 9.)

Realty Portfolio relies on the court's statement to argue that it was "impossible" for it to know that Lansing and the Lansing Owner Entities breached their fiduciary duties to Carroll because Realty Portfolio's "alleged knowledge is based on a transaction that, as this Court has held, never occurred." (Reply at 9.) Realty Portfolio mischaracterizes the nature of the court's holding, however. The court did not state that the June 29, 2011 closing never occurred but rather that "Lansing never acquired the right to purchase Carroll's interests" under the relevant contracts. (Dkt. #23, Memo. & Order 4/11/2012, at 15.) Counter-plaintiffs

**STATEMENT**

allege that as a result of the unilateral closing, Lansing claimed that "'all of Mr. Carroll's interests in the entities subject to the compulsory Buy-Sell have passed to Mr. Lansing' and, accordingly, 'Carroll would no longer be receiving any payments to which he would be entitled to receive as an owner of those entities.'" (Am. Countercl. ¶ 65 (quoting Ex. 8).) Although counter-plaintiffs "demanded that Lansing and Realty Portfolio immediately disclaim any control or ownership of the Litchfield stock and ownership interests in the General Partner Entities," Lansing and Realty Portfolio declined to relinquish control and instead "wrongfully deprived" counter-plaintiffs of Carroll's interests. (*Id.* ¶¶ 71, 72, 74.) These allegations, along with those contained in the 93-paragraph counterclaim, plausibly suggest that Realty Portfolio had knowledge of the breach.

Finally, as to the last element, counter-plaintiffs allege that Realty Portfolio "assert[ed] ownership and control of Carroll's Interests as of June 29, 2011" and "convert[ed]" the same. (*Id.* ¶¶ 66, 86.) Realty Portfolio argues that counter-plaintiffs cannot demonstrate that it benefitted from the closing because the transaction was later nullified by the court. For the reasons already discussed, the court rejects this argument and holds that counter-plaintiffs have sufficiently pleaded the elements of a "participation" claim.

## II. Intracorporate conspiracy doctrine

Realty Portfolio further argues that Count I of the amended counterclaim should be dismissed because the intracorporate conspiracy doctrine precludes liability for its alleged participation in Lansing's and the Lansing Owner Entities' breach. Realty Portfolio contends that Lansing (as the sole member of Realty Holdings) acted as Realty Portfolio's agent and Lansing's interests were the same as those of Realty Portfolio. As such, argues Realty Portfolio, the intracorporate conspiracy doctrine bars counter-plaintiffs' participation claim.

The intracorporate conspiracy doctrine provides that no conspiracy can exist between a principal and an agent because under agency law the agent's acts are considered to be the acts of the principal. *See Buckner* v. *Alt. Plant Maint., Inc.*, 694 N.E.2d 565, 571, 182 Ill. 2d 12, 230 Ill. Dec. 596 (Ill. 1998); *Alpha Sch. Bus Co.* v. *Wagner*, 910 N.E.2d 1134, 1150, 391 Ill. App. 3d 722, 331 Ill. Dec. 378 (Ill. App. Ct. 2009); *see also Keri* v. *Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 642 (7th Cir. 2006) ("In a corporate conspiracy, co-conspirators must be outside of the corporation."). An exception to the intracorporate conspiracy doctrine occurs "where the interests of a separately incorporated agent diverge from the interests of the corporate principal and the agent at the time of the conspiracy is acting beyond the scope of his authority or for his own benefit, rather than that of the principal." *Bilut* v. *Nw. Univ.*, 692 N.E.2d 1327, 1332–33, 296 Ill. App. 3d 42, 230 Ill. Dec. 161 (Ill. App. Ct. 1998) (citing *Pink Supply Corp.* v. *Hiebert, Inc.*, 788 F.2d 1313, 1317 (8th Cir. 1986)); *see also Hartman* v. *Bd. of Trs. of Comm. Coll. Dist. No. 508*, 4 F.3d 465, 470 (7th Cir. 1993) (intracorporate conspiracy doctrine inapplicable "where corporate employees are shown to have been motivated solely by personal bias"); *Mnyofu* v. *Bd. of Educ. of Rich Twp. High Sch. Dist. 227*, No. 10-CV-7870, 2012 WL 5389732, at *8 (N.D. Ill. Nov. 1, 2012) ("[A]ctions done purely in the employee's own interest are not performed within the scope of his employment.").

