| | |
|---|---|
| ROBERT T.E. LANSING, et al., | |
| Plaintiffs, | |
| v. | |
| GEORGE CARROLL and GW CARROLL VI LLC, | |
| Defendants. | No. 11 CV 4153 |
| and | |
| GEORGE CARROLL and GW CARROLL VI LLC, | Judge Manish S. Shah |
| Counter-Plaintiffs, | |
| v. | |
| ROBERT T.E. LANSING, REALTY PORTFOLIO HOLDINGS LP, MICHAEL COULTER SMITH, as trustee of CELEBRATE LIFE TRUST, RICHARD J. STEPHENSON, et al., | |
| Counter-Defendants. | |

## MEMORANDUM OPINION AND ORDER

George Carroll and Robert Lansing co-founded a real-estate investment business in which each owned equal interests. Years later, however, the relationship between the two co-owners soured, and Lansing elected to invoke the "buy/sell" provisions of various governing agreements. Pursuant to those agreements, Lansing offered to purchase Carroll's shares in the business for

approximately 14.5 million dollars, and simultaneously made an offer to sell Lansing's own shares to Carroll for the same price. Carroll chose to buy Lansing's shares, but was unable to close on the purchase within the prescribed period of time. When Carroll then refused to allow Lansing to buy his interests for the previously-set amount, Lansing sued Carroll for breach of contract. Lansing also purported to purchase Carroll's interests anyway through a transfer agreement, which Carroll never signed.

Carroll filed a counterclaim against Lansing, asserting a breach-of-fiduciary-duty claim based on Lansing's alleged "conversion" of Carroll's ownership interests. Carroll also brought counterclaims against the entities that had provided Lansing with the funds necessary to carry out the conversion, alleging that these entities—Realty Portfolio Holdings LP, a limited partnership; and its limited partner, Celebrate Life Trust—participated in the alleged breach. In addition, Carroll asserted counterclaims against the trust and one of its settlors, Richard Stephenson, for aiding and abetting that breach. Realty Portfolio filed a motion to dismiss the participation claim against that entity, which was denied. Celebrate Life Trust and Richard Stephenson now move to dismiss the counterclaims against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons discussed below, the motion is denied.

## I.    Legal Standard

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a claim for relief contain "a short and plain statement of the claim showing that the pleader is

entitled to relief." The purpose of this requirement is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). To satisfy these "notice" pleading requirements, the complaint need not set forth detailed factual allegations. *Id.* (citation omitted). But it must present enough "factual matter, accepted as true, [that the] 'claim to relief . . . is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Motions under Rule 12(b)(6) are meant "to test the sufficiency of the complaint, not . . . the merits" of the plaintiff's case. *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 n. 1 (7th Cir. 1996) (quoting *Triad Assocs., Inc. v. Chicago Hous. Auth.*, 892 F.3d 583, 586 (7th Cir. 1989)). In considering a Rule 12(b)(6) motion to dismiss, I therefore accept as true all well-pleaded factual allegations and draw all reasonable inferences in the plaintiff's favor. *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 946 (7th Cir. 2013) (quoting *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010)).

## II.    Facts

This is, at bottom, a business divorce between two individuals, but the tangle of related entities and trusts involved in the case requires some explanation. The procedural history also warrants some detailed recitation since, through no fault of the parties, the suit has been assigned to three different district judges during several years of motion practice over the pleadings.

## A.    Creation of the Westminster/Litchfield Business

In the 1990s, George Carroll and Robert Lansing created a real-estate investment business. As part of this business, Carroll and Lansing established a series of ten investment funds—the "Westminster funds"—through which individuals and entities could invest in small- and medium-sized properties. *See* [129] ¶ 31.[1] Each of the ten funds was created as a limited partnership, each with its own general partner. *See id.* ¶ 1; *id.* at 59 n. 6; *see also* [129-TAC] ¶ 24. The ten general partners—one for each fund—were limited liability companies created jointly by Carroll and Lansing (and of which Carroll and Lansing served as equal members ). *See* [129] ¶¶ 1, 31; *id.* at 59 n. 6.[2] As part of their investment business, Carroll and Lansing also co-created Litchfield Advisors Incorporated, a management-consulting company that performed various advisory and administrative services for the Westminster funds. *See id.* ¶ 1. Upon incorporation, Carroll and Lansing each owned an equal number of Litchfield shares. *Id.* Carroll moved to California to manage the corporation's Los Angeles office, while Lansing stayed in Illinois to oversee operations there. *See id.* ¶ 30; [129-TAC] ¶ 23.

