# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ROBERT T.E. LANSING, et al.,

      Plaintiffs,

     v.

GEORGE CARROLL and GW CARROLL VI LLC,

      Defendants.

and

GEORGE CARROLL and GW CARROLL VI LLC,

      Counter-Plaintiffs,

     v.

ROBERT T.E. LANSING, REALTY PORTFOLIO HOLDINGS LP, MICHAEL COULTER SMITH, as trustee of CELEBRATE LIFE TRUST, RICHARD J. STEPHENSON, et al.,

      Counter-Defendants.

No. 11 CV 4153

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

In the 1990s, George Carroll and Robert Lansing co-created a real-estate investment business. But over time the two grew apart, and in 2010 Lansing invoked the "buy/sell" provisions of the business' governing agreements. A battle over ownership, and years of litigation, followed. The complexity of the parties' relationships—a web managed by intermediaries (often lawyers)—may have made

some sense as a business matter, but sorting out whether one side breached a promise made or duty owed to another requires the untangling of many details. The reader is duly warned.

The parties move for summary judgment. Carroll's motion is granted in part and denied in part, and Lansing's motion is granted. Summary judgment is also granted for the additional defendants to Carroll's counterclaim.

## I.     Legal Standard

Summary judgment must be granted where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cnty, Wis.*, 752 F.3d 708, 712 (7th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (internal quotation marks omitted). In reviewing a summary-judgment motion or a cross-motion for summary judgment, a court construes all facts, and draws all reasonable inferences from those facts, in favor of the non-moving party. *United States v. P.H. Glatfelter Co.*, 768 F.3d 662, 668 (7th Cir. 2014) (quoting *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013)).

## II.     Facts

The parties have in certain instances responded to another's Local Rule 56.1 statements of fact by objecting to the relevance of those statements, or by purporting to dispute an entire statement of fact when only a portion of that statement is actually disputed. The purpose of Local Rule 56.1 is to permit the

district court to identify at summary judgment which facts are indeed in dispute. Argumentative responses about relevance, or about inferences to be drawn from the statements as presented, are inappropriate. "Replies" to statements of fact, *see* [356] at 3–62,[1] are not permitted by Local Rule 56.1, and are not considered. Unless otherwise noted, the facts related below are undisputed or are considered undisputed because the responding party did not properly controvert the factual statement as required by local rule.

### A.    Creation of the Westminster/Litchfield Business

In the 1990s, George Carroll and Robert Lansing established a series of ten investment funds (the "Westminster Funds"), through which individuals and entities could invest in commercial real-estate properties. *See* [311] at 4 ¶ 13. Each of the ten funds was created as a limited partnership, each with its own general partner. *Id.* The ten general partners—one for each fund—were limited liability companies created jointly by Carroll and Lansing. *See id.* Carroll and Lansing (or their respective affiliates[2]) also served as equal members of those companies, and owned equal stakes in each. *See id.* To help manage the investment funds, Lansing

---

[1] Bracketed numbers refer to entries on the district court's docket; referenced page numbers are from the CM/ECF header placed at the top of filings. While the facts related in this opinion are taken largely from the parties' Local Rule 56.1 Statements of Undisputed Material Fact (and answers or exhibits thereto), some of the facts were also related in the opinion deciding an earlier motion to dismiss. [197]. Many of the documents referenced in this opinion were filed under seal. To the extent this opinion discusses any content previously filed under seal, the seal is lifted.

[2] Carroll's affiliate was GW Carroll VI LLC. Lansing's affiliates were de Gelderse Blom LP; RTE Lansing VI LLC; and RTE Lansing CCRC, LLC. For simplicity, I refer to Carroll and his affiliate as "Carroll," and to Lansing and his affiliates as "Lansing."

and Carroll also created Litchfield Advisors Incorporated, an Illinois corporation that performed various administrative, accounting, and other services. *See id.* ¶ 12. Lansing and Carroll each owned an equal number of Litchfield shares. *See id.* Carroll worked in Litchfield's Los Angeles office, while Lansing worked from the company's office in Lake Forest, Illinois. *See* [129] at 11 ¶ 23; [356] at 65 ¶ 4. Neither Lansing nor Carroll had prescribed job duties, but Carroll generally oversaw a number of the firm's activities (such as establishing the company's compensation program, managing and selling assets, and obtaining financing); it was Lansing, however, who typically communicated with investors and otherwise managed investor relations. *See* [327] at 7 ¶ 7; August 13, 2015 Deposition of George W. Carroll, [331-1] at 136–37, Tr. at 73:2–74:12, 74:22–:24.

Included in the governing document for Litchfield (the shareholders' agreement) was a "buy/sell" provision, which set forth a process whereby one shareholder could either dissociate from the corporation or take full control of it. *See* [311] at 5 ¶ 15; Shareholders Agreement of Litchfield Advisors Inc., [311-2] at 19–20 § 12.2. To invoke the buy/sell provision, a shareholder was required to make a dual offer—*i.e.*, an offer to buy all of the other owner's shares for a stated price, and, simultaneously, an offer to sell the offeror's own shares for the same price. *See* [311-2] at 19–20 § 12.2(a). The offeree would then decide which of the two offers—buy or sell—he wished to accept. *See id.* Acceptance of either offer marked the start of a 120-day closing period, at the end of which the offeror and offeree had to buy and sell (or sell and buy) at the agreed price. *See id.* at 20 § 12.2(c). Similar "buy/sell"

provisions were also included in the operating agreements governing the general partners of the Westminster funds. *See* [311] at 5 ¶ 15; *see also*, *e.g.*, [311-3] at 15–17 § 6.7 (operating agreement of Westminster Advisors VIII LLC).

## B.    Lansing's Exercise of the Buy/Sell Provisions

On November 1, 2010, Lansing invoked the buy/sell provisions of the Litchfield shareholders' agreement and each of the Westminster operating agreements. *See* [311] at 5 ¶ 16. Lansing offered to buy Carroll's shares and membership interests, or, alternatively, to sell to Carroll all of Lansing's own shares and interests, for approximately $14.5 million. *See id.* Carroll elected to buy Lansing's interests and so accepted Lansing's "sell" offer on November 26, 2010, thus triggering a 120-day closing period on the sale (ending on March 29, 2011). *See id.* ¶ 17. Carroll tried to obtain financing for the purchase, but was ultimately unable to complete the transaction and the March 29 closing did not take place. *See id.*; [327] at 12 ¶ 19; [340] at 3 ¶ 3.

Several days later, Lansing asserted (through his attorneys) that, because Carroll was unable to close on Lansing's interests, Lansing now had the right—pursuant to the governing buy/sell provisions—to purchase all of Carroll's interests in the Westminster/Litchfield entities, at the November 2010 offer price. *See* [327] at 25 ¶ 38; [340] at 5 ¶ 6; April 3, 2011 Letter from Michael Mayer to O'Malley Miller, [312-49]. Carroll disagreed, *see* [340] at 5 ¶ 6; April 5, 2011 Letter from Ronald Meyer to Michael Mayer, [294-2] at 28–29; and on June 17, 2011, Lansing filed a complaint against Carroll in federal court, alleging, among other things, that

Carroll had breached the governing agreements, *see* [1] at 21–22 ¶¶ 59–65; *id.* at 26–27 ¶¶ 82–88 (pleading in the alternative). Lansing sought (among other forms of relief) specific performance of the agreements, which, according to Lansing, required Carroll to sell his ownership interests to Lansing. *See id.* at 22, 27.

Also on June 17, Lansing reiterated to Carroll Lansing's position that he had a right to purchase Carroll's shares, and sent to Carroll: (1) a corresponding "transfer agreement," to be executed by both owners at a closing on June 21, 2011 (though Lansing later pushed the closing date back to June 29, 2011, *see* [327] at 27 ¶ 40; June 24, 2011 Letter from Andrew McDonough to Jeff Harris, [294-2] at 155); and (2) a photocopy of a cashier's check, made out to Carroll for $13,016,385.72. *See* [327] at 27 ¶ 40; [340] at 5–6 ¶ 7; *see also* June 17, 2011 Letter (and attachments) from Andrew McDonough to O'Malley Miller, [294-2] at 31–62.[3] On June 24, Lansing informed Carroll that if he did not execute the transfer documents by June 29, Lansing would treat Carroll's interests as having passed to Lansing. *See* [294-2] at 155.

## C.    The June 2011 Closing

Carroll did not attend the June 29 closing, and never signed the transfer agreement. *See* [327] at 27–28 ¶ 41; [340] at 8–9 ¶ 11. Lansing did sign the

---

[3] In his Rule 56.1 statement of undisputed facts, Lansing states that the he originally set the closing date for June 20, 2011. *See* [327] at 27 ¶ 40. The June 17 letter to Carroll, however, stated that the closing would take place on June 21. *See* [294-2] at 31. The letter also explained that the amount on the cashier's check represented Lansing's original buy/sell offer price ($14,045,000) less "unmet capital calls" ($21,678.18) and "unfunded capital commitments" ($1,006,936.10) purportedly owed by Carroll. *See id.*; *see also* [327] at 27 ¶ 40; [340] at 5–6 ¶ 7.

agreement—both on his own behalf (*i.e.*, in his individual capacity), and also as manager of Realty Holdings GP LLC, the general partner of Realty Portfolio Holdings. *See* [311] at 3 ¶ 7; [340] at 8–9 ¶ 11; [294-2] at 170. Realty Portfolio, a limited partnership created on June 16, 2011, had provided the majority of the money needed to purchase Carroll's shares (as explained in Part II.G, below).

After Lansing executed the transfer agreement, he told Carroll that Carroll's interests in the Westminster/Litchfield business had passed to Lansing[4], and that Carroll would no longer receive any payments from those entities. *See* [340] at 9–10 ¶ 12; July 6, 2011 Letter from Michael Mayer to Jeff Harris, [294-3] at 6–7. Lansing also signed two "written consent" documents. The first, entitled "Action by Written Consent of the Sole Shareholder of Litchfield Advisors Incorporated," stated that Lansing owned 100% of Litchfield's outstanding shares, and that the shareholders' agreement was terminated "in accordance with its terms pursuant to Section 14(a) thereof." [294-3] at 28; *see also* [340] at 11–12 ¶ 15. (Section 14(a) of the shareholders' agreement provided that the agreement would terminate "upon [a] single Shareholder becoming the owner of all of the Shares" of the corporation. [311-2] at 21 § 14(a).) The second document, *i.e.*, the "Unanimous Written Consent"— signed by Lansing and the other members of the Westminster companies (except Carroll)—stated that Realty Portfolio had acquired 100% of Carroll's interests in

---

[4] Technically, the transfer agreement provided that Lansing would acquire Carroll's interests only in the Litchfield corporation; Realty Portfolio would acquire his interests in the general partners for the Westminster funds. *See* [294-2] at 161–63 ¶¶ 2(a)–(c).

those entities[5], and that Carroll and his then-wife, Laura, were removed from their positions with each such company. [294-3] at 33; *see also* [340] at 12 ¶ 16. Lansing also wrote to Carroll and his wife to notify them of the removal. *See* [340] at 12–13 ¶ 17; [356] at 65 ¶ 4; *see also* July 15, 2011 Letter from Lansing to Carroll, [294-3] at 38–39; July 15, 2011 Letter from Lansing to Laura Carroll, [294-3] at 41–42.