Counter-plaintiffs allege that in 2010 Lansing devised a scheme to obtain control over Litchfield and the General Partner Entities through the removal of Carroll from the companies. (Am. Countercl. ¶¶ 7–8.) Part of this scheme entailed shifting Litchfield's attention away from the Westminster funds to focus on the Apogee Fund and other possible transactions and investments with the Richard J. Stephenson family and its affiliates. (*Id.* ¶ 8.) Lansing wanted exclusive control over this new business model because he personally stood to profit as the sole owner. (*Id.*) To implement his plan, Lansing and the Stephenson family and its affiliates formed Realty Portfolio to effectuate a buyout of Carroll's interests. (Resp. at 13–14.)[3] Lansing

**STATEMENT**

was the manager of Realty Holdings, which served as the general partner of Realty Portfolio. (*Id.* ¶¶ 24, 86.) The Stephenson family, through an entity called Celebrate Life Trust, served as the limited partner of Realty Portfolio and provided the financing for Carroll's buyout. (Resp. at 13–14.) Realty Portfolio argues that because Lansing acted as its agent, the intracorporate conspiracy doctrine bars counter-plaintiffs' claim because Lansing and Realty Portfolio were one and the same. That Reality Portfolio was a limited partnership, however, undercuts this argument because the Stephenson family, through the Celebrate Life Trust, was a limited partner in Realty Portfolio. Thus, Realty Holdings was not the sole partner of Realty Portfolio, and counter-defendants have not argued that the interests of Realty Holdings and the Celebrate Life Trust (the two partners of Realty Portfolio) were one and the same. Thus, the court concludes that counter-plaintiffs have alleged sufficient facts to plausibly suggest Lansing's interests diverged from those of Realty Portfolio.[4]

Realty Portfolio further argues that counter-plaintiffs have essentially pleaded themselves out of court by alleging that Realty Portfolio acted in concert with Lansing, thereby defeating the argument that Lansing somehow acted out of his own self-interest. (*See* Am. Countercl. ¶¶ 5, 10.) Counter-plaintiffs allege that Lansing had three principal motives for purchasing Carroll's interests: (1) to reap an economic windfall by purchasing Carroll's interests for less than it was worth; (2) to obtain the financial benefits of sole ownership for Lansing and his designated entity Realty Portfolio; and (3) to remove Carroll and the Carroll entities from participating in the new business model for Litchfield that would rely on transactions and investments with the Stephenson family. (*See* Am. Countercl. ¶¶ 31–32.) Thus, the purpose behind the June 29, 2011 transaction was to afford Lansing "all of the income, distributions, and other benefits to be gained from this secret new business model solely for himself through exclusive ownership and control of Litchfield." (*Id.* ¶ 8.) It is plausible to conclude that Lansing's motivations were divergent from Realty Portfolio's in that Lansing had an independent financial motive for buying-out Carroll's interests, namely to obtain "exclusive ownership and control of Litchfield," whereas Realty Portfolio did not. (Am. Countercl. ¶ 8.) Realty Portfolio was not a member of the partnership and did not share the same financial motivation as Lansing to effectuate the deal. The allegations in the counterclaim do not suggest otherwise, and as such, Realty Portfolio's motion to dismiss Count I will be denied.

---

1. The court assumes that the parties are familiar with the facts alleged in the amended counterclaim and recites only those facts that are relevant to the pending motion.

2. Counter-plaintiffs argue that no benefit is required to proceed under the participation theory of breach of fiduciary duty. A case cited by counter-plaintiffs indicates otherwise, however. *See In re Pritzker*, Nos. 02 CH 21426, 03 CH 7531, 2004 WL 414313, at *6 (Ill. Ch. Ct. Mar. 5, 2004) ("[A]ctive participation in a trustee's breach of fiduciary duty by a person who receives a benefit from the breach can give rise to a legal obligation to provide restitution.").

3. While counter-plaintiffs do not allege in that the Stephenson family controlled Celebrate Life Trust and that Celebrate Life Trust was a limited partner of Realty Portfolio, the court finds that it may consider these facts because they are consistent with allegations in the amended counterclaim. *See*, *e.g.*, *Help At Home, Inc.* v. *MEd. Capital, L.L.C.*, 260 F.3d 748, 752–53 (7th Cir. 2001) ("A plaintiff need not put all of the essential facts in the complaint; he may add them by affidavit or brief in order to defeat a motion to dismiss if the facts are consistent with the allegations of the complaint.") (internal quotation marks omitted).

4. Counter-plaintiffs additionally argue that the intracorporate conspiracy doctrine does not apply to Realty Portfolio's participation in the fiduciary breaches of the Lansing Owner Entities because these entities were not agents of Realty Portfolio. Realty Portfolio contends that because Lansing was the

general partner and/or only member of the Lansing Owner Entities that he was effectively an agent of these entities. That Lansing was an agent of the Lansing Owner Entities does not similarly make these entities an agent of Realty Portfolio. The intracorporate conspiracy doctrine is thus inapplicable with regard to the Lansing Owner Entities.