---

[1] Citations to the record are designated by the document number as reflected on the district court's docket, enclosed in brackets. Unless otherwise indicated, citations to document [129] are to the second amended counterclaim. Citations to the portion of this document comprising plaintiffs' third amended complaint (or defendants' answers thereto) are designated as [129-TAC]. I also note that in some instances the parties have filed two separate versions of the referenced pleadings: one under seal, and one (redacted) on the public docket. As I do not rely on any of the redacted statements or materials, all citations included here are to the publicly-filed versions of those documents.

[2] According to Lansing, some of Carroll's and Lansing's membership interests, respectively, were in fact owned by separate business entities created by and affiliated with those individuals. *See* [129-TAC] at 14 n. 2. Although these entities are named as parties to the litigation between Carroll and Lansing, their involvement is not relevant to the instant

The governing document for Litchfield (the shareholders' agreement) included a "buy/sell" provision, which set forth a process whereby one shareholder could either dissociate from the corporation (by selling his shares to the other owner) or take full control of the company (by buying the other owner's shares). *See* [129] ¶ 2; *see also* [129-TAC] ¶¶ 2, 32. The buy/sell provision required that any offer made under its terms be at once an offer to buy *and* to sell—that is, if one co-owner offered to buy the other's shares for a stated price, the offering owner was also obligated to sell his own shares for that same price. *See* Shareholders Agreement of Litchfield Advisors Inc., [106-2] ¶ 12.2(a); *see also* [129] at 59 n. 7 (incorporating by reference the shareholders' agreement). It would then be up to the offeree to determine which of the two offers—buy or sell—he wished to accept. *See* [106-2] ¶ 12.2(a)–(c) Acceptance of either offer marked the start of a 120-day closing period, at the end of which the offeror and offeree had to buy and sell (or sell and buy) at the agreed price. *See id.* ¶ 12.2(c). Similar "buy/sell" provisions were also included in the operating agreements governing the general partners of the Westminster funds. *See* [129] ¶ 2; *see also id.* at 59 n. 7; [129-TAC] ¶ 2.

## B.    Lansing's Exercise of the Buy/Sell Provisions

On November 1, 2010, Lansing invoked the buy/sell provisions in both the Litchfield shareholders' agreement and the Westminster operating agreements. *See* [129] ¶¶ 2, 9. Pursuant to the provisions, Lansing offered to buy Carroll's shares and, simultaneously, to sell Lansing's own shares to Carroll for approximately

---

motion and so is not discussed here. Accordingly, references to "Carroll" or "Lansing" include those individuals and their affiliated business entities, as appropriate.

14.5 million dollars. *See id.* ¶¶ 2, 55. Carroll elected to buy Lansing's interests and so accepted Lansing's "sell" offer on November 26, 2010—triggering a 120-day closing period on that sale (ending on March 29, 2011). *See id.* ¶¶ 10, 57. Carroll was unable to obtain the funds necessary to complete the transaction, however, and the March 29 closing did not take place. *See id.* ¶¶ 12, 63.

Several days later, on April 3, 2011, Lansing informed Carroll that, because Carroll was unable to complete the purchase of Lansing's shares, Lansing now had the right to purchase Carroll's interests under the governing buy/sell provisions (and pursuant to the terms of Lansing's November 2010 offer). *See id.* ¶ 65. When Carroll refused to comply, Lansing filed on June 17, 2011 a complaint against Carroll in federal court, alleging, *inter alia*, that Carroll had breached the governing agreements. *See id.* ¶ 70; *see also* [1] ¶¶ 59–65. As remedy, Lansing sought (among other forms of relief) specific performance of the buy/sell provisions invoked in 2010—which, according to Lansing, required Carroll to sell his ownership interests to Lansing. *See* [1] at 22.

Also on June 17, Lansing reiterated his position that he had a right to purchase Carroll's shares, and he sent to Carroll a corresponding draft "transfer agreement" to be executed by both owners at a closing on June 21, 2011 (a date that Lansing later pushed back to June 29, 2011). *See* [129] ¶¶ 68, 74. Also included in the draft agreement was a provision requiring Carroll and Carroll's wife to resign from the various positions they held in the Westminster/Litchfield business. *See id.* ¶ 68.