Lansing then amended his complaint in the pending breach-of-contract action. In addition to the claims stemming from Carroll's failure to purchase Lansing's shares in March 2011, the amended complaint also included allegations based on Carroll's refusal to "voluntarily relinquish" his interests to Lansing on June 29, 2011. [14] at 19–20 ¶ 63. Lansing requested in his new complaint (among other things): a declaratory judgment that Lansing and Realty Portfolio had already acquired Carroll's interests pursuant to the "closing" on June 29, *see id.* at 17–19 ¶¶ 49–59; and an order requiring Carroll to execute the transfer agreement as evidence of that acquisition, *see id.* at 21.

### D.    Carroll's Motion to Dismiss

Carroll filed a motion to dismiss Lansing's declaratory-judgment claim and the portion of the breach-of-contract claim based on Carroll's refusal to voluntarily transfer his interests to Lansing on June 29, 2011. *See* [15] at 2 ¶ 3. Judge Manning granted Carroll's motion after determining that Lansing's interpretation of the governing agreements was not supported by the plain meaning of the buy/sell

---

[5] In an apparent typographical error, the document referred to "Realty *Property* Holdings," not "Realty Portfolio Holdings," *see* [294-3] at 33 (emphasis added).

provisions, and that, consequently, Lansing had never acquired the right to buy Carroll's interests under those provisions (even after Carroll's failed purchase of Lansing's shares in March 2011). *See* April 11, 2012 Memorandum and Order, [23] at 9–15, 17, 20.

Lansing understood Judge Manning's ruling to mean that the June 29 transfer of Carroll's interests was ineffective and thus had never occurred. *See* [327] at 28 ¶ 42; [340] at 15–16 ¶ 23. Litchfield amended the companies' books and records to reflect what Lansing now believed was Carroll's continuous ownership of his interests, and tax returns for Litchfield and the Westminster general-partner entities were similarly revised. *See* [327] at 28 ¶ 42; [340] at 18–19 ¶ 27; [350] at 13–14 ¶ 17. Litchfield also began to send payment distributions to Carroll (less unpaid capital contributions that Lansing claimed Carroll still owed), but Carroll never cashed the checks. *See* [327] at 34–37 ¶¶ 52, 54–55; [350] at 17–18 ¶¶ 23–24.

### E.    The April 2012 Board Meeting

On April 23, 2012, Lansing issued a notice to Litchfield's board of directors—which, according to Lansing, now included himself, George and Laura Carroll, and two others—of a special board meeting to take place on April 27. *See* [327] at 28–29 ¶ 43; [340] at 21–22 ¶¶ 30, 32; April 23, 2012 Letter from Lansing to the Board Members, [294-3] at 108–09. The notice explained that the purpose of the meeting was to address Judge Manning's April 2012 order, and to determine whether Carroll had engaged in "shareholder misconduct" as set forth in Section 9 of the shareholders' agreement. [294-3] at 108; [311-2] at 15–16 § 9.

The meeting went forward on April 27, but neither Carroll nor his wife attended. *See* [327] at 28–29 ¶ 43; [340] at 25 ¶ 35. Those who did attend concluded that Carroll had materially breached the Litchfield shareholders' agreement when he failed to purchase Lansing's shares in March 2011—as the agreement had required Carroll to do once he accepted Lansing's "sell" offer in November 2010—and thus had engaged in "shareholder misconduct" as described in Section 9(vi) of that document. *See* [327] at 29–30 ¶ 44; [340] at 26 ¶ 37. The shareholders' agreement provided that, once a determination of misconduct had been made, the corporation had (for a limited period of time) the option to buy from the offending shareholder all of his shares; should the company decline to exercise its option, the remaining shareholder(s) then acquired the option to purchase those shares. *See* [311-2] at 15–17 §§ 9, 10.1–10.2; *see also* [327] at 30 ¶ 45. If either option were exercised, the offending shareholder would have to sell his stock. *See* [311-2] at 18 § 10.5.

If Litchfield did acquire an option to buy Carroll's shares after the misconduct finding (Carroll argues that the company did not), it declined to exercise it. *See* [327] at 31 ¶ 47. But Lansing did exercise his option (again assuming that he had one), and notified Carroll of that decision. *See id.*; *id.* at 32 ¶ 49; [340] at 26 ¶ 38; *see also* June 1, 2012 Letter from Lansing to Carroll, [312-56] at 2–3. Carroll would not sell, *see* [340] at 27 ¶ 41; June 12, 2012 Letter from Carroll to Lansing, [294-4] at 6–8, and Lansing again amended his complaint in the pending litigation,

this time to include a claim for breach of Section 9 of the shareholders' agreement, *see* [30] at 17–18 ¶¶ 50–56 (Count II).

### F.  Carroll's Counterclaim and The Amended Pleadings

In May 2012, Carroll filed a counterclaim against Lansing and Realty Portfolio Holdings based on events related to the alleged taking of Carroll's interests in June 2011. [41] at 36–65. The counterclaim included claims against Lansing for fiduciary breach (Count I), against Realty Portfolio for participating in that breach (also Count I), against Lansing for breach of contract (Count II), and against Lansing and Realty Portfolio for conversion (Count III). *See id.* at 58–65 ¶¶ 81–97. Judge Lefkow, *see* [51], granted Lansing's motion to dismiss the conversion claim under the economic-loss doctrine (in Illinois, also referred to as the *Moorman* doctrine), *see* [58] at 2–3. Realty Portfolio filed a motion to dismiss the (since-amended) participation-in-breach claim, *see* [69], but that motion was denied, *see* [93] at 2–4.

Following Judge Lefkow's second ruling, both parties amended their respective pleadings. Lansing's third amended complaint against Carroll included three breach-of-contract claims—one based on Carroll's failure to purchase Lansing's Litchfield shares on March 29, 2011 (Count I), a second based on Carroll's failure to sell his shares to Lansing after the board determined Carroll had engaged in shareholder misconduct (Count II), and another based on Carroll's alleged failure to make capital contributions as required by Section 2.1 of the operating

agreements for the general partners of the Westminster funds (Count III); a claim for breach of fiduciary duty (Count IV); and a defamation claim (Count V). *See* [109].

Carroll also revised his pleading, retaining in his second amended counterclaim the contract claim against Lansing, *see* [130] at 93–95 ¶¶ 105–10 (Count II), and the fiduciary-breach claims against Lansing and Realty Portfolio, *see id.* at 88–93 ¶¶ 94–104 (Count I), but adding allegations that Celebrate Life Trust—Realty Portfolio's (sole) limited partner—had also participated in Lansing's fiduciary breach by providing 99.8 percent of the money that Realty had put toward the June 29, 2011 "closing," *id.* (also Count I).[6] Carroll also asserted that the trust and one of its settlors, Richard Stephenson, had aided and abetted the wrongful transaction by selecting the trust as the entity to invest in Realty Portfolio as a limited partner. *See id.* at 95–100 ¶¶ 111–20 (Count III). Realty Portfolio was also named as a defendant to Count III. *See id.*

### G.     Stephenson, Celebrate Life Trust, and Realty Portfolio

In 1988, Richard Stephenson founded the Cancer Treatment Centers of America, and has since acted as chairman of the corporation. *See* [361] at 2 ¶¶ 1–2. Stephenson was also chairman of the International Capital & Management Company, which contracted with the Cancer Treatment Centers to provide business-management services. *See* May 12, 2015 Deposition of Richard J. Stephenson, [344-1] at 8–9, Tr. at 29:19–32:3. These services were provided through

---

[6] Carroll named as defendant Michael Smith, the trustee of Celebrate Life Trust. For simplicity, I refer to the claims against Smith (a nominal counter-defendant) as claims against the trust.

or in connection with Rising Tide, a Switzerland-based company of which Stephenson's son, Shawn, was CEO. *See* April 14, 2015 Deposition of Darren Keller, [344-1] at 106, Tr. at 22:6–:24; May 26, 2011 E-mail from Shawn Stephenson to Chris Stephenson et al., [336-2] at 11.

In 2001, the Stephenson family began to invest money in the Westminster funds—an investment that, by 2010, had grown to millions of dollars. *See* [335] at 5 ¶ 5. Beginning in early 2010, Lansing and individuals associated with Stephenson discussed new investment opportunities for the Stephenson group. *See* [361] at 5 ¶ 5. One idea for a new real-estate portfolio was dubbed "Apogee." *See id.* at 5–7 ¶ 6. The Apogee-related communications between Westminster/Litchfield employees and members of the Stephenson group were not shared with Carroll. *See* [356] at 78 ¶ 24. Then, in October 2010—as Lansing was about to trigger the buy/sell provisions of his deal with Carroll—Lansing approached Stephenson's team with the opportunity to acquire Carroll's interests in Westminster. *See* [335] at 6–7 ¶¶ 9–10; [361] at 7–8 ¶ 7; October 22, 2010 E-mail from Lansing to Bill Hostetler et al., [336-1] at 190. Stephenson's Global Investment Committee[7] received a memo in December suggesting that the acquisition of Carroll's interests would be an attractive opportunity. [307-8] at 2.

---

[7] The Global Investment Committee comprised approximately four members of the Stephenson family (including Stephenson) and several advisors, and was formed to investigate investment strategies around the world. *See* Stephenson Deposition, [344-1] at 13, Tr. at 51:14–52:16.

But Carroll didn't agree to sell his shares; he agreed to buy Lansing's. In January 2011, the people around Stephenson learned the "troubling news" that Carroll was trying to turn the tables on Lansing. *See* [361] at 9–10 ¶ 10; July 6, 2011 E-mail from Bill Hostetler, [336-1] at 228. One of Stephenson's sons said that one of Stephenson's sons-in-law could relay this news to Stephenson, and Stephenson's assistant said she would make available to Stephenson a hard copy of an e-mail chain about the Lansing-Carroll battle. [336-1] at 228. A January 21, 2011 memo described Carroll's maneuver as a "shock" because "Westminster [had] described . . . Carroll as being in poor physical and financial condition recently, and [as having] become a pariah to the team." [308-2] at 2. "For the past 3 years or more," the memo continued, Carroll "ha[d] distanced himself from the Westminster management, contributing precious little to the mission or to everyday activities." *Id.*

The Stephenson group aligned itself with Lansing. The Chief Operating Officer of a Stephenson-related entity called International Capital & Investment Company encouraged Lansing to explore his options. *See id.* at 4; [335] at 4 ¶ 4; August 21, 2014 Deposition of James J. Grogan, [362-3] at 12, Tr. at 110:2–:5. Stephenson's team understood, presumably from some communication by Lansing, that the original plan to buy out Carroll would still be viable if Carroll failed to close (on his agreement to buy out Lansing) in March 2011. [208-2] at 5. So Stephenson's business-management services company, International Capital & Management Company, conducted an audit of Westminster in case the Stephenson family were

able to move forward with the acquisition of Carroll's shares. *See* [335] at 14 ¶ 22; March 2011 E-mails between Darren Keller and Bill Hostetler, [336-1] at 246; *see also* June 2, 2011 Internal Review, [308-10]. The March 29 closing date came and went, and Carroll was unable to complete his purchase of Lansing's interests.