## C.    The June 2011 Closing

Carroll refused to sign the transfer agreement provided to him by Lansing. *See id.* ¶¶ 71–73. On June 29, 2011, Lansing nonetheless purported to close on the purchase of Carroll's shares by signing the agreement himself. *Id.* ¶ 74. Lansing signed the document not only on his own behalf (*i.e.*, in his individual capacity), but also as manager and sole member of Realty Holdings GP LLC, the general partner of Realty Portfolio Holdings LP. *See id.* ¶¶ 24, 74. Realty Portfolio, a limited partnership created on June 6, 2011, provided the money needed to purchase Carroll's shares on June 29 of that year. *See id.* ¶¶ 69, 100. As of that date, the (sole) limited partner of Realty Portfolio was Celebrate Life Trust. *See id.* ¶ 101. Carroll asserts that one of the trust's settlors, Richard Stephenson, selected the trust as the entity to invest in Realty Portfolio as a limited partner (and thus to contribute funds toward Lansing's purchase of Carroll's shares). *See id.* ¶¶ 101, 119. Of the money that Realty Portfolio put toward the June 29 transaction, Celebrate Life Trist provided 99.8 percent. *See id.* ¶¶ 100–01. The trust did not sign or otherwise participate in the execution of the transfer agreement between Lansing and Carroll. *See id.*

After Lansing executed the transfer agreement, he informed Carroll that, as a result of the transfer, Carroll no longer possessed any interests in the Westminster/Litchfield business and would no longer receive any payouts from that venture. *See id.* ¶ 74. Two weeks later, on July 15, 2011, Lansing closed Litchfield's Los Angeles office and removed Carroll and Carroll's wife, Laura, from their

positions as officers and directors of Litchfield and the Westminster funds. *See id.* ¶ 77–78. Lansing also amended his complaint in the pending breach-of-contract action against Carroll. In addition to the original contract claim, the amended complaint included, *inter alia*: an additional breach-of-contract claim, this time based on Carroll's refusal to voluntarily relinquish his shares on June 29, 2011, *see* [14] ¶ 63; and a request for a declaratory judgment that Lansing and Realty Portfolio had already acquired Carroll's interests pursuant to the "closing" on that date, *see id.* ¶¶ 49–59 (Count I).

## D. Carroll's Motion to Dismiss and Counterclaim

In August 2011, Carroll demanded that Lansing and Realty Portfolio disclaim any right to Carroll's ownership interests, but neither Lansing nor Realty Portfolio responded. *See* [129] ¶¶ 80–81. Carroll then filed a motion to dismiss the newly-added contract and declaratory-judgment claims. *See* [15] ¶ 3. In an April 2012 order, Judge Manning granted Carroll's motion. *See* [23]. Judge Manning concluded that Lansing's interpretation of the governing agreements was not supported by the plain meaning of the buy/sell provisions, and that, consequently, Lansing had never acquired the right to seize control of Carroll's shares under those provisions (even after Carroll failed purchase of Lansing's shares in March 2011). *See id.* at 9–15.

Lansing amended his complaint, now limiting his claims to Carroll's alleged breach of contract in March 2011. *See* [30] ¶¶ 44–49.[3] Appended to Carroll's answer

---

[3] The second amended complaint also included a new declaratory-judgment claim, this time premised on an April 2012 finding by the Litchfield Board of Directors that Carroll had

to the new complaint was a counterclaim against Lansing and Realty Portfolio Holdings, which included claims against Lansing for fiduciary breach and against Realty Portfolio for participating in that breach (both based on the alleged "conversion" of Carroll's interests on June 29, 2011). *See* [41] ¶¶ 81–87.[4] Realty Portfolio filed a motion to dismiss the (since-amended) participation-in-breach claim. *See* [69]. Judge Lefkow, to whom the case had been reassigned, *see* [51], denied the motion, concluding that Carroll had alleged enough facts to suggest that Realty Portfolio had furthered or completed Lansing's purported breach, *see* [93] at 2–4.

Following Judge Lefkow's ruling, both parties amended their respective claims. Carroll amended his counterclaim to now include allegations that Celebrate Life Trust, too, had participated in Lansing's fiduciary breach (Count I), and that both Celebrate Life and Richard Stephenson had aided and abetted the wrongful transaction (Count III). *See* [129] ¶¶ 94–104, 111–120.[5] Celebrate Life and Stephenson jointly filed a motion to dismiss those claims. [146, 147]. The case was subsequently reassigned to me. *See* [184].

---

engaged in "shareholder misconduct" when he failed to purchase Lansing's interests in March 2011. *See* [30] ¶¶ 50–56.

[4] The cited paragraph numbers refer to the paragraphs in Carroll's counterclaim.