On May 26, 2011, Stephenson's son wrote to other family members, individuals associated with Stephenson entities, and Stephenson's assistant (among others) that there was "some exciting progress to report about . . . the opportunity to buy a stake" in Westminster. [336-2] at 10. Carroll was now out, he reported, and Lansing "wants to have us involved and he wants to move quickly." *Id.* at 10–11. Due diligence by ICMC's business-relations manager and ICIC's COO was underway, and the two would submit their findings "to the family no later than June 8." *Id.* at 11.

Also in May 2011, Lansing's attorneys at Winston & Strawn prepared a "Private Placement Memorandum" describing to potential investors the format of the investment opportunity in Carroll's Westminster interests. *See* [309-4]. Interested investors would purchase the limited-partner interests in Realty Portfolio Holdings, a limited partnership to be created specifically for the purpose of buying Carroll's shares in the Westminster entities. *See id.* at 3. The general partner of Realty Portfolio would be Realty Holdings GP, a company owned and controlled by Lansing. *See id.* at 8, 21. The memo explained that $14.8 million was needed to purchase Carroll's interests, that the investment opportunity arose from

Lansing's exercise of the Westminster entities' buy/sell provisions, and that the closing of the buy/sell process "may be the subject of litigation." *Id.* at 8, 41.

On June 2, 2011, one of Lansing's lawyers met with Lansing, Bill Hostetler (the ICMC business-relations manager), and Paul Grogan (ICIC's COO) to discuss a possible investment in Westminster (through Realty Portfolio). *See* [335] at 14–15 ¶ 23. The lawyer explained that the buy/sell process had begun in the fall of 2010, that Carroll had elected to buy Lansing's interests but had breached the Westminster operating agreements by failing to close, and that "we had the ability to buy [Carroll's] interests [but were] having discussions with him" and were hopeful for an "amicable resolution." April 24, 2015 Deposition of Andrew J. McDonough, [308-11] at 6–7, Tr. at 36:11–37:5; *see also* Grogan Deposition, [307-3] at 19, Tr. at 133:17–:22. The lawyer wanted Grogan and Hostetler to understand that buy/sell issues between partners commonly involved litigation, or at least protracted negotiation, and that this was a risk of the investment in Realty/Westminster. *See* McDonough Deposition, [308-11] at 7, Tr. at 37:14–:23. In a post-meeting summary, Hostetler noted that "Carroll could try to delay or block the legal conclusion" of the buy/sell agreements, but if that occurred, Lansing's attorneys were "confident they [would] prevail." Private Equity Real Estate Investment Executive Summary, [308-13] at 13.

Stephenson's son let Hostetler know that "the family" had agreed to go through with the Realty Portfolio transaction (though Hostetler clarified at his deposition that, with respect to the Stephensons, the word "family" was often used

16

loosely, as individuals like Dennis Lynde, ICIC's Global Managing Director, were also considered part of that group). *See* [335] at 2 ¶ 1; [361] at 26–27 ¶ 22; August 26, 2014 Deposition of William Ladd Hostetler, [344-1] at 100, Tr. at 174:20–175:7.[8] By that time, Michael Smith, Celebrate Life's trustee, had authorized Lynde to act as signatory for the trust, *see* [335] at 20 ¶ 28; and in early June 2011, Lynde determined that the Realty investment was "consistent with [the trust's] overall . . . strategy and goals"—so he asked attorneys at Katten Muchin Rosenman LLP to begin legal due diligence on that investment, and to work with Lansing's attorneys at Winston on the terms of a limited-partnership agreement for Realty, *see id.* at 21 ¶ 29; Affidavit of Dennis P. Lynde, [307-9] at 4 ¶¶ 11–12. At Grogan's and Hostetler's request, Winston attorneys sent Katten several documents concerning the Realty Portfolio transaction, *see* [335] at 21 ¶ 29; June 3, 2011 E-mail from Wade Challacombe to Charles Harris, [309-3], and Katten began work on the matter.

A Katten lawyer reviewed the Private Placement Memorandum, as well as several of the operating agreements for the Westminster general-partner entities, and reported their contents to another Katten lawyer. *See* [335] at 28–29 ¶¶ 35–36; [361] at 29–30 ¶ 25. The Katten firm also worked with Lansing's lawyers at Winston on the language of the Realty Portfolio limited-partnership agreement, *see*

---

[8] Relying on Grogan's deposition testimony, Stephenson, Celebrate Life Trust, and Realty Portfolio suggest that it was Grogan and Hostetler who decided to move forward with the Realty investment. *See* [335] at 17 ¶ 25 (citing Grogan Deposition, [307-3] at 17, Tr. at 127:13–:19). But Grogan testified that he did not know who had made that decision. *See* [307-3] at 17, Tr. at 127:20–:21.

[309-6]; [309-7]; [309-8]; [309-9], which ultimately included the following "unwinding" provision:

> In the event [Realty Portfolio Holdings LP] has not acquired all or a substantial portion of [Carroll's Westminster interests] on or before [June 16, 2014], the [general and limited partners—Realty Holdings and Celebrate Life Trust, respectively] shall be released from their obligation to make any . . . Capital Contribution and the Partnership shall be dissolved and liquidated . . . .

[310-1] at 11 (Section 3.1(A)). On June 16, 2011, Cathleen Booth at Katten wrote Wade Challacombe at Winston that the limited partner in Realty Portfolio would be Celebrate Life Trust. *See* [361] at 38 ¶ 29. (At her deposition, Booth could not recall who had given her that information, but she thought it may have been another Katten lawyer, Phil Tortorich. *See id.* Tortorich, however, did not know how the trust had been chosen as limited partner. *Id.*) Lynde executed the Realty Portfolio agreement on behalf of the trust, and Lansing signed the contract on behalf of Realty Holdings GP. *See* [335] at 33 ¶ 42; [310-1] at 29. Approximately $13.7 million was wired (also on June 16, 2011) from the trust's bank account to an account for Realty Portfolio. *See* [335] at 33 ¶ 43.

On June 24, Challacombe e-mailed Booth about the buyout:

> We notified [Carroll] and his attorney last week of a closing to be held this week in Chicago. We tendered payment at the scheduled closing, but [Carroll] did not show up. He changed legal counsel . . . around the time we sent the closing notices and final transaction documents, so his new lawyer is still getting up to speed. [W]e're currently assessing options and should be in a position to provide more of an update sometime next week.

[310-12] at 2; *see also* [361] at 44–46 ¶ 36. Booth pressed Challacombe for an update on June 30, to which Challacombe responded: "George refused to sign, so suggest we

have a status call in July sometime." [310-13] at 2; *see also* [361] at 44–46 ¶ 36. Booth and Challacombe did have a call, on July 7, in which Tortorich (from Katten) and Andrew McDonough (from Winston) also participated. *See* March 30, 2015 Deposition of Philip Tortorich, [309-2] at 18, Tr. at 172:8–:12; [310-7]. The Winston attorneys updated the Katten attorneys on what was happening with the acquisition, and let them know that Lansing had filed a complaint against Carroll. *See id.*, Tr. at 172:13–:16; July 11, 2011 E-mail from Tortorich to Challacombe et al., [310-7] at 2 (requesting a copy of the complaint referenced during the call, and asking if Carroll had been served). Challacombe forwarded a copy of the complaint to the Katten lawyers a few days later. *See* [310-7] at 2.

On August 12, 2011, Lansing sent a letter to Westminster investors stating that Carroll was "no longer part of the firm pursuant to completion of the buyout of his interests." [361] at 46–47 ¶ 37. Hostetler, on the Stephenson front, followed up with a memo to the Global Investment Committee on August 23, explaining that Westminster was "closing out their documents on . . . Carroll," who was no longer part of the organization. [336-2] at 17. "[H]is investment portion has been acquired," wrote Hostetler, "and the new partner is already assuming capital calls and distributions." *Id.* But Hostetler later stated at his deposition that Realty Portfolio never actually received from or contributed any money to the Westminster business. *See* Hostetler Deposition, [307-1] at 39–40, Tr. at 186:23–187:6; *see also* September 10, 2015 Affidavit of Darren Strotman, [312-59] at 4 ¶ 11 (stating that all distributions attributed to Carroll's interests were maintained in the respective

bank accounts of Westminster's general-partner entities). Realty Portfolio was dissolved on June 16, 2014, and $13.3 million[9] was returned to Celebrate Life Trust's bank account in January 2015. *See* [335] at 47 ¶ 60.

Lansing, Stephenson, Celebrate Life Trust, and Realty Portfolio move for summary judgment on the claims against them. [299]; [301]. Carroll moves for partial summary judgment on Counts I and II of his counterclaim against Lansing (as to liability only), for partial summary judgment on Count III of Lansing's complaint (as to Carroll's alleged failure to make capital contributions after June 29, 2011), and for summary judgment on Count II of Lansing's complaint. [291].

## III. Analysis

### A. The Contract Claims

Lansing claims that Carroll breached: (1) the Litchfield shareholders' agreement and the operating agreements for the general partners of the Westminster funds, by failing to purchase Lansing's interests in March 2011 (Count I); (2) the shareholders' agreement, by failing to sell Carroll's Litchfield shares after the board determined in 2012 that Carroll had engaged in "shareholder misconduct" (Count II); and (3) the Westminster operating agreements, by failing to make all capital contributions required by those agreements (Count III). Only Counts II and III of Lansing's complaint are at issue here. In his counterclaim, Carroll alleges that

---

[9] A January 26, 2015 letter from Lansing (acting on behalf of Realty Holdings, the general partner of Realty Portfolio) explained that $13,338,669.42 was Celebrate Life Trust's share of the "liquidating distribution" under Section 8.2 of the limited-partnership agreement. *See* [310-18] at 2.

Lansing breached the buy/sell provisions of the governing agreements when Lansing "unilaterally closed" on Carroll's interests in June 2011 (Count II of the counterclaim).[10] All of these agreements are governed by Illinois law. *See, e.g.*, [311-2] at 27 § 17.1 (shareholders' agreement); [311-3] at 18 § 8.2 (operating agreement of Westminster Advisors VIII LLC).

### 1. Carroll's Claims Against Lansing

Carroll claims that neither the shareholders' agreement nor the operating agreement permitted Lansing to take Carroll's interests in the Westminster/Litchfield companies, which Lansing did, says Carroll, by "unilaterally closing" on those interests on June 29, 2011. *See* [293] at 24. Lansing argues: first, that Carroll cannot enforce the governing agreements, because Carroll materially breached them; and, second, even if the agreements were enforceable, still Carroll could not recover because Lansing never actually took Carroll's ownership interests in the first place.