[5] Carroll names as counter-defendant Michael Smith, the trustee of Celebrate Life Trust. For simplicity, I refer to the claims against Smith (a nominal counter-defendant) as claims brought against the trust.

## III.   Analysis

### A.   Choice of Law

Although Carroll's claims against the trust and against Stephenson have been brought in diversity,[6] none of the parties has affirmatively raised the choice-of-law issue. The parties cite to Illinois law when describing the elements of participating in a fiduciary breach or of aiding and abetting such a breach. *See* [147] at 9, 12; [160] at 3–4, 8. The parties therefore agree that Illinois law governs, and it is appropriate to apply Illinois substantive law in considering this motion. *See GATX Leasing Corp. v. Nat'l Union Fire Ins. Co.*, 64 F.3d 1112, 1115 n. 6 (7th Cir. 1995) (observing that "if neither party raises a conflict-of-law issue in a diversity case," the court "may apply the law of the state in which [it] sits" (citing *Employers Ins. v. Bodi-Wachs Aviation Ins. Agency, Inc.*, 39 F.3d 138, 141 n. 2 (7th Cir. 1994))).

### B.   Participation in a Fiduciary Breach (Count I)

Under Illinois law, a (non-fiduciary) third party such as Celebrate Life Trust may be liable for a fiduciary's breach of duty if the third party actively participates in that breach—that is, if: (1) the third party commits an act or omission that furthers or completes the breach of duty; and (2) at the time of the act or omission, the third party knows (or possesses the "legal equivalent" of knowledge) that the

---

[6] Carroll is a citizen of California, *see* [129] ¶ 18. Carroll's business affiliate, GW Carroll VI LLC, also a counter-plaintiff, is similarly a citizen of California. *See id.* ¶ 19 ("Carroll is the only member of [this limited liability company.]"); *Fellowes, Inc. v. Changzhou Xinrui Fellowes Office Equip. Co. Ltd.*, 759 F3d 787, 787 (7th Cir. 2014) ("[A] limited liability company . . . has the citizenship of each member . . . ." (citing *Cosgrove v. Bartolotta*, 150 F.3d 729 (7th Cir. 1998))). Smith (and thus Celebrate Life Trust) is a citizen of Missouri, *see id.* ¶ 25; *Hicklin Eng'g, L.C. v. Bartell*, 439 F.3d 346, 348 (7th Cir. 2006) ("The citizenship of a trust is that of the trustee . . . ." (citing *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458 (1980))). Stephenson is a citizen of Illinois. *See* [129] ¶ 26.

fiduciary's actions amount to a breach. *See Chabraja v. Martwick*, 248 Ill.App.3d 995, 998 (1993) (citing G. Bogert, Trusts & Trustees, 2d Ed., 1982, § 901 at 258–59). The third party must also benefit from the breach. *See, e.g.*, *Kehoe v. Saltarelli*, 337 Ill.App.3d 669, 677 (2003).[7]

Carroll asserts that, as co-owners of the Westminster/Litchfield business, Carroll and Lansing owed one another a fiduciary duty, and that Lansing breached that duty when, for example, Lansing "converted" Carroll's ownership interests in June 2011. *See* [129] ¶¶ 95, 96(g). Carroll also contends that, by agreeing to provide the bulk of the money to fund this "conversion," Celebrate Life Trust participated in Lansing's breach. *See id.* ¶ 101.

Relying on *Allen v. Amber Manor Apartments P'ship*, 95 Ill.App.3d 541 (1981), Celebrate Life argues that even if Lansing did breach his duty to Carroll,

---

[7] The parties dispute whether additional elements must also be proven to establish a participation claim. While counter-defendants assert that the complainant must also show that the third party *induced* the fiduciary to breach his duty, or that the two *colluded* to carry out the breach, *see* [147] at 9–10 (citing *Ottawa Sav. Bank v. JDI Loans, Inc.*, 871 N.E.2d 236, 243 (Ill. App. Ct. 2007)), Carroll disagrees, *see, e.g.*, [160] at 3–4 (citing *In re Pritzker*, No. 02 CH 21426, 2004 WL 414313, at *6 (Ill. Cir. Ct. Mar. 5, 2004)).