When a party to a contract materially breaches that contract, the other party is usually excused from performing. *See, e.g.*, *InsureOne Indep. Ins. Agency, LLC v. Hallberg*, 976 N.E.2d 1014, 1025 (Ill. App. Ct. 2012) (citing *Israel v. Nat'l Can.*

---

[10] In Count II of his counterclaim, Carroll alleges that Lansing also breached the buy/sell provision by: undervaluing the Westminster/Litchfield interest (and failing to disclose, or improperly concealing, their true value); setting a price for the Litchfield shares that was not based on the value of that property; concealing from Carroll the Apogee project and otherwise keeping Carroll out of the loop on business issues; and spreading false information about him to investors and Litchfield employees. *See* [129] at 93–94 ¶¶ 106–07. In response to Lansing's arguments for summary judgment, however, Carroll explained that the only breach-of-contract claim he is pursuing is based on the "unilateral closing" in June 2011. *See* [328] at 6–7, 33–34. Thus, to the extent Carroll's pleading suggests that he seeks to hold Lansing liable for other breaches of contract, those claims have been waived.

*Corp.*, 276 Ill.App.3d 454, 461 (1995)); *Elda Arnhold & Byzantio, L.L.C. v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 700 (7th Cir. 2002) (citing *Finch v. Ill. Cmty. Coll. Bd.*, 315 Ill.App.3d 831, 836 (5th Dist. 2000); *Circle Sec. Agency Inc. v. Ross*, 107 Ill.App.3d 195, 202–03 (1st Dist. 1982)). So if Carroll materially breached the Westminster/Litchfield agreements in March 2011, as Lansing claims, Lansing was entitled to abandon the agreements and sue for damages. Lansing did sue Carroll for damages, but as of June 29, 2011, Lansing had not abandoned the contracts: he asked the court on June 17 for specific performance of the agreements—in particular, an order compelling Carroll to sell to Lansing the former's interests in the companies, as Lansing believed the agreements required—thus signaling Lansing's intent to continue with the contracts despite Carroll's breach. *See* [1] at 22, 25, 27. At that time, Lansing was "bound to the obligations that the contract[s] impose[d] on" him. *Emerald Invs. Ltd. P'ship v. Allmerica Fin. Life Ins. & Annuity Co.*, 516 F.3d 612, 618 (7th Cir. 2008) (applying Illinois law) (citations omitted). If he breached those same agreements, then Carroll, too, could recover damages for any resulting injuries.[11]

But did Lansing breach the agreements? Carroll says "yes"—that Lansing breached the buy/sell provisions of both the shareholders' agreement and the general-partner operating agreements when he unilaterally closed on Carroll's

---

[11] In essence, Lansing treated Carroll's allegedly "material" breach as merely a "partial" one. *See All EMS Inc. v. 7-Eleven Inc.*, 181 F. App'x 551, 557–58 (7th Cir. 2006) (applying Illinois law). Unlike a material breach, a partial breach does not justify the other party's later failure to perform. *InsureOne*, 976 N.E.2d at 1025 (quoting *Israel*, 276 Ill.App.3d at 460).

interests on June 29, 2011. The buy/sell provisions of the Litchfield/Westminster agreements provide that if the offeree does not accept the offeror's buy/sell offer within 30 days, then "the Offer shall automatically expire and be of no further force or effect; provided, however, that the Offeror shall thereupon have the right, on or before the fifteenth . . . day after the expiration of [the 30-day] period, to purchase the interests of the Offeree, at the Buy/Sell Price." [311-2] at 20 § 12(b) (shareholders' agreement); *e.g.*, [311-3] at 17 § 6.7(2)(c) (operating agreement of Westminster Advisors VIII LLC) (similar). But as Judge Manning explained in her April 2012 order, Carroll did not fail to accept Lansing's buy/sell offer. Carroll accepted the "sell" offer (though, ultimately, he was unable to complete the purchase), so Lansing never acquired the right to buy Carroll's interests, and Carroll was never required to sell. *See* [23] at 9–15. Carroll's theory is that, if Lansing somehow managed to acquire Carroll's interests on June 29, 2011, without complying with the buy/sell provisions, then he breached those provisions.

Lansing argues that he could not have breached the buy/sell provisions, because Judge Manning determined in her April 2012 order that Lansing did not obtain Carroll's interests—a determination that now operates as the law of the case. Not quite. In her April 2012 order, Judge Manning concluded that, "under the terms of the [governing agreements], Lansing never acquired *the right* to purchase Carroll's interests," and dismissed with prejudice Lansing's own breach-of-contract claim to the extent it was based on such a right. [23] at 15 (emphasis added). Lansing had also brought a declaratory-judgment claim, and because he sought

through that claim the same relief as he did through his breach-of-contract claim—namely, an order declaring that Carroll's interests had passed to Lansing—Judge Manning exercised her discretion and dismissed the declaratory-judgment claim as duplicative. *See id.* at 17. Parsed carefully, Judge Manning's holding was about Lansing's rights, not about whether Lansing actually took Carroll's interests. She did observe that the declaratory-judgment claim would in any event "be subject to dismissal for the same reasons that led the court to dismiss portions of" the breach-of-contract claim. *Id.* This observation suggests that, if called upon to decide the issue, Judge Manning would not have declared Lansing the owner of Carroll's interests pursuant to the June 29, 2011 "closing." But there was no holding to that effect.

Lansing is correct, however, that his June 2011 efforts were ineffective—he did not actually acquire Carroll's interests. In Illinois, whether a person has acquired a certificated security is governed by statute. *See* 810 ILCS 5/1-101 *et seq.* (adopting the Uniform Commercial Code). Under that statute, a person acquires a security if the person is a "purchaser" to whom the security "is delivered." *Id.* at 5/8-104(a)(1). Delivery of a certificated security occurs when: (1) the purchaser acquires possession of the security certificate; or (2) another person (other than a "securities intermediary") either acquires possession of the certificate on behalf of the purchaser or, having previously acquired possession of the certificate, acknowledges

that they hold the certificate for the purchaser. *Id.* at 5/8-301(a)(1)–(2).[12] A purchaser, in turn, is someone who "takes by purchase"—that is, who takes by "sale, lease, . . . gift, or any other *voluntary transaction.*" *Id.* at 5/1-201(b)(29)–(30) (emphasis added); *cf. id.* at 5/8-304 cmt. 3 ("There must be a *voluntary* parting with control in order to effect a valid transfer of a certificated security as between the parties.") (emphasis added). Whatever took place on June 29, 2011, was not a voluntary relinquishment of control by Carroll. Lansing signed the so-called transfer documents, but Carroll did not, and nor did he endorse his Litchfield certificates to Lansing. There is no evidence from which to infer that Carroll intended to give Lansing control of Carroll's certificated interests. Accordingly, no reasonable juror could conclude that Lansing actually acquired those interests.

The same is true of Carroll's interests in the Westminster general-partner entities. These interests were not securities, and so were not subject to the statutory provisions just discussed[13], but the evidence yields the same result. No authority

---

[12] Delivery of a certificated security may in some instances be effected through a securities intermediary, *see* 810 ILCS 5/8-301(a)(3), but there was no such intermediary (as defined in Section 5/8-102(14)) here.

[13] An interest in a limited liability company is not considered a "security" unless the interest is dealt in or traded on securities exchanges or in securities markets, its terms expressly provide that it is a security governed by Article 8 of the Uniform Commercial Code, or it is an investment company security. 810 ILCS 5/8-103(c). (An "investment company security" is a "share or similar equity interest issued by an entity that is registered as an investment company under the federal investment company laws." *Id.* at 5/8-103(b).) There is no evidence that any of these exceptions applies here. The companies' operating agreements limit the transfer of members' interests to relatives or to those whom the companies' managers have approved, *see, e.g.*, [311-3] at 15 § 6.3 (Operating Agreement of Westminster Advisors VIII LLC), and no mention is made of any governance by Article 8 of the UCC. A search of the U.S. Security Exchange Commission's EDGAR database also revealed no registrations for the limited liability companies at issue here (though

allowed Lansing to take Carroll's Westminster's interests through the unilateral transfer agreement and consent documents, and Carroll never agreed to part with those interests.

Lansing certainly acted as if he took Carroll's interests, but his actions did not make the transfer a reality. Lansing wrote (through his attorneys) several letters stating that Carroll's interests had passed, and that Carroll was no longer an owner of Litchfield or the general-partner entities; Lansing also wrote to Westminster investors, informing them that Carroll was no longer a part of the firm; Lansing signed two written-consent documents—the first stating that Lansing owned all of Litchfield's shares, the second that Realty Portfolio had acquired all of Carroll's interests in the general-partner companies; Lansing wrote to Carroll and his wife that, as of July 15, 2011 (the date of the written consents), they had been removed from their positions with Litchfield and the Westminster general-partner entities; and Realty Portfolio executed (for the Westminster entities) amended operating agreements, which said that Realty had taken over Carroll's interests in those companies on June 29. There is no dispute that Lansing (or Realty Portfolio) did or said these things. But at most this evidence suggests only that Lansing *believed* Carroll's interests had transferred (a belief consistent with Lansing's request for a declaratory judgment on that issue)—not that a transfer had actually taken place.

---

documents may be found for some of the Westminster funds themselves). *See* https://www.sec.gov/edgar/searchedgar/companysearch.html (search "Westminster") (last visited July 28, 2016).

Lansing believed that he and Realty Portfolio had acquired Carroll's interests in the Westminster/Litchfield business, and took certain actions in accordance with that assumption. Those actions may have repercussions, as we shall see, but they do not demonstrate that the transfer took place. There is no evidence, and no legal authority offered in support of such a proposition, that through Lansing's posturing and unilateral execution of documents, he actually took Carroll's interests; and there is therefore no evidence that Lansing breached the governing agreements' buy/sell provisions.[14] Lansing is entitled to summary judgment on Carroll's breach-of-contract counterclaim (Count II). Carroll's cross-motion on that claim is denied.

2. *Lansing's Claims Against Carroll*

Lansing claims that Carroll breached the operating agreements for the Westminster general-partner entities by failing to make required capital contributions. Carroll also breached Section 9 of the Litchfield shareholders' agreement, says Lansing, when Carroll refused to sell his Litchfield shares to Lansing after the company's board of directors determined in April 2012 that Carroll had engaged in "shareholder misconduct." Carroll argues that he is entitled

---

[14] There is another way to look at Lansing's June 2011 efforts, though it is one not raised by Lansing: his conduct was not a breach of any promise he made in the buy/sell provisions. The buy/sell provisions set forth a series of obligations concerning a particular procedure to use if certain offers were made. Lansing's obligations under these provisions were not triggered by any of the events following Carroll's failure to close in March 2011, so the June 2011 conduct occurred outside their bounds. Breach of the buy/sell provisions therefore would not be the cause of action to assert against Lansing. *See, e.g.*, *Dore v. Sweports Ltd.*, 2014 IL App (1st) 121980-U, ¶¶ 9–12, 2014 WL 1757896, at *3–*4 (1st Dist. 2014) (unpublished).

to summary judgment because he no longer had any obligations under the agreements after Lansing repudiated them in 2011.