The Illinois courts sometimes do refer to "participation," "inducement," and "collusion" together. *See, e.g.*, *Alpha Sch. Bus Co., Inc. v. Wagner*, 391 Ill.App.3d 722, 738 (2009) (citing *Paul H. Schwendener, Inc. v. Jupiter Elec. Co.*, 358 Ill.App.3d 65, 74 (2005)); *Kehoe*, 337 Ill.App.3d at 677. Regardless of the specific term (or terms) employed, the case law collectively turns on the same fundamental inquiry—the one I engage here: whether the plaintiff has alleged facts suggesting that the third-party *knowingly or intentionally* involved themselves in a fiduciary's wrongful behavior. *See Chabraja*, 248 Ill.App.3d at 999 (noting that "active" participation may comprise misuse of information the defendant knew to be confidential) (citation omitted); *see also In re Pritzker*, 2004 WL 414313, at *7 (explaining that under Illinois law, the "active participation" requirement demands that "the parties knew or had reason to believe at the time of their alleged participation that the acts were wrongful."); *cf. Dexia Credit Local v. Rogan*, No. 02 C 8288, 2003 WL 22349111, at *8 (N.D. Ill. Oct. 14, 2003) ("A person or entity can be held liable [in Illinois] for colluding in a breach of fiduciary duty . . . by engaging in activities that are perfectly usual and legal *as long as those activities are done with the requisite knowledge or intent.*" (citing *Appley v. West*, 832 F.2d 1021, 1030 (7th Cir. 1987))) (emphasis added).

the trust merely invested in a limited partnership (Royalty Portfolio)—an action for which the trust cannot be held liable, since a limited partner's "cash contribution is substituted for personal liability." [167] at 5 (quoting *Allen*, 95 Ill.App.3d at 547). The reliance on *Allen* is misplaced. *Allen* merely explains the legal principle that a limited partner's liability "for the debts and obligations of the firm" typically is capped at the amount initially invested by the limited partner. 95 Ill.App.3d at 547–48. The question at hand, however, is not whether Realty Portfolio—the limited partnership in which Celebrate Life invested—has failed to repay a debt or to fulfill an obligation to another party (and thus whether, and to what extent, Celebrate Life may be personally liable for that deficiency). The question is whether Celebrate Life Trust, in agreeing to invest in Realty Portfolio, knowingly participated in a fiduciary breach by Robert Lansing. I find that Carroll has alleged sufficient facts, accepted as true, to plausibly suggest that the answer to the latter question is "yes."

According to Carroll, Celebrate Life Trust knew, before it invested in Realty Portfolio, that any funds provided to Realty would be used by Lansing to purchase Carroll's shares in the Westminster/Litchfield business (*i.e.*, in the "closing" to take place on June 29, 2011). *See* [129] ¶ 101. Moreover, says Carroll, the trust's attorneys reviewed the agreements governing Carroll and Lansing's business relationship—including the buy/sell provisions in dispute—before the trust agreed to provide any capital to Realty Portfolio.[8] Carroll asserts that the trust's attorneys

---

[8] Although Carroll does not state explicitly that the attorneys for Celebrate Life reviewed the relevant agreements before the trust agreed to invest in the partnership, such a contention is implied by—and thus may be reasonably inferred from—several allegations in the counterclaim, including: (1) that the trust, through its attorneys, knew that the planned

also knew at that time that the terms of the buy/sell provisions would not permit Lansing to purchase Carroll's shares on June 29, 2011, because—and as Judge Manning later confirmed in her April 2012 opinion—any interpretation to the contrary would run afoul of the plain meaning of those terms. *See* [129] ¶ 102. As an attorney's knowledge is imputed to their client under Illinois law, *see Segal v. Illinois Dep't of Ins.*, 404 Ill.App.3d 998, 1002 (2010), Carroll plausibly alleges that before Celebrate Life Trust agreed to invest in Realty Portfolio (and thus agreed to fund Lansing's purchase of Carroll's shares), the trust itself knew that such an investment would facilitate a fiduciary breach. The trust went ahead with the investment, however, and became Realty Portfolio's limited partner. *See id.* ¶ 101. These allegations are sufficient to support the conclusion that Celebrate Life Trust knowingly furthered a fiduciary breach by Lansing.