A party to a contract may treat the agreement as ended when the other party repudiates that agreement. *Arlington LF, LLC v. Arlington Hospitality, Inc.*, 637 F.3d 706, 713 (7th Cir. 2011) (citing *Timmerman v. Grain Exch., L.L.C.*, 394 Ill.App.3d 189, 915 N.E.2d 113, 124 (2009); *Truman L. Flatt & Sons Co., Inc. v. Schupf*, 271 Ill.App.3d 983, 649 N.E.2d 990, 994 (1995)); *Kelly v. Orrico*, 8 N.E.3d 1055, 1062 (Ill. App. Ct. 2014) (explaining that the non-repudiating party is excused from performing) (citation omitted). Anticipatory repudiation occurs where a party manifests, through words or other conduct, a clear and unequivocal intent not to perform under the contract. *See Arlington*, 637 F.3d at 713 (citations omitted); *Busse v. Paul Revere Life Ins. Co.*, 341 Ill.App.3d 589, 594 (1st Dist. 2003) (citations omitted); *see also In re Marriage of Olsen*, 124 Ill.2d 19, 24 (1988) (doubtful and indefinite statements that performance may or may not occur are insufficient). Whether an anticipatory repudiation has occurred is a question of fact, assessed from the perspective of a reasonable person on the receiving end of the comments or conduct at issue. *Arlington*, 637 F.3d at 713–14.

Carroll argues that Lansing repudiated the shareholders' and operating agreements when, after Carroll failed to purchase Lansing's interests in March 2011 (as Carroll was obligated to do), Lansing insisted that he now had a right under the agreements to purchase Carroll's interests (and Carroll an obligation to sell), and, when Carroll still refused to sell, executed the "transfer agreement" and

"written consent" documents, and informed Carroll that he was no longer an owner of Westminster/Litchfield (and so would no longer receive any payments to which he would otherwise be entitled). Simply conveying the view that Lansing had the right to purchase Carroll's interests under the governing agreements was not, in itself, a clear and unequivocal communication of an intent to breach those agreements. *See Olsen*, 124 Ill.2d at 24 (explaining that an offer to perform a contract in accordance with one's own interpretation effects an anticipatory breach only where the there is also a manifestation of a clear intent not to perform in accordance with any other interpretation). Nor was such an intent clear from Lansing's execution of the transfer agreement or written-consent documents—until Carroll received those documents, they did not communicate Lansing's intent.

But Carroll reasonably could have understood from Lansing's subsequent communications that Lansing clearly intended to abandon any obligations he had to Carroll. On July 6, 2011 (one week after Lansing signed the transfer agreement), Lansing wrote to Carroll, through the parties' respective attorneys, and told him that his interests had passed to Lansing, and that Carroll "will no longer be receiving any payments to which he would be entitled . . . as an owner" of those interests. [294-3] at 6. On July 15 (the same day Lansing signed the written-consent documents), Lansing told Carroll, again through the parties' attorneys, that Carroll was being removed from all positions he held with the Westminster/Litchfield entities. *Id.* at 38. A reasonable person in Carroll's position would have understood these statements to mean that, moving forward, Lansing did not intend to perform

any of his contractual obligations to Carroll, as performance of those obligations was (or would be) required only so long as Carroll remained a co-owner of the Westminster/Litchfield entities. Indeed, the Litchfield shareholders' agreement provided that the agreement would self-terminate upon any one owner becoming the sole owner of all corporate stock. *See* [311-2] at 21 § 14(a). Carroll's status as co-owner was thus a condition of Lansing's duties under the agreements, and by informing Carroll that Lansing would in future act as though Carroll were *not* a co-owner, Lansing clearly communicated an intent not to carry out those duties.

Lansing argues that his statements cannot have amounted to a repudiation, because the evidence shows he was trying to *implement* the parties' agreements, not contravene or abandon them. How can he have abandoned the contracts, says Lansing, if he in good faith believed that, under the terms of the governing agreements' buy/sell provisions, he had acquired an equitable interest in Carroll's share of the Westminster/Litchfield businesses, and thus had effectively obtained those shares by executing the transfer agreement on June 29, 2011? If Lansing had indeed obtained Carroll's interests, then Lansing's contractual duties toward Carroll would have self-terminated. So where's the repudiation?

The word "repudiate" means, generally, to reject something, or to refuse to accept or support something.[15] But the legal doctrine of repudiation encompasses more than just intentional rejection. A party may "repudiate" an agreement by

---

[15] See Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/repudiate (last visited July 28, 2016).

refusing to perform his contractual duties based on a mistaken belief or misunderstanding of his rights. *See* 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 8.21 at 561 (2004) (explaining the "traditional view . . . that [a] party's good faith will not prevent [his] statement from amounting to a repudiation."). Lansing suggests that Illinois has rejected the traditional view, as demonstrated by the Illinois appellate court's decision in *Schilling v. Book*, 84 Ill.App.3d 972 (3d Dist. 1980). The parties in *Schilling* disagreed on their contractual rights and duties in light of certain statutory provisions and related regulations, and the defendant refused to perform the contract except in accordance with his own interpretation. His interpretation turned out to be wrong, but the court declined to label the defendant's refusal to perform a "repudiation" of the parties' agreement, because he had acted in good faith. *See id.* at 978–79.

In *In re Marriage of Olsen*, the Illinois Supreme Court relied on the Corbin treatise for the proposition that an anticipatory breach of contract occurs when a party to that contract clearly manifests an intent not to perform it except in accordance with his own interpretation of its provisions or legal effects. *See* 124 Ill.2d at 24 (quoting 4 A. Corbin, *Contracts* § 973, at 911–12 (1951)). And, more recently, the Illinois appellate court cited both the *Olsen* opinion and the Farnsworth treatise in observing that a party may repudiate a contract "by insisting that it is obligated to perform only according to its own incorrect interpretation of the contract's terms." *Busse*, 341 Ill.App.3d at 594 (citing *Olsen*, 124 Ill.2d at 19; *Farnsworth* § 8.21). Though neither decision took up the good-faith

issue explicitly, Farnsworth, as noted above, explains the common view that good-faith beliefs do not save a statement from amounting to a repudiation, *see* § 8.21 at 561 ("A party . . . acts at its peril if that party, insisting on what it mistakenly believes to be its rights, refuses to perform its duty.")—a view likewise espoused by Corbin and others, *see* 10-54 Corbin on Contracts § 54.15; *see also id.* § 54.15A ("Where [a party] insists on his interpretation [and] announces his refusal to perform based on that interpretation[, this is] a repudiation even though his assertion is in good faith."); 13 Williston on Contracts § 39:40 (4th ed.) ("[T]he existence of a good faith dispute will not prevent a statement from serving as a repudiation."); Restatement (Second) of Contracts § 250 cmt. d (1981). Given the Illinois appellate court's recent reliance on the resources just noted, which reliance in turn echoes an acceptance of these resources by the Illinois Supreme Court, *Schilling* is not persuasive. *Cf. Jackson v. Bank of Am. Corp.*, 711 F.3d 788, 791 (7th Cir. 2013) ("Our job in applying [Illinois] law is to use our own best judgment to estimate how the [Illinois] Supreme Court would rule.") (citation and internal quotation marks omitted). So even if Lansing believed in good faith that he had acquired Carroll's interests in the Westminster/Litchfield entities, that belief does not prevent Lansing's statements about the transfer of those interests from constituting a repudiation of the businesses' governing agreements.

Lansing next argues that his statements were not repudiatory because they did not *unequivocally* communicate an intent not to perform his contractual duties. After purporting to take Carroll's interests in the business, Lansing amended his

complaint in the pending lawsuit to request a declaration that Lansing and Realty Portfolio had in fact acquired those shares. That Lansing sought judicial "affirmation of what [they] had done," he says, evinced an intent to change course should the district court ultimately rule against him. So, too, did the limited-partnership agreement with Realty Portfolio, which, argues Lansing, expressly contemplated the possibility of an adverse ruling; and so did the accounting that Lansing says he maintained of all distribution payments that would otherwise be due to Carroll were he still an owner.

If Lansing did keep such an accounting, there is no evidence that Carroll knew about it at a time when it could have signaled equivocation on Lansing's part. The same is true of the Realty Portfolio partnership agreement. Section 3.1(A) of the limited-partnership agreement for Realty Portfolio Holdings provided that, if Realty did not acquire all of Carroll's interests in the Westminster entities by June 16, 2014, the partnership would be dissolved and liquidated. [310-1] at 11. Lansing argues that this language made clear his willingness to treat Carroll as a co-owner of Westminster—and thus Lansing's willingness to perform his contractual duties as set forth in the Westminster operating agreements—should the district court rule against Lansing in the pending suit. But there is no suggestion that Carroll even saw Realty's partnership agreement at a time relevant to the issue of repudiation. Carroll was told in July 2011 that, by operation of the relevant buy/sell provisions, he would no longer be considered an owner of the Westminster companies, and so would not be paid as such in future. From Carroll's perspective,

there was nothing ambiguous or equivocal about this message. Nor would Carroll have inferred any equivocation from the fact that Lansing later sought a judicial declaration of full ownership. When Lansing filed his original complaint on June 17, 2011, he sought specific performance of the shareholders' agreement (Litchfield) and operating agreements (Westminster), which Lansing said required Carroll to sell his interests. But Lansing didn't wait for a judgment on the specific-performance claim. He instead attempted to take the interests, and acted as though he had done so. Only then did Lansing ask, by amending his complaint in August 2011, for a *post hoc* declaration that those actions had been proper. Nothing in this sequence of events signaled any tentativeness on Lansing's part, and Lansing did not suggest to Carroll a readiness to change course (and resume obligations under the agreements) if circumstances changed.

In any event, argues Lansing, he did change course after Judge Manning's April 2012 ruling, thus retracting any repudiation he may have communicated before. Lansing claims he did so by: (1) amending tax and accounting records to reflect Carroll's continued ownership; and (2) sending to Litchfield's board members, including Carroll, a notice of a special meeting to address the April 2012 order and certain of Carroll's conduct. A repudiation may be retracted by a clear and unequivocal statement, if made before the non-repudiating party materially changes his position in reliance on the repudiation, or before the non-repudiating party indicates to the repudiating party that the former considers the repudiation to be final. *Arlington*, 637 F.3d at 715 (citations omitted); *Truman*, 271 Ill.App.3d at

988 (quoting Restatement (Second) of Contracts § 261(a) at 293 (1981)). Carroll made clear that he considered Lansing's repudiation to be final in Carroll's answer and affirmative defenses to Lansing's complaint, where Carroll explained his view that, because of the repudiation, the shareholders' and operating agreements were no longer enforceable against him. *See* [41] at 25–26 ¶¶ 45–46; *id.* at 30 ¶¶ 51–52; *see also id.* at 34 (second affirmative defense to Count II of the second amended complaint). Carroll filed his answer and affirmative defenses on May 29, 2012; consequently, to have been effective, a retraction of Lansing's repudiation must have come before that date. There is no evidence that Carroll learned of the amended tax and accounting records before May 29, 2012, so Lansing cannot have retracted his repudiation through those amendments. This leaves the board-meeting notice.