The trust argues that Carroll's reference to Judge Manning's 2012 opinion is improper, and cannot support Carroll's claim that the trust knowingly participated in a fiduciary breach, because the opinion issued nearly a year after the relevant time period (*i.e.*, when Celebrate Life decided to invest in Realty Portfolio). *See* [167] at 10–11. But the trust mischaracterizes what Carroll alleges. Carroll does not assert that the attorneys for the trust foresaw in 2011 precisely how Judge Manning would interpret in 2012 the language of the buy/sell provisions. Such an allegation would indeed be implausible. Carroll instead contends that the attorneys

---

"transaction would constitute a breach of Lansing's . . . fiduciary duties" since the "plain meaning" of the agreements' terms did not permit Lansing to take such action, *see* [129] ¶ 102; and (2) that Celebrate Life nevertheless "ignored" the terms of those agreements and agreed to fund Lansing's purchase of Carroll's shares, *see id.* ¶¶ 74, 101.

for Celebrate Life Trust knew (or, at least, must have known) that the buy/sell provisions would not permit Lansing to take control of Carroll's shares on June 29 because the *plain meaning* of the provisions told them as much. *See* [129] ¶ 102. That Judge Manning later confirmed Carroll's interpretation of the agreements to be correct merely supports the inference that, when Celebrate Life's attorneys looked at those agreements in 2011, they knew—or possessed "the legal equivalent of such knowledge," *Chabraja*, 248 Ill.App.3d at 998—that Lansing was headed for a breach. At the motion-to-dismiss stage, this is enough. *See Brown v. Budz*, 398 F.3d 904, 914 (7th Cir. 2005) ("Where pleadings concern matters peculiarly within the knowledge of the defendants, conclusory pleading . . . should be liberally viewed" (quoting *Tankersley v. Albright*, 514 F.2d 956, 964 n. 16 (7th Cir. 1975))).

This case is therefore distinguishable from *Ottawa Sav. Bank v. JDI Loans, Inc.*, 374 Ill.App.3d 394 (2007), on which counter-defendants rely, *see* [147] at 10–11; [167] at 6. In *Ottawa*, the court explained that the plaintiffs had not successfully pleaded—indeed, could not successfully plead—that the defendants had induced or participated in a fiduciary breach, because the defendants had never seen the contract creating the fiduciary's duty in the first instance. *See* 374 Ill.App.3d at 403. Not so here. As discussed above, Carroll alleges that Celebrate Life Trust, through its attorneys, *did* see the agreements from which Lansing's fiduciary duty to Carroll arose (and saw them before the trust agreed to fund the allegedly wrongful transaction). *See* [129] ¶¶ 74, 101–02.

Celebrate Life also contends that Carroll's participation claim must fail because Carroll has not pleaded any facts indicating that the trust's attorneys "directly contacted" the trust or "specifically warn[ed it] that Lansing did not have the right to purchase" Carroll's interests. [167] at 12. This argument misses the point. Under Illinois law, an attorney's knowledge is *imputed* to the client—that is, it is presumed that the client knows what the attorney knows, "notwithstanding whether the attorney has actually communicated such knowledge to the client," *Segal*, 404 Ill.App.3d at 1002 (citing *Eckel v. Bynum*, 240 Ill.App.3d 867, 875 (1992); *Williams v. Dorsey*, 273 Ill.App.3d 893, 898 (1995)).

Counter-defendants note that in an earlier opinion, Judge Lefkow declined to dismiss a similar participation claim against Realty Portfolio, in part because Realty signed the transfer agreement between Lansing and Carroll—which, to Judge Lefkow, suggested "active misbehavior" on the part of Realty Portfolio and thus supported an inference that that entity had furthered or completed Lansing's fiduciary breach. *See* [147] at 6 (quoting [93] at 3). As there is no allegation that the trust, too, executed the same agreement, counter-defendants posit that the trust did not "actively" participate in the conversion of Carroll's interests (and so could not have furthered or completed Lansing's breach under Illinois law). *See, e.g.*, [167] at 4–5.

I disagree. While the trust may not have been *as* active a participant in the transfer as Realty Portfolio, this does not mean that the trust was not an active participant at all. As discussed above, Carroll alleges facts sufficient to permit an

inference that Celebrate Life Trust provided funds to Lansing, through its investment as a limited partner in Realty Portfolio, despite knowing that the provision of such capital would facilitate a breach of Lansing's fiduciary duty. If true, these allegations convert what Celebrate Life prefers to characterize as an innocuous business investment into a knowing participation in Lansing's misbehavior. A knowing participation is a sufficiently "active" one in Illinois. *See Appley v. West*, 832 F.2d 1021, 1031 (7th Cir. 1987) (observing that when a plaintiff has alleged that a third party knowingly facilitated a fiduciary's breach, or facilitated such a breach in bad faith, "there is a legal theory [in Illinois] on which [the plaintiff] can possibly recover," and "[he] should be given the opportunity to proceed with discovery and to test [his] evidence").