The notice was sent to Carroll on April 23, 2012, and notified recipients of a special board meeting to take place on April 27. The purposes of the meeting, as Lansing explained in the notice, were to discuss Judge Manning's order from April 11, and to determine whether Carroll had "engaged in conduct as set forth in Section 9 of the . . . Shareholders' Agreement," [312-52] at 2. Section 9 of the shareholders' agreement addressed "shareholder misconduct." If the board of directors determined that a Litchfield shareholder had, for example, breached or made an attempt to materially breach the shareholders' agreement, that shareholder was required to sell his shares to the company or, if the company declined to exercise its option, to sell them to the other owner. [311-2] at 15–16.

Copies of the shareholders' agreement and Judge Manning's order were attached to Lansing's letter.

The letter may have been a valid retraction. Drawing inferences in Lansing's favor, his reference in the letter to Section 9 of the Litchfield agreement reasonably could have been understood as a clear sign from Lansing that he intended to honor the shareholders' agreement, and that he accepted that agreement as an operative contract between the parties.

Carroll's motion for partial summary judgment on Count II of Lansing's complaint is therefore denied. Lansing repudiated the Litchfield shareholders' agreement in July 2011, but may have successfully retracted his repudiation (of that agreement only) on April 23, 2012. So Carroll may have breached the shareholders' agreement by refusing to sell his shares after the April 2012 finding by the Litchfield board of directors that Carroll had engaged in "shareholder misconduct." But Carroll was not compelled to make capital contributions to the Westminster entities as of July 6, 2011, because Lansing repudiated the operating agreements and did not retract that repudiation before May 29, 2012. Carroll claims that the repudiation occurred as early as June 29, 2011; however, and as explained above, it was not until July 6 of that year that a reasonable person in Carroll's position would have understood from Lansing's communications that the latter intended to ignore his obligations under the Westminster operating agreements. Carroll's motion for summary judgment on Count III of Lansing's complaint is

therefore denied to the extent Carroll seeks reprieve from answering capital calls made before July 6, 2011.[16] The motion as to Count III is otherwise granted.

## B.    Fiduciary Breach

### 1.    *Carroll's Claims Against Lansing*

Both parties move for summary judgment on Carroll's claims against Lansing for fiduciary breach. To establish a breach of fiduciary duty in Illinois, a plaintiff (or, in this case, counter-plaintiff) must show: (1) that a fiduciary duty exists; (2) that the duty was breached; and (3) injury proximately caused by the breach. *See nClosures Inc. v. Block & Co., Inc.*, 770 F.3d 598, 603 (7th Cir. 2014) (quoting *Ball v. Kotter*, 723 F.3d 813, 826 (7th Cir. 2013)) (applying Illinois law). Fiduciary duties may be created through partnerships or other joint ventures, such as closely-held corporations and limited liability companies. *See id.*; *Anest v. Audino*, 332 Ill.App.3d 468, 476 (2d Dist. 2002) (citing *Hagshenas v. Gaylord*, 199 Ill.App.3d 60, 71 (1990)); 805 ILCS 180/15-3(b), (d), (g)(2). Lansing, as 50-percent shareholder of Litchfield, and as manager of the general-partner Westminster entities, *see* [340] at 4–5 ¶ 5, owed to Carroll, a member of the latter and co-shareholder of the former, a fiduciary duty. Carroll claims that Lansing breached that duty when Lansing: withheld, and caused Westminster/Litchfield employees to withhold, material business information from Carroll—including and especially about the Apogee project— before Lansing invoked the buy/sell provisions in November 2010; spread negative

---

[16] The distinction appears to be one without a difference. As far as may be gleaned from the record, no capital calls were noticed between June 29 and July 6, 2011. *See* September 10, 2015 Affidavit of Darren Strotman, [312-59] at 6–7 ¶ 19.

and false information about Carroll to investors, thus preventing Carroll from raising the capital needed to purchase Lansing's interests in March 2011; and took Carroll's Westminster/Litchfield interests, and the benefits that flowed from them, without a right to do so. Both parties move for summary judgment on this claim.[17]

a.    Concealing Business Information

Carroll claims that, in the two or so years before Lansing invoked the buy/sell provisions, Lansing breached his fiduciary duty toward Carroll by withholding from him, or causing others (at Litchfield) to withhold from him, material business information. Lansing does not dispute that withholding material business information from one's business partner may in theory constitute a fiduciary breach. Lansing argues instead that there is no evidence of concealment here. I agree.

In support of his claim, Carroll relies on his "sense" that, in the two years before November 2010, he was included in fewer Westminster/Litchfield activities than he had been previously. November 5, 2013 Deposition of George Carroll, [331-1] at 118, Tr. at 79:12–:16. The amount of communications he received from Lansing and other Litchfield employees, says Carroll, also declined (though he couldn't "put [a number] on it"). *Id.* at 79:16–:19. Carroll may in general rely on his own self-serving testimony to avoid (or obtain) summary judgment, *see Durukan Am., LLC v. Rain Trading, Inc.*, 787 F.3d 1161, 1164 (7th Cir. 2015) (citations omitted), but speculative evidence furthers neither objective, *see Formella v.*

---

[17] Carroll seeks judgment on liability only. *See* [291] at 5.

38

*Brennan*, 817 F.3d 503, 513 (7th Cir. 2016); *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). And, with respect to evidence of concealment, Carroll's "sense" of being included in fewer business activities is just speculation. Carroll presumably had personal knowledge of how many business-related communications he on average received from other Litchfield employees, so we may assume that those communications did decrease in the two or so years before November 2010, as Carroll claims. This assumption, however, does not itself permit the inference that those employees were *concealing* things from Carroll at Lansing's direction.

To show actual concealment, Carroll points to the e-mails and letters, etc., between Lansing and others (*e.g.*, Paul Grogan and Bill Hostetler, from the International Capital companies) about the Apogee project—none of which Carroll ever received. In addition, some of Lansing's messages to Grogan and Hostetler requested confidentiality about the project on the latter's part. *See* July 7, 2010 Memorandum from Lansing to Grogan, [332-2] at 118 ("[W]e request this proposal outline and any investment . . . program formalized with the family be kept <u>entirely confidential</u> and not disclosed to outsiders at any time."); August 24, 2010 Memorandum from Lansing to Grogan and Hostetler et al., [332-2] at 123 (same). These requests, argues Carroll, were aimed at keeping information about Apogee secret from *him*.

This is not a plausible reading of the evidence. Read in context, the "we" to whom Lansing refers as requesting the secrecy is Westminster—which includes Carroll—and the "outsiders" to whom the information should not be disclosed are

39

other investors, not other Westminster/Litchfield partners or employees. *See* [332-2] at 119 (stating that "*Westminster* is confident that it can construct and manage . . . a [strong] portfolio appropriate for the family's investment goals") (emphasis added); [332-2] at 123 (explaining, before requesting confidentiality about the project, Westminster's desire not to "irritate . . . other investors" by maintaining a large number of family-specific side investments). Nor has Carroll adequately explained why he believes he should have received these communications in the first place, or, consequently, why his failure to receive them signals any wrongdoing on Lansing's part. It was Lansing who usually communicated with and otherwise handled relations with investors, and Carroll offers no evidence reasonably suggesting that these particular communications fell into another category.

Moreover, the record shows that on June 28, 2010, Carroll received an e-mail from Mark Mazur, manager of Litchfield's Commercial Properties Group, about new real-estate acquisitions. *See* [312-25]; [350] at 3 ¶ 3. In this e-mail (which was also addressed to Lansing), Mazur described a real-estate transaction in Blue Island, Illinois, and recommended that "a portion of this asset be presented to the Stephenson family for a JV investment." [312-25] at 3. "[P]erhaps," wrote Mazur, "this kicks off the Fund of Funds concept we have been discussing with them." *Id.* Carroll says that he didn't see this comment in Mazur's e-mail, and so didn't learn about the Apogee project until after Lansing had triggered the buy/sell provisions. *See* [327] at 14–16 ¶ 22; [356] at 79–80 ¶ 26; *id.* at 81 ¶ 28. But whether Carroll *saw* the comment is beside the point. The question, as Carroll phrases it, is whether

Lansing was trying to keep Carroll "in the dark," or was instructing others to do so, about the new investment project with the Stephensons. [328] at 35. There is no evidence from which a jury could find that Lansing concealed material business information. Lansing's motion for summary judgment on this issue is granted, and Carroll's cross-motion is denied.

b. Making "Negative and False" Comments

Carroll also claims that Lansing breached his fiduciary duty by spreading "negative and false" information about Carroll to investors and Litchfield employees, thus preventing Carroll from raising enough money to buy Lansing's interests in Westminster/Litchfield (as Carroll had agreed to do by accepting Lansing's "sell" offer in November 2010). In support of this claim, Carroll relies on: (1) e-mails from a Westminster investor to Lansing, admonishing Lansing for "focusing on discrediting" Carroll, and from the same investor to Carroll, chastising Carroll and Lansing for disseminating "harsh, negative, . . . and destructive" remarks about each other; and (2) the January 21, 2011 memorandum to the Stephenson "Family Business Meeting" members, in which Bill Hostetler, a Stephenson-affiliated business-relations manager, expressed surprise at Carroll's having chosen to buy Lansing's shares rather than sell his own (since, according to Hostetler, "Westminster" had said Carroll was "in poor physical and financial condition," and had "distanced himself" from the business in recent years). *See* [328] at 37–40; [356] at 82–86 ¶¶ 31–32, 35; *see also* [312-72] at 2; [331-1] at 140; [332-2] at 100.

The investor's e-mails about Lansing having tried to "discredit" Carroll, and about Carroll and Lansing having spread negative remarks about each other, are hearsay and cannot be used to prove that such statements were made. *See* Fed. R. Evid. 801(c); *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) (the district court may not consider hearsay evidence at summary judgment) (citation omitted).[18] Sworn testimony from the investor in which he related statements made by Lansing would be admissible, but Carroll presents no such testimony. Hostetler's comments from the January 2011 memorandum are also hearsay, though Hostetler testified at his deposition that it was Lansing who told him Carroll was in poor physical and financial condition, *see* [332-2] at 83, Tr. at 125:14–:126:3, so those comments may be considered, *see* Fed. R. Evid. 801(d)(2)(A). Nevertheless, these statements are unhelpful to Carroll, because they were made to the Stephensons (or to individuals acting in connection with members of the Stephenson family), and Carroll never approached them for money to buy Lansing's interests, *see* [327] at 18 ¶ 26. Carroll, in other words, has shown no injury from these comments, and he has no evidence

---

[18] Carroll also points to another e-mail from the investor, in which the investor wrote (to Carroll): "Because [Lansing] activated the buy/sell I believe . . . the law is on your side so long as you have the capital necessary to closely timely . . . . It seems, to me without many of the facts, that *his remaining option must be to seek to stir up resistance among the limited partners*?" January 12, 2011 E-mail from Eliot Wadsworth to Carroll, [332-2] at 85 (emphasis added). The investor wrote to Carroll again the next day: "There remains the issue of your financing the buy-out, which obviously gets harder if there are underlying economic issues or *if [Lansing] has poisoned some significant number of the limited partners.*" January 13, 2011 E-mail from Wadsworth to Carroll, *id.* at 90 (emphasis added). These statements, too, are hearsay if used to prove that Lansing sought to "stir up resistance" or "poison" other parties against Carroll, and are inadmissible for that purpose. Moreover, the statements are unhelpful to Carroll even if admissible. The e-mails convey the author's speculation about what Lansing *may* have done, or *might* do in future, but that is all. Carroll cannot defeat (or obtain) summary judgment with such conjecture.

that any other investor was dissuaded from backing him because of Lansing's misinformation campaign. Lansing's motion for summary judgment is therefore granted on Count I of Carroll's counterclaim, and Carroll's cross-motion denied, to the extent that claim is based on Lansing's having made negative comments about Carroll.

c.     <u>Taking Carroll's Interests</u>

Finally, Carroll alleges in Count I of his counterclaim that Lansing breached his fiduciary duty by taking Carroll's interests in Westminster and Litchfield without any right to do so. As explained above, Lansing never actually took Carroll's interests in the companies, as those interests never effectively transferred. But Lansing thought they had transferred, so he withheld from Carroll cash distributions for a time. (After Judge Manning's ruling in April 2012, Lansing attempted to tender the payments, but Carroll would not accept them.) The payments should have been made all along, as Carroll was still a co-owner of the general-partner entities. *See, e.g.*, Operating Agreement of Westminster Advisors VIII LLC, [311-3] at 13 § 5.2 ("All proceeds of the Company shall be distributed to the Members in proportion to their Percentage Interests . . . ."). That Lansing temporarily didn't make the payments, however, is not enough to show a fiduciary breach.