Carroll has also alleged facts sufficient to support an inference that Celebrate Life Trust derived a benefit from its knowing participation in Lansing's breach. According to Carroll, Celebrate Life has benefitted—through its investment as limited partner of Realty Portfolio—from owning a majority interest in the shares of the Westminster/Litchfield business that Realty Portfolio and Lansing purportedly took from Carroll on June 29, 2011. *See id.* ¶ 103.

I therefore find that Carroll has stated a plausible claim for relief against Celebrate Life Trust for participating in Lansing's alleged fiduciary breach. Counter-defendants' motion to dismiss Count I of the counterclaim, as that claim pertains to Celebrate Life Trust, is denied.

### C.    Aiding and Abetting a Fiduciary Breach (Count III)

In Illinois, courts also recognize a cause of action for aiding and abetting a fiduciary's breach. To prevail on an aiding-and-abetting claim, the plaintiff must prove: (1) that the defendant aided a party who performed a wrongful, injury-causing act; (2) that the defendant was aware of its role at the time it provided the assistance; and (3) that the defendant knowingly and substantially assisted the violation. *See Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006) (citing *Thornwood, Inc. v. Jenner & Block*, 344 Ill.App.3d 15 (2003)); *see also Time Savers, Inc. v. LaSalle Bank, N.A.*, 371 Ill.App.3d 759, 772 (2007).

Here, Carroll claims that both Celebrate Life Trust and Richard Stephenson aided and abetted Lansing's breach of fiduciary duty. In support of this claim, Carroll again alleges that Lansing breached his duty toward Carroll by, *inter alia*, taking control of Carroll's shares in the Westminster/Litchfield business on June 29, 2011, *see* [129] ¶ 113(g). Carroll asserts that Celebrate Life Trust aided and abetted this breach by providing the majority of the funding to facilitate it, and that Richard Stephenson aided and abetted the breach by designating the trust as the funding source in the first instance. *See id.* ¶¶ 118–19.

#### 1.    Celebrate Life Trust

The trust contends that Carroll has failed to state a proper aiding-and-abetting claim because he has not alleged facts suggesting that the trust *knowingly* assisted in Lansing's purported misdeeds. *See* [147] at 13. In support of this contention, Celebrate Life reiterates its earlier arguments concerning Carroll's

"participation" claim against the trust. *See id.* at 13–14. For the reasons discussed above, however, I do not find these arguments to be persuasive. Carroll's allegations, accepted as true, permit the conclusion that Celebrate Life Trust knowingly furthered—and thus knowingly participated in—Lansing's breach. Those same allegations (both incorporated by reference in, and restated in, Count III, *see* [129] ¶¶ 111, 118) similarly support the conclusion that Celebrate Life knowingly "assisted" in that violation.

My inquiry therefore turns on whether the facts as alleged reasonably suggest: first, that the trust *substantially* assisted in Lansing's "conversion" of Carroll's shares by contributing funds to the purchase, and second, that the trust was aware of its role as "aider and abetter" when it provided that money. *See Hefferman*, 467 F.3d at 601. I find that Carroll's allegations are sufficient on both fronts.

According to Carroll, Celebrate Life provided more than 99% of the capital Lansing needed to effect the (allegedly) wrongful purchase of Carroll's interests in the Westminster/Litchfield business. *See* [129] ¶ 118. If the act of providing funds to Lansing constitutes participation in—or, here, assistance of—Lansing's breach, then providing the vast majority of those funds certainly qualifies as "substantial" participation or assistance. Moreover, Carroll alleges that when the trust provided the funds, it knew that Lansing did not himself have the money needed to carry out the purchase. *See id.* The trust, in other words, knew that by investing in Realty Portfolio, it was facilitating a (wrongful) transaction that may not otherwise have

taken place. Carroll therefore has alleged facts sufficient to permit an inference that Celebrate Life Trust was aware of its role in Lansing's purported breach.

### 2. *Richard Stephenson*

Carroll asserts that Richard Stephenson also aided and abetted Lansing's breach by designating Celebrate Life Trust as the funding source for the unlawful purchase of Carroll's shares. *See id.* ¶ 119. Stephenson argues that Carroll has not stated a proper aiding-and-abetting claim against him because: (1) the counterclaim does not establish how Stephenson "knew" that Lansing's planned purchase could constitute a fiduciary breach; and (2) the counterclaim lacks allegations "giving rise to an inference that Stephenson knowingly directed Lansing" to breach his duty. *See* [147] at 14–16. Neither argument is persuasive.