Under the operating agreements, Lansing had the right to buy Carroll's interests in the general-partner entities if, within 30 days of Lansing's buy/sell

offer, Carroll failed to accept it. *See, e.g.*, [311-3] at 17 § 6.7(2)(c).[19] Carroll did accept Lansing's offer—specifically, the "sell" offer, thus obligating Carroll to buy Lansing's shares—but after Carroll failed to close on the transaction in March 2011, Lansing took the position (which he explained in correspondence to Carroll and, later, in filings with the court) that Carroll's "acceptance" was legally defective and, consequently, inoperative. *See* April 3, 2011 Letter from Michael Mayer to O'Malley Miller, [294-2] at 25 (stating that, in Lansing's view, Carroll "improperly accepted the [November 2010 buy/sell] offer"); Lansing's June 17, 2011 Complaint, [1] ¶¶ 7, 44, 50–53, 62 (alleging that Lansing had a right to purchase Carroll's interests in light of Carroll's bad-faith "acceptance"); Lansing's August 19, 2011 Amended Complaint, [14] ¶¶ 3, 63–64 (alleging that Carroll sabotaged the buy/sell process by "accepting" Lansing's offer in bad faith, thus violating the contractual covenant of good faith and fair dealing); Plaintiff's Response to Defendant's Motion to Dismiss, [20] at 6–9 (arguing that, under the case law, Carroll's bad-faith "acceptance" was in effect a nullity). Lansing was up-front with Carroll about what he was doing, and why, in Lansing's estimation, he was entitled to do it. And though Lansing's position was flawed, and his arguments to the contrary ultimately unpersuasive (as explained in Judge Manning's April 2012 ruling, [23]), they were not frivolous. This is not the kind of behavior that in Illinois suggests a fiduciary breach.

---

[19] The Litchfield shareholders' agreement included a similar provision concerning Carroll's shares in that company. *See* [311-2] at 20 § 12.2(b).

There was no usurpation of company opportunities or hiring away of company employees. *Cf. Anest*, 332 Ill.App.3d at 477–78; *Hagshenas*, 199 Ill.App.3d at 71. There was no harm, in short, to the business' interests. *See Kehoe v. Wildman, Harrold, Allen & Dixon*, 387 Ill.App.3d 454, 469 (1st Dist. 2008) ("The essence of a breach of fiduciary duty between partners is that one partner has advantaged himself at the expense of the firm." (quoting *Day v. Sidley & Austin*, 394 F.Supp. 986, 993 (D.D.C. 1975))); *see also Stopka v. Alliance of Am. Insurers*, No. 95 C 7487, 1996 WL 494269 (N.D. Ill. Aug. 27, 1996) (employee used redeemable telephone-service "points" belonging to the business). Nor were there secret dealings or other forms of concealment, deception, or obfuscation. *Cf. Ill. Rockford Corp. v. Kulp*, 41 Ill.2d 215, 221–23 (1968); *Bakalis v. Bressler*, 1 Ill.2d 72, 78–80 (1953); *Pielet v. Hiffman*, 407 Ill.App.3d 788, 796–97 (1st Dist. 2011); *Lurz v. Panek*, 172 Ill.App.3d 915, 922 (2d Dist. 1988); *cf. also Halperin v. Halperin*, 750 F.3d 668, 670–71 (7th Cir. 2014) (applying Illinois law). And Lansing did not obtain Carroll's interests through economic coercion. *Cf. Pielet*, 407 Ill.App.3d at 797; *Labovitz v. Dolan*, 189 Ill.App.3d 403, 417 (1st Dist. 1989).

Partners must deal openly and honestly with one other, and exercise good faith in all matters relating to the business. *Kulp*, 41 Ill.2d at 223; *Pielet*, 407 Ill.App.3d at 795 (citing *Winston & Strawn v. Nosal*, 279 Ill.App.3d 231, 239–40 (1996)). But there is no evidence that, in temporarily withholding some of Carroll's distribution payments, Lansing rejected these responsibilities. His conduct amounted to a contract repudiation (for a time), but was not the kind of dishonesty

that severs the fiduciary bond. Carroll has not mustered enough evidence for a jury to reasonably conclude that Lansing breached his fiduciary duty. Accordingly, and insomuch as Carroll bases Count I of his counterclaim on Lansing's purported taking of Carroll's interests (or corresponding benefits), Lansing's motion for summary judgment is granted; Carroll's cross-motion is denied.

### 2. *Claims Against Stephenson, the Trust, and Realty Portfolio*

Carroll claims that Stephenson, Celebrate Life Trust, and Realty Portfolio aided and abetted Lansing's fiduciary breach, and that Realty and the trust also participated in that breach, by providing the majority of the funds needed to purchase (*i.e.*, take) Carroll's Westminster interests in June 2011. Because, as just explained, Lansing did not violate his duty toward Carroll, there was no breach in which to assist or participate. Stephenson et al.'s joint motion for summary judgment, [301], is therefore granted. For completeness, however, I address their argument that, even if Lansing had breached his fiduciary duty, Stephenson, etc., still would not be liable for aiding or participating in that breach.

### a. Aiding and Abetting

In Illinois, a defendant is liable for aiding and abetting a fiduciary breach when: (1) the defendant aided a party who performed a wrongful, injury-causing act; (2) the defendant was aware of their role when providing this assistance; and (3) the defendant knowingly and substantially assisted in the violation. *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006) (citing *Thornwood, Inc. v. Jenner & Block*, 344 Ill.App.3d 15, 799 N.E.2d 756, 767 (2003)); *Time Savers, Inc. v. LaSalle Bank,*

*N.A.*, 371 Ill.App.3d 759, 772 (2d Dist. 2007) (citation omitted). Carroll claims that Celebrate Life Trust knowingly and substantially assisted Lansing's violation of his fiduciary duties (assuming, for the moment, that he did violate those obligations) by investing in Realty Portfolio as a limited partner, and thus by providing most of the money Lansing needed to purchase Carroll's interests in the Westminster entities. Stephenson, says Carroll, knowingly and substantially joined the fray by selecting the trust to be this funding source.

Stephenson claims that he never knew about Realty Portfolio, or that Lansing was trying to buy Carroll out of the Westminster business, and that he never spoke with anyone about providing the funds to make such a purchase—so how could he have assisted in Lansing's wrongful conduct? *See* [305] at 17; [335] at 21 ¶ 30. There is evidence, however, to suggest that Stephenson not only knew of the intended buyout, but also that he knew some of his family's money was being used to facilitate the transaction. First, multiple memoranda to the Global Investment Committee discussed the opportunity to purchase Carroll's Westminster interests, and the opportunity was also discussed at some GIC meetings, *see* Keller Deposition, [344-1] at 112, Tr. at 81:4–:8. Although Stephenson says he didn't always receive the GIC memos (because he doesn't use e-mail), *see* Stephenson Deposition, [362-4] at 6–7, Tr. at 52:22–53:16, he was a GIC member, and a reasonable juror could infer from his membership that Stephenson learned of the Westminster buyout opportunity before June 29, 2011. A reasonable juror could also question Stephenson's claim that he neither saw any e-mails about the buy/sell

dispute nor discussed the topic with anyone before that date. Stephenson's personal assistant was included on e-mails and indicated that she would leave for Stephenson a hard copy of one (that referenced Lansing's plan to pursue a buyout of Carroll). Stephenson's son also suggested that Stephenson's son-in-law would raise the Lansing-Carroll drama with Stephenson. Stephenson's awareness of the buy/sell issue is disputed.

A jury could also infer that Stephenson knew his family's money was being used to buy Carroll out of Westminster. Stephenson claims that no one ever spoke to him about financing such a purchase, *see* Stephenson Deposition, [307-2] at 9, Tr. at 69:5–:15, but Lansing testified that he may have broached the subject with Stephenson in May or June of 2011, *see* November 1, 2013 Deposition of Robert T.E. Lansing, [344-1] at 131, Tr. at 258:23–259:19; *see also id.*, Tr. at 258:23–259:2 ("Q. And . . . did you tell Mr. Stephenson that you appreciated that he or his family were arranging for this financing to be provided? A. I may have."). The details of these conversations are fuzzy, and Lansing could not recall at his deposition what exactly he may have said. But his testimony is sufficient, when viewed in Carroll's favor, to suggest that Lansing did raise the funding issue with Stephenson, and that he did so before the "unilateral closing" on June 29, 2011.