First, I disagree that the counterclaim fails to suggest how Stephenson knew that Lansing's purchase of Carroll's shares might constitute a fiduciary breach. Carroll alleges that in June 2011, Stephenson shared the same attorneys as Celebrate Life Trust. *See* [129] ¶ 119. According to Carroll, Stephenson therefore "knew" through his lawyers—just as Celebrate Life "knew" through those same attorneys—that the relevant contractual provisions would not permit Lansing to purchase Carroll's interests. *See id.* For the reasons explained above, this allegation of knowledge is sufficient to survive counter-defendants' motion to dismiss.

Stephenson's second argument is also unavailing, as it does not apply the appropriate test. Stephenson contends that Carroll's allegations are deficient because they fail to suggest that Stephenson ever directed Lansing to breach his

duty toward Carroll. *See* [147] at 15. To successfully plead an aiding-and-abetting claim, however, Carroll must allege only that Stephenson knowingly *assisted* Lansing in committing a breach (and was aware of his role in said breach)—not that Stephenson individually instructed or "directed" Lansing to commit a particular act. *See Hefferman*, 467 F.3d at 601. And here, Carroll has pleaded facts sufficient to infer a knowing assistance by Stephenson. According to Carroll, Stephenson: (1) knew that Lansing's intended acquisition would constitute a fiduciary breach (as discussed above); (2) had the ability to nonetheless put his family's money behind that breach, *see* [129] ¶ 119 ("Stephenson controls all aspects of his family's investments through a . . . web of trusts and [other] entities."); and (3) exercised that ability by "designat[ing] the pre-existing Celebrate Life Trust as the funding source of 99.8% of Realty Portfolio's capital," *id.* And, as Stephenson knew (again according to Carroll) that Lansing did not otherwise have the financial means to purchase Carroll's shares, Stephenson was allegedly aware of his role in facilitating the wrongful transaction. *See id.* ¶ 120.[9]

---

[9] This case is therefore distinguishable from those cited by Stephenson. *See Vasiljevich v. Levitt*, No. 1-10-1329, 2011 IL App (1st) 101329-U, at *8 (Ill. App. Ct. Oct. 31, 2011) (no facts supporting the allegation that the defendant had "advised and facilitated" a wrongful sale of property); *Fox v. Riverview Realty Partners*, No. 12 C 9350, 2013 WL 1966382, at *9 (N.D. Ill. May 10, 2013)) (no facts supporting the allegation that the defendant had "knowingly encourag[ed], incit[ed], and provid[ed] substantial assistance" in an unlawful issuance of company stock). *In re Parkcentral Global Litig.*, No. 3:09-CV-0765-M, 2010 WL 3119403 (N.D. Tex. Aug. 5, 2010)), which Stephenson discusses more extensively, *see* [147] at 14–15; [167] at 8, applies Texas and Delaware (not Illinois) law, *see id.* at *9, and in any event is distinguishable because in that case, there was no factual link between the alleged "assistance" in the fiduciary breach and the entities charged with having provided that assistance, *see id.* Here, by contrast, Stephenson is the one charged with having assisted Lansing's purchase of Carroll's shares, and it is Stephenson who is alleged to have carried out that assistance by selecting Celebrate Life Trust as the primary funding source for the purchase. Moreover, to the extent Stephenson suggests that the counterclaim must show or

Counter-defendants' motion to dismiss Count III of the counterclaim, as that claim pertains to Celebrate Life Trust and Richard Stephenson, is therefore denied.

## IV. Conclusion

Accepting as true the facts presented in Carroll's counterclaim, [129], and drawing from those facts all reasonable inferences in his favor, I find that the counterclaim plausibly suggests that Carroll is entitled to relief from Celebrate Life Trust and from Richard Stephenson. Carroll has put both the trust and Stephenson on sufficient notice of Carroll's claims against them. For the reasons discussed above, counter-defendants' motion to dismiss Count I of Carroll's counterclaim against Celebrate Life Trust (participating in a fiduciary breach), and Count III of the counterclaim against Celebrate Life Trust and Richard Stephenson (aiding and abetting a fiduciary breach), [146], is denied.

ENTER:

Manish S. Shah
United States District Judge

Date: 10/20/14

---

establish "evidence" of particular acts or occurrences, *see* [167] at 8, he invokes the wrong standard. At the motion-to-dismiss stage, the court "is concerned not with what [counter-plaintiff] did or did not show, but rather with what [counter-plaintiff] did or did not allege." *Brown*, 398 F.3d at 914.