What is missing, however, is any indication that Stephenson himself caused his family's money to be used to buy Carroll out. To be liable for aiding and abetting Lansing's breach of fiduciary duty, Stephenson must have "assisted" in the violation. *See Hefferman*, 467 F.3d at 601. But there is no evidence that *Stephenson*

took any action at all to facilitate the purchase of Carroll's shares. Carroll argues that Stephenson must have taken action, because none of the Katten attorneys knew or could recall who had selected Celebrate Life Trust as the limited partner for Realty Portfolio, and Hostetler says it wasn't him. *See* [334] at 33–34; [361] at 38 ¶ 29. Celebrate Life's trustee, Michael Smith, also had no involvement in designating the trust as the funding source for the buyout of Carroll's interests. *See* [335] at 25 ¶ 31; [361] at 47–48 ¶ 38. That neither Smith nor Hostetler was responsible for funding the buyout does not reasonably suggest that Stephenson was. It was Lynde, Celebrate Life's authorized signatory, who determined that the investment in Realty Portfolio was "consistent with [the trust's] overall . . . strategy and goals," [307-9] at 4 ¶ 11; and there is no evidence that Stephenson asked Lynde to undertake this analysis. Nor is there any proof that Stephenson may be held liable for Lynde's conduct under principles of agency law. Stephenson, as chairman of ICIC, may have delegated certain powers to Lynde as ICIC's Global Managing Director, but there is no evidence that the selection of Celebrate Life Trust as Realty Portfolio's limited partner was one of them.[20]

---

[20] Carroll notes that the money ultimately transferred from the trust's bank account to Realty Portfolio's account was wired at the request of Ruth Pfotenhauer, an employee of Cancer Treatment Centers of America. *See* [334] at 34; [361] at 38–39 ¶ 30. Whether Pfotenhauer was indeed a CTCA employee is unclear. *Compare* [336-2] at 295 (listing for Pfotenhauer a CTCA e-mail address) *with* Stephenson Deposition, [362-4] at 18, Tr. at 141:11–:15 (stating that she worked in the treasury department at ICIC). But even assuming that Pfotenhauer worked at CTCA, this is not enough to link Stephenson (CTCA's chairman) with the investment in Realty Portfolio. Pfotenhauer was also involved in the Apogee Real Estate Fund, where her role, as in the Realty transaction, was to facilitate the transfer of funds. *See* Hostetler Deposition, [362-1] at 8, Tr. at 43:4–:19. The Apogee group included more than just CTCA employees, *see* [336-2] at 295—suggesting that Pfotenhauer

Moreover, under Illinois law, aiding and abetting a fiduciary breach requires knowing assistance in another's wrongful conduct, *see Hefferman*, 467 F.3d at 601—meaning that the defendant must have known that the fiduciary's actions were unlawful. Carroll argues that, as a matter of law, Stephenson knew what his lawyers knew; and his lawyers knew that Lansing was headed for a breach. It is true that an attorney's knowledge is imputed to their client. *See Segal v. Ill. Dep't of Ins.*, 404 Ill.App.3d 998, 1002 (1st Dist. 2010) (citing *Eckel v. Bynum*, 240 Ill.App.3d 867, 875 (1992); *Williams v. Dorsey*, 273 Ill.App.3d 893, 898 (1995)). Stephenson does not argue that the Katten attorneys were not his lawyers, or that their knowledge otherwise may not be imputed to him in this case. But what did the lawyers know?

Pointing to the "unwinding" provision of the Realty Portfolio limited-partnership agreement, Carroll argues that the Katten attorneys must have known about the nature of the conflict between Lansing and Carroll over Carroll's shares, because Katten (and Winston) added the unwinding provision to the agreement, and, according to Carroll, they did so to address the possibility that Carroll might obtain an injunction prohibiting Lansing and Realty from acquiring Carroll's interests. Katten also knew that legal action over those interests was forthcoming, says Carroll, because the Private Placement Memorandum on Realty Portfolio, which Booth reviewed as part of her due diligence on that investment, stated that

worked with and took direction from persons outside of CTCA. That she participated in the Realty transaction therefore does not reasonably implicate Stephenson, or anyone else from CTCA, in the deal.

the closing of the buy/sell process might be the subject of litigation. Katten also marked as undiscoverable work product in this litigation several draft agreements and e-mails concerning the Realty investment.

The work-product assertion means that Katten thought the materials were prepared in anticipation of litigation, but it would be too speculative, even when drawing inferences in Carroll's favor, to infer that the anticipated litigation was based on a fiduciary breach in pursuing Carroll's shares. Similarly, the generic notion that the closing might trigger litigation tells us little. Booth did see that language, *see* [335] at 28 ¶ 35, but she generally saw such risk disclosures in *all* placement memoranda she read in her work. In her view, these warnings were included as a matter of course, and she did not understand this particular disclosure to refer to any specific litigation, whether pending or contemplated. *See id.*; April 23, 2015 Deposition of Cathleen Booth, [309-1] at 4–6, Tr. at 22:16–24:10.

Carroll claims that the "unwinding" provision of the Realty Portfolio agreement was included to address the possibility that he would obtain an injunction preventing Lansing (or Realty) from acquiring his Westminster interests. But there is no evidence of this. There was a concern that the transaction would not be consummated, [309-6] at 2, but nothing in the record indicates a specific concern, on Katten's part, that Carroll would seek an injunction to prevent the buyout.[21]

---

[21] Carroll suggests that Grogan and Hostetler may have had such a concern, based on their June 2, 2011 meeting with Lansing's counsel (where, apparently, Lansing's attorneys observed that Carroll could try to delay or block the legal conclusion of the buy/sell agreements). But nothing indicates that Grogan or Hostetler shared these thoughts with the Katten lawyers. Nor, as far as we know, may Grogan's or Hostetler's knowledge be

And there is no evidence that Katten knew Lansing's plan to be wrongful under the Westminster operating agreements. As far as may be gleaned from the record, the lawyers' roles neither called for nor included an analysis of whether Lansing could do what he said he wanted to do. *See* Booth Deposition, [309-1] at 8, Tr. at 35:15–:23 (explaining that Booth's objective was simply to understand the terms of the interests to be acquired); *see also id.* at 7, Tr. at 27:20–:22 (stating that "[Realty Portfolio] was going to acquire interests if they were acquired from another party in a transaction in which [Booth] was not involved"). Even imputing the Katten attorneys' knowledge to Stephenson, Carroll still does not have enough evidence to show that Stephenson aided and abetted Lansing's (assumed) fiduciary breach.

Carroll also asserts an aiding-and-abetting claim against Celebrate Life Trust. Michael Smith, the trustee, never knew about the opportunity to purchase Carroll's interests, *see* [335] at 25 ¶ 31; [361] at 47–48 ¶ 38, so the trust cannot have assisted in a breach through Smith (again assuming that there was a breach in the

---

imputed directly to Stephenson. In general, the knowledge and conduct of agents are imputed to their principals. *McRaith v. BDO Seidman, LLP*, 391 Ill.App.3d 565, 589 (1st Dist. 2009) (citing *Metro. Condo. Ass'n v. Crescent Heights*, 368 Ill.App.3d 995, 998 (2006)). And in his Rule 56.1 statement of material facts, Carroll refers to Grogan and Hostetler as Stephenson's "representatives." *See* [361] at 2–3 ¶ 3; *id.* at 5 ¶ 5. Agency, however, is a question not of fact, but of law; and Carroll makes no argument that, as a matter of law, either Grogan or Hostetler was Stephenson's agent for purposes relevant to this case.

first place). The assistance, then, must have come from another individual or entity authorized to act on behalf of the trust.[22]

Dennis Lynde, the authorized signatory for Celebrate Life Trust, knew quite a bit about the buy/sell issue. He learned in October 2010 about the opportunity to invest in the Westminster entities; he knew in January 2011 that Lansing had invoked the buy/sell provisions of the operating agreements, and that Carroll had chosen to buy Lansing's interests rather than to sell his own; and he knew (in April 2011) that Carroll had failed to close on that purchase, *see* Lynde Affidavit, [307-9] at 4 ¶ 10. From e-mail correspondence, and updates sent to attendees of the Stephenson family business meetings (of which Lynde was apparently one), a reasonable juror could also infer that Lynde knew Lansing and Carroll were engaged in a legal dispute over ownership of Westminster/Litchfield, and that Lansing and his attorneys claimed to have a strategy for winning that contest. But there is no suggestion that Lynde knew what that strategy was, or that it did not comport with the buy/sell process set forth in the governing contracts. Indeed, Lynde never even saw the buy/sell provisions of those agreements, *see* [335] at 29 ¶ 37. At least one of the trust's attorneys (Booth) did read the agreements, of course. And, as with Stephenson, the attorneys' knowledge may be imputed to Celebrate Life. As explained above, however, the evidence here does not show any knowledge

---

[22] Stephenson, as grantor, also may have retained some authority to act for the trust. But as Stephenson did not aid and abet any fiduciary breach, his conduct does not lead to liability against the trust.

on Katten's part of an impending breach. Even ascribing both Katten's and Lynde's knowledge to the trust, the aiding-and-abetting claim against the trust still fails.

b. Participation

Carroll claims that both Celebrate Life Trust and Realty Portfolio participated in Lansing's breach of fiduciary duty. (Carroll does not assert a participation claim against Stephenson.) To succeed on a participation claim, the plaintiff must show that the non-fiduciary: (1) committed an act or omission that furthered or completed a breach of the fiduciary's duty; (2) knew, at the time of the act or omission, that the fiduciary's conduct amounted to a breach; and (3) benefitted from the breach. *See Kehoe v. Saltarelli*, 337 Ill.App.3d 669, 677 (1st Dist. 2003); *Chabraja v. Martwick*, 248 Ill.App.3d 995, 998 (1st Dist. 1993). Celebrate Life could not have participated in a fiduciary breach because, as just explained, the trust did not have the requisite knowledge.

If Lansing breached his fiduciary duty, then his control over Realty Portfolio would preclude summary judgment in Realty Portfolio's favor on the participation claim. Realty Portfolio nevertheless claims that it never retained a benefit from its purported ownership in Westminster—that is, it never received any cash distributions from that venture, and so cannot be liable for participating in Lansing's alleged fiduciary breach. *See* [305] at 37. There is conflicting evidence on this point. There is some indication that no money went out to Realty Portfolio, and Hostetler's deposition testimony appears to support this argument. *See* [307-1] at 40, Tr. at 187:2–:5 ("No money came in. No money came out."); *see also* Strotman

Affidavit, [312-59] at 4 ¶ 11 (stating that all distributions attributed to Carroll's interests were maintained in Westminster bank accounts). But in an August 2011 memo to the Global Investment Committee, Hostetler wrote that the "new partner" in Westminster—presumably, Realty Portfolio—had already started "assuming capital calls and distributions." [336-2] at 17.[23] Resolving the conflict in Carroll's favor, there is enough evidence to suggest that Realty did receive at least some benefit from the purported transfer of interests on June 29, 2011. Realty Portfolio's motion for summary judgment is granted solely because Lansing is entitled to summary judgment on the fiduciary-breach claim.

---

[23] Realty Portfolio does not argue that the memo is inadmissible.

## IV.    Conclusion

The buy/sell provision was not as simple as it seemed. Notwithstanding the millions of dollars at stake, and the presence of lawyers on all sides, both Lansing and Carroll misunderstood how to dissolve their partnership, and ratcheted up the ensuing litigation largely for naught. The Stephenson parties were bystanders who stood ready to pick up the pieces but did not encourage the collision. Carroll's motion for summary judgment, [291], is granted in part and denied in part. The motion is denied as to Counts I and II of Carroll's counterclaim (against Lansing), and as to Count II of Lansing's complaint. The motion is granted in part as to Count III of Lansing's complaint, insofar as Carroll seeks to avoid responsibility for capital calls made on or after July 6, 2011. Lansing's cross-motion for summary judgment (as to Counts I and II of Carroll's counterclaim), [299], is granted. Stephenson's, Celebrate Life Trust's, and Realty Portfolio's joint motion for summary judgment (as to Counts I and III of the counterclaim), [301], is also granted.

ENTER:

Manish S. Shah
United States District Judge

Date: 7/28/